# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

| | |
|---|---|
| THE CASCADES OF IRON RIVER HOLDINGS, LLC, and BENJAMIN T. FRIEDMAN, | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) Case No. 24-cv-10013 |
| | ) |
| IRON RIVER LAND COMPANY, LLC, and ROBERT W. POSSANZA, JR., | ) ) ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs, THE CASCADES OF IRON RIVER HOLDINGS, LLC and BENJAMIN T. FRIEDMAN, by and through their undersigned attorneys, complain against Defendants, IRON RIVER LAND COMPANY, LLC and ROBERT W. POSSANZA, JR., and alleges as follows:

**I.   NATURE OF THE ACTION**

1. This case involves the purchase and sale of a nursing home business along with the property and building. Despite certain representations regarding the condition of the building, shortly after the sale, the buyer discovered that the roof was not in good working order. In fact, the roof had surpassed its useful life and was past due for full replacement. The seller concealed the condition of the roof by warrantying that all major structural components of the building were in good working order when the seller knew – based upon persistent leaking issues – that the roof was not in good working order and needed to be replaced.

**II.   THE PARTIES**

2. Plaintiff, THE CASCADES OF IRON RIVER HOLDINGS, LLC ("Buyer"), is an Illinois limited liability company whose only member, Benjamin Friedman, is a citizen of and domiciled in Illinois.

1

3. Plaintiff, BENJAMIN T. FRIEDMAN ("Friedman"), is an individual domiciled in and a citizen of Illinois.

4. Defendant, IRON RIVER LAND COMPANY, LLC ("Seller"), is a Michigan limited liability company with a principal place of business at 540 W. Hagerman Lake Road, Iron River, Michigan whose only member is a citizen of and domiciled in Michigan.

5. Defendant, ROBERT W. POSSANZA, JR. ("Possanza"), is an individual domiciled in and citizen of Michigan.

### III. JURISDICTION

6. This court has diversity jurisdiction with respect to Plaintiffs' claims against Seller and Possanza pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2).

### IV. ALLEGATIONS COMMON TO ALL COUNTS

8. On December 31, 2018, Buyer and Seller entered into an Asset Purchase Agreement ("APA") – and accompanying Stock Purchase Agreement ("SPA") between Friedman and Possanza – for the purchase of the Iron River Care Center located at 330 Lincoln Avenue, Iron River, Michigan (the "Property"). The APA and SPA are attached hereto as Exhibits A and B. Buyer and Seller structured the deal so that it would be a comprehensive purchase and sale of the Property together with the facility located thereon and the company operating the facility.

9. Contemporaneously with the APA and SPA, Buyer issued a Promissory Note to Possanza in the amount of $650,000 secured by a mortgage against the Property. The Promissory Note is attached hereto as Exhibit C. Under the Promissory Note, Buyer was required to pay forty-eight consecutive monthly installments in the amount of $3,799.84 each until December 31, 2023

when the remaining unpaid principal balance would become due. Based upon the amortization schedule, between principal and interest, at the end of the term, Buyer would be required to make a final balloon payment of $592,133.88 for a total payment amount of $774,526.20.

10. Section 6(a)(xxiii) of the APA provides:

"The representations and warranties of Seller contained in this Agreement shall be true and complete as of the Closing Date and Seller shall be in full compliance with the terms and provisions of this Agreement, in each case subject only to exceptions permitted by this Agreement."

11. Section 9(i) of the APA provides:

"Condition of the Purchased Assets. There exists no defective condition, structural or otherwise, with respect to the Purchased Assets. All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted)."

12. Section 9(y) of the APA provides:

"Truth and Accuracy of Representations and Warranties. No representation or warranty by or on behalf of Seller contained in this Agreement and no statement by or on behalf of Seller in any certificate, list, exhibit or other instrument furnished or to be furnished to Purchaser by or on behalf of Seller pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect."

13. Section 12(d) of the APA provides:

"Note. Amounts due under the Note may be offset with respect to any obligations of the Seller under this Agreement and/or obligations of the Seller under the SPA; provided that not more than the amount of Two Hundred Fifty Thousand Dollars ($250,000) may be offset against the Note with respect to such obligations (for purposes of which any amounts offset against the Note pursuant to the SPA shall be included in such calculation) and that offset against the Note shall be made only with respect to claims made in writing during the period of thirty-six (36) months following the Closing."

14. Under section 9(i) of the APA, Seller warranted that there was no defective condition at the Property and that all major structural elements were in good working order and condition for their intended use.

15. Buyer took possession of the Property on January 1, 2019.

**Defective Condition of the Roof**

16. Shortly after taking possession of the Property, it became readily apparent that the roof of the Property was not in good working order and was not in good condition for its intended use.

17. Specifically, Buyer became aware of leaks within the Property from the roof and employees informed Buyer that these leaks had been an ongoing issue for years. Employees further informed Buyer that Seller had only ever performed temporary repairs on the roof as well as cosmetic repairs to interior locations that were affected by water damage.

18. Accordingly, as of December 31, 2018, Seller was aware of the fact that the roof was not in good working order and was not in good condition for its intended use. Seller intentionally concealed the condition of the roof by making temporary repairs to the roof and cosmetic repairs to interior locations that were affected by water damage.

19. In August, 2020, Buyer engaged Champion Roofing, Inc. to inspect the roof. Champion Roofing found the roof to be in poor condition, having split seams and holes that had been repaired in an ad hoc, inadequate manner. Champion Roofing performed numerous cores to analyze the condition of the underlying insulation and discovered the insulation to be completely saturated in many areas. Champion Roofing determined that the roof was in failure and needed to be replaced. Champion Roofing further opined that the saturation of the insulation indicated a longstanding problem, not a recent one.

20. Because of the temporary repairs that had been made to conceal the split seams and holes as well as the latent condition of the saturated insulation, Buyer would not have been able to discover the true condition of the roof even with a thorough investigation.

21. Buyer engaged Champion Roofing to replace the roof at a cost of $240,000.

22. Upon demolition of the existing roof, Champion Roofing confirmed that the insulation was wet and disintegrated and, as a result, the roof was not in good working order or in good condition for its intended use. Champion Roofing further confirmed that the disintegrated condition of the insulation indicated a longstanding problem.

23. On December 31, 2021, Buyer informed Seller of the defective condition of the roof and requested a setoff against the Note in the amount of $240,000. A copy of the December 31, 2021 email is attached hereto as Exhibit D.

24. On February 1, 2022, Seller's attorney responded to Buyer and denied any setoff to the Note or any financial obligations on Seller's behalf towards Buyer. A copy of the February 1, 2022 letter is attached hereto as Exhibit E.

25. Under the APA, Seller is liable to Buyer for any misrepresentations and Buyer is entitled to a setoff of the Note for any obligations of Seller that occur within three years of the Closing.

26. Buyer notified Seller of the defective condition of the roof and the $240,000 obligation within 3 years of the Closing and is entitled to a setoff.

**Uncollectible Accounts Receivable**

27. Section 4(b) of the SPA provides: "Each of the representations and warranties of Seller contained in this Agreement shall be true and correct as of the Closing Date."

28. Section 19(z) of the SPA provides:

>"<u>Financial Materials</u>. All materials and/or documents relating to the financial condition and/or census of the Facility, provided by Seller to Purchaser, are true and complete in all material respects, and are not misleading in any material respect."

29. Section 11 of the SPA provides:

>"All unpaid accounts receivable with respect to the Facility which relate to the period prior to the Closing, including, but not limited to, any accounts receivable arising from rate adjustments which relate to the period prior to the Closing, even if such adjustments occur after the Closing shall remain the property of Operator following the Closing (the "Designated Receivables")."

30. Seller was aware prior to the Closing that accounts 1059 and 1195 with balances in the amount of $32,644.44 and $4,420.05 were uncollectible. Specifically, an administrative law judge determined that the Seller failed to submit Michigan Medicaid eligibility renewal application filings on time for these resident accounts, thus precluding any associated claims coverage for the periods of service in question.

31. On December 31, 2021, Buyer informed Seller of the uncollectible nature of accounts 1059 and 1195 and requested a setoff to the Note in the amount of $37,064.49.

32. On February 1, 2022, Seller's attorney responded to Buyer and denied any setoff to the Note or any financial obligations on Seller's behalf towards Buyer.

33. Under the SPA, Buyer may recover monetary damages for Seller's breach. And, under the APA, Buyer may offset obligations of Seller under the SPA against the Note.

34. Buyer notified Seller of the uncollectible accounts receivable and the $37,064.49 obligation within 3 years of the Closing and is entitled to a setoff.

V.     CLAIMS

**COUNT I**
**Breach of Contract – Asset Purchase Agreement**
*Buyer v. Seller*

35.     Buyer restates and reallages paragraphs 1 through 34 of the Complaint as paragraph 35 of Count I as if fully set forth herein.

36.     The APA between Buyer and Seller is a valid and enforceable contract.

37.     As of December 31, 2018, Seller was aware of the fact that the roof was not in good working order and was not in good condition for its intended use. Therefore, the representations and warranties Seller made in Sections 6(a)(xxiii), 9(i), and 9(y) were false.

38.     Buyer satisfied all of its contractual obligations under the APA by successfully closing the transaction.

39.     Buyer has continued to make all monthly payments under the Note and is in good standing thereunder.

40.     Seller breached its contractual obligations under the APA by making false representations and warranties regarding the condition of the roof.

41.     Seller further breached its contractual obligations under the APA by refusing to treat the cost of the new roof as a setoff against the Note.

42.     Buyer has been damaged in the amount of at least $240,000.00 as a result of Seller's breach of the APA.

WHEREFORE, Plaintiff, THE CASCADES OF IRON RIVER HOLDINGS, LLC, prays for judgment against IRON RIVER LAND COMPANY, LLC, in the sum of $240,000.00 and for such other and further relief as is deemed just and proper.

## COUNT II
## Breach of Contract – Stock Purchase Agreement
### *Friedman v. Possanza*

43.　Friedman restates and realleges paragraphs 1 through 34 of the Complaint as paragraph 43 of Count II as if fully set forth herein.

44.　The SPA between Friedman and Possanza is a valid and enforceable contract.

45.　Seller was aware prior to the Closing that accounts 1059 and 1195 with balances in the amount of $32,644.44 and $4,420.05 were uncollectible. Therefore, the representations and warranties Seller made in Sections 4(b) and 19(z) were false.

46.　Friedman satisfied all of his contractual obligations under the SPA by successfully closing the transaction.

47.　Possanza breached his contractual obligations under the SPA by making false representations and warranties regarding the accounts receivable.

48.　Possanza further breached his contractual obligations under the SPA by refusing to treat the uncollectible accounts receivable as a setoff against the Note.

49.　Buyer has been damaged in the amount of at least $37,064.49 as a result of Possanza's breach of the SPA.

WHEREFORE, Plaintiff, BENJAMIN T. FRIEDMAN, prays for judgment against ROBERT W. POSSANZA, JR., in the sum of $37,064.49 and for such other and further relief as is deemed just and proper.

## COUNT III
## Fraud
## All Defendants

50. Buyer restates and reallages paragraphs 1 through 34 of the Complaint as paragraph 35 of Count I as if fully set forth herein.

51. Possanza, individually and as an agent of Seller, falsely represented and warranted to Buyer that that there was no defective condition at the Property and that all major structural elements were in good working order and condition for their intended use.

52. However, as of December 31, 2018, Seller was aware of the fact that the roof was not in good working order and was not in good condition for its intended use.

53. Seller intentionally concealed the condition of the roof by making temporary repairs to the roof and cosmetic repairs to interior locations that were affected by water damage.

54. Although Buyer was given access and an opportunity to inspect the Property prior to Closing, Seller's temporary repairs concealed the latent defects of the roof and Buyer was unable to discover the actual poor condition of the roof.

55. Buyer would not have agreed to the purchase price under the APA but for this material misrepresentation regarding the condition of structural components of the Property.

56. Possanza also falsely represented and warranted to Friedman that accounts 1059 and 1195 were collectible.

57. However, as of December 31, 2018, Possanza was aware of the fact that accounts 1059 and 1195 were uncollectible.

58. Buyer would not have agreed to the purchase price under the SPA but for this material misrepresentation regarding the collectability of the accounts receivable.

59. The condition of the roof and collectability of the accounts receivable were material to the transaction as Buyer and Friedman would have required Seller and Possanza to renegotiate the terms of the Agreement if they had been aware of the condition of the roof and collectability of the accounts receivable.

60. Possanza had a duty to make truthful representations and warranties and, instead, fraudulently concealed the condition of the roof and the collectability of accounts receivable.

61. Possanza's representations and warranties were materially false and were made to induce Buyer and Friedman's reliance thereon, to enter the APA and SPA, respectively, and close the transaction.

62. The condition of the roof and the collectability of accounts receivable should have been disclosed by Possanza to Buyer and Friedman for their consideration in deciding whether to close the deal.

63. Possanza intentionally withheld this information from Buyer and Friedman with the intent that Buyer and Friedman would finalize the deal at the prices identified in the APA and SPA.

64. Possanza intentionally withheld this information.

65. As a direct and proximate result of the acts and omissions above, Buyer and Friedman have been damaged in the amount of not less than $277,064.49.

WHEREFORE, Plaintiff, THE CASCADES OF IRON RIVER HOLDINGS, LLC and BENJAMIN T. FRIEDMAN, prays for judgment against IRON RIVER LAND COMPANY, LLC and ROBERT W. POSSANZA, JR., in the sum of $277,064.49 plus punitive damages in excess of $500,000 and for such other and further relief as is deemed just and proper.

        Respectfully submitted,

**THE CASCADES OF IRON RIVER HOLDINGS, LLC and BENJAMIN T. FRIEDMAN**,
Plaintiffs

By: __/s/*Ross Good*___
       One of Their Attorneys

Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
p: 312.899.7629
ross@loftusandeisenberg.com

Dated:  January 21, 2023