UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN (DETROIT) DIVISION

THE CASCADES OF IRON RIVER HOLDINGS, LLC    )
AND                                                                          )
BENJAMIN T. FRIEDMAN,                                          )
                                                                                 )
             PLAINTIFFS,                                               )
                                                                                 )   CIVIL ACTION NO. 24-CV-10013
-V-                                                                           )   HON. MARK A. GOLDSMITH
                                                                                 )   MAGISTRATE HON. CURTIS IVY, JR.
                                                                                 )
IRON RIVER LAND COMPANY, LLC                       )
AND                                                                          )
ROBERT W. POSSANZA, JR.,                                     )
                                                                                 
             DEFENDANTS.

## <u>DEFENDANTS' MOTION TO DISMISS</u>

NOW COME Defendants, IRON RIVER LAND COMPANY, LLC AND ROBERT W. POSSANZA, JR. by and through their attorneys, Wood Kull Herschfus Obee & Kull, PC, and more specifically Brian H. Herschfus, and moves this Court for dismissal of Plaintiff's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

Under ED Mich LR 7.1(a) and this Court's motion practice guidelines, on February 20, 2024, there was telephone correspondence between the parties' attorneys in which defense counsel (i) explained the nature of this motion and its legal basis, and (ii) requested, but did not obtain, concurrence in the relief sought.

WHEREFORE Defendants IRON RIVER LAND COMPANY, LLC AND ROBERT W. POSSANZA, JR. respectfully request this Court to grant their motion and enter an order: (i) dismissing Plaintiff's Complaint with prejudice (ii) awarding Defendants costs and fees, including attorney fees incurred in having to defend this action, and (iii) granting any other relief this Court considers appropriate.

Respectfully submitted,
**Wood, Kull, Herschfus, Obee & Kull, P.C.**

By:   /s/ Brian H. Herschfus
      Brian H. Herschfus (P41567)
      *Attorneys for Defendants*
      37000 Grand River Ave, Ste 290
      Farmington Hills, MI 48335-2881
      248-476-2000

Dated: February 23, 2024    bhh@woodkull.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN (DETROIT) DIVISION

THE CASCADES OF IRON RIVER HOLDINGS, LLC )
AND )
BENJAMIN T. FRIEDMAN, )
 )
PLAINTIFFS, )
 ) CIVIL ACTION NO. 24-CV-10013
 ) HON. MARK A. GOLDSMITH
-V- ) MAGISTRATE HON. CURTIS IVY, JR.
 )
IRON RIVER LAND COMPANY, LLC )
AND )
ROBERT W. POSSANZA, JR., )
 )
DEFENDANTS.

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................ii

STATEMENT OF ISSUES PRESENTED......................................................iii

    I.    **Whether Plaintiffs' Complaint should be dismissed as Plaintiffs fail to state a claim for Breach of Contract** .......................................................iii

    II.    Whether Plaintiff's claims should be dismissed because Plaintiffs' claims of Fraud are barred.........................................................................................iii

    III.    Whether this court should order an adverse inference and utilize same in determining the instant motion before it based on Spoliation of Evidence...........iii

CONTROLLING AND MOST APPROPRIATE AUTHORITY............................iv

INDEX OF AUTHORITIES......................................................................... v

STATEMENT OF FACTS .............................................................................1

STANDARD OF REVIEW ............................................................................6

    Federal Rule of Civil Procedure 12(b)(6) ...................................................6

LEGAL ARGUMENT ..................................................................................7

    I.    PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS' CLAIMS OF FRAUD ARE BARRED ..................................................................7

    II.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT** ...........................................................................................15

    III.    THIS COURT SHOULD ORDER AN ADVERSE INFERENCE AND UTILIZE SAME IN DETERMINING THE INSTANT MOTION BEFORE IT BASED ON SPOLIATION OF EVIDENCE:................................................. 21

CONCLUSION AND PRAYER FOR RELIEF ...............................................25

## STATEMENT OF ISSUES PRESENTED

I.    Whether Plaintiffs' Complaint should be dismissed as Plaintiffs fail to state a claim for Breach of Contract

<blockquote>
Defendants answer "yes."<br>
Plaintiff answers "no."
</blockquote>

II.   Whether Plaintiff's claims should be dismissed because Plaintiffs' claims of Fraud are barred.

<blockquote>
Defendants answer "yes."<br>
Plaintiff answers "no."
</blockquote>

III.  Whether this court should order an adverse inference and utilize same in determining the instant motion before it based on Spoliation of Evidence.

<blockquote>
Defendants answer "yes."<br>
Plaintiff answers "no."
</blockquote>

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

Defendants rely on Federal Rules of Civil Procedure 12(b)6) and the authorities cited in their Brief in Support of their Motion to Dismiss.

# INDEX OF AUTHORITIES

## Cases

*Accord Huron Tool and Engineering Co v Precision Consulting Svcs, Inc*, 209 Mich App 365 (1995) ................................................................................................. 12

*Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) ......................................... 22

*AFSCME v Bank One*, 267 Mich App 281, 705 NW2d 355 (2005) ..................... 18

*Aron Alan, LLC v. Tanfran, Inc.*, 240 Fed. Appx. 678, 682 (6th Cir. 2007) ........ 13

*Ashcroft v Iqbal*, 556 US 662; 129 S Ct 1937; 173 L Ed 2d 868 (2009) ................................. 6, 7

*Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014) .. 23

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) ...................... 22

*Bell Atlantic Corp v Twombly*, 550 US 544; 127 S Ct 1955; 167 L Ed 2d 929 (2007) ..................................... 6

*Bergen v. Baker*, 264 Mich. App. 376, 384 (Mich. Ct. App. 2004) .................... 14

*Bovee v Coopers & Lybrand CPA*, 272 F3d 356 (CA 6, 2001) ........................................................................... 6

*Burton v. Beaumont Hosp.*, 373 F.Supp.2d 707, 718 (E.D. Mich. 2005) ............. 17

*Central Jersey Dodge Truck Ctr. v. Sightseer Corp.*, 608 F.2d 1106 (6th Cir. 1979) ............. 16

*City of Livonia v. Aquatic Renovation Sys.*, 2022 U.S. Dist. LEXIS 93072, *11 (E.D. Mich. May 24, 2022) .......................................................................................... 23

*Comerica Bank v Cohen* 291, Mich App 40, 885 NW2d 544 (2010) .................. 17

*Commercial Money Ctr, Inc v Illinois Union Ins Co*, 508 F3d 327 (CA 6, 2007) ........................................................................... 7

*E-Poch Props., LLC v. TRW Auto. U.S., LLC*, 286 Fed. Appx. 276 (6th Cir. 2008) ............ 13

*Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013) ................................................. 23

*Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (Mich. 1976) ........... 8

*Hoffner v Lonctoe*, 290 Mich App 449, 802 NW2d 648 (2010) ........................................ 17

*Holland v Trinity Health Care Corp.*, 287 Mich App 524, 791 NW2d 724 (2010) ............. 18

*Jones v City of Cincinnati*,
521 F3d 555 (CA 6, 2008) ......................................................................................... 7

*Koubriti v Convertino*,
593 F3d 459 (CA 6, 2010) ......................................................................................... 7

*M&D, INC. v. McConkey*, 231 Mich. App. 22, 31 (Mich. Ct. App. 1998) ......................... 14

*McKenzie v Allconnect, Inc*, 369 F Supp 3d 810, 815 (E.D. Ky, 2019) ............................. 23

*McMullen v. Joldersma*, 174 Mich. App. 207 (Mich. Ct. App. 1988) ............................... 14

*Montgomery Ward & Co v Williams*, 330 Mich 275; 47 NW2d 607 (1951) ....................... 8

*Nationwide Mutual Fire Insurance Company v. Ford Motor Company*, 174 F.3d 801, 804 (6th Cir. 1999) ................................................................................................................. 22

*New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 761 N.W.2d 832, 837 (Mich. App. 2008) ...................................................................................................................... 17

*Paw Paw Wine Distribs. V. Joseph E. Seagram & Sons*, 34 F. Supp. 2d 550, 554 (W.D. Mich. 1987) ............................................................................................................... 15

*Seit-Olsen v. Appraisals*, 2006 Mich. App. LEXIS 1493 ................................................... 8

*Wilke v Auto Owners Insurance Company*, 469 Mich 41, 664 NW 2d 776 (2003 ............. 18

*Wysocki v Int'l Bus Mach Corp*,
607 F3d 1102 (CA 6, 2010) ...................................................................................... 7

## Rules

Federal Rule of Civil Procedure 12(b)(1) ........................................................................ iv

Federal Rules of Civil Procedure 12(b)(6) ................................................................ iv, 6, 7

## STATEMENT OF FACTS

Defendants IRON RIVER LAND COMPANY, LLC (IRLC) and ROBERT W. POSSANZA, JR. (POSSANZA) owned a Nursing Home Business at 330 Lincoln Avenue, Iron River, Michigan. On December 31, 2018, these Defendants entered into a written agreement with the Plaintiffs THE CASCADES OF IRON HOLDINGS (CASCADES) and BENJAMIN T. FRIEDMAN (FRIEDMAN) wherein the Plaintiff CASCADES as Buyer, was purchasing the Nursing Home and the real property from IRLC and the individual Plaintiff, Friedman, was purchasing the stock of IRON RIVER CARE SERVICES, LLC (IRCS) from Possanza.  Plaintiffs bring the instant lawsuit alleging a defective roof and a failure on the Plaintiff's part to collect approximately $40,000.00 from the State for a specific resident of the Nursing Home. The Plaintiffs' claims fail as a matter of law and are barred by the very language of the written agreements executed by the parties. Although argued hereinafter, the pertinent provisions of the written Agreements, are set forth hereinafter.

The Asset Purchase Agreement (APA) (ECF No. 1-1 PageID.18), Paragraph 5 states in pertinent part as follows:

5.     **Due Diligence; Title Survey; and Licensure.**

(a)     Due Diligence Period.     Purchaser shall have the right, at reasonable times and on reasonable prior notice to Seller to enter upon the Property *to conduct such inspections, investigations, tests and studies as Purchaser shall deem necessary, without limitation,*

*environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and feasibility studies. …*

*Purchaser shall also have the right to tour the facility, to review the books and records related to the financial condition of the operations thereof and to observe the day-to-day operations and management thereof. This Agreement shall be subject to the condition that Purchaser shall determine during the period ending one hundred and ten business days from July17, 2018, which is December 21, 2018 (the "Due Diligence Period"), that Purchaser is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and operations of the Facility and the transactions contemplated herein. If Purchaser shall not be so satisfied and Purchaser notifies Seller thereof in writing on or prior to the end of the Due Diligence Period, this contract shall be null and void and the Deposit plus any accrued interest thereon shall be returned to the Purchaser. If Purchaser fails to give such notice to Seller, it shall be conclusively presumed that Purchaser is satisfied with its due diligence review, and this Agreement shall continue in full force and effect.*

Additionally, the Stock Purchase Agreement (SPA) (ECF 1-2 PageID.47) clearly provides in paragraph 4.i., the same limited period for due diligence of one hundred and ten business days from July 17,2018 through December 21, 2018. The SPA states:

i.   Within one hundred and ten business days from July 17, 2018, or December 21, 2018, *Purchaser shall have completed his due diligence to his satisfaction.*

Paragraph 6 xxi (ECF 1-2 PageID.20) of the APA, states as follows:

6.   <u>Conditions to Closing.</u>

(xxi)  *Purchaser has determined during the Due Diligence Period that it is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and*

2

*operations of the Facility and the transactions contemplated herein, as set forth (sic) Section 5(a).*

Notwithstanding the foregoing language and representations by the Buyer Plaintiffs, Plaintiffs quote paragraph 9.(i), which provides in pertinent part, as follows:

(i)      <u>Conditions of the Purchased Assets.</u>   There exists no defective condition, structural or otherwise, with respect to the Purchased Assets. All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).

What the Plaintiffs of course fail to appreciate, is the following portion of the foregoing clause:

*...All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).*

The roof was in fact in good working order and as would be expected of a used and aged commercial roof, in the ordinary course of business it had to be patched and tarred and maintained. This was not only the condition of the roof during the Due Diligence period outlined in the written agreement and in the aforementioned paragraphs, but further, present on ceiling tiles were several water spots from where the roof had previously leaked and required patching. Plaintiff Friedman walked the roof with Defendant Possanza and the roof was discussed. Pursuant to the aforementioned verbiage, Plaintiffs were free to perform *any* due

diligence they deemed appropriate, *as long as it was performed within the 110 business day period.* Thus had Plaintiffs inspected the premises, if the roof was so bad, the inspection would have likewise reflected an aged roof in poor or good condition as may have been.  Of course, Defendants made no representation that Plaintiffs were purchasing a building with a new roof. The sole representation was that the roof was in good working order and in fact it was; it merely required maintenance as does electrical, plumbing, etc. Moreover, Plaintiffs closed in 2018 and the very first time any notification was provided about the condition of the roof was December 31, 2021, three years later and the e mail from Plaintiff (ECF No.1-4) clearly reflects that the roof was already replaced. To that end, Defendants have no possible way of evaluating the condition of the roof, the extent of the alleged damage.  Consequently, Defendants have no way to establish or prove whether the roof did or did not require replacement. The Plaintiffs *allege* in their Complaint that it was right after Closing on December 31, 2018 that they discovered the defects with the roof. If so, why wait three years to make the disclosure and more importantly, why destroy any vestige of Defendants' ability to inspect and ascertain the condition of the roof.

Much the same, Plaintiffs had the absolute right to review any and all financial documentation and information, personally, with professionals or otherwise, to ascertain the financial condition of the entity being sold as well as the

propriety of the financial information being provided; *as long as it was performed within the 110 business day period.* The claim for an alleged loss of income is solely caused by Plaintiffs' failure to pursue these monies and to file the appropriate documentation with the proper Governmental authorities. Again, this is not the result of Defendants' failures; however, even if it was, Plaintiffs obligation to undertake due diligence *or waive* anything therefrom, is against the Plaintiffs and in turn bars the claims herein.

Lastly, Plaintiffs' Complaint herein, seeks to offset the indebtedness under the Note as a result of the following condition 12(d) (ECF misstatements, however the provision allows for a set-off for obligations, i.e. undertakings or actions *to be* taken, not for alleged warranty misstatements. The specific language states as follows:

> (d)    Note. Amounts due under the Note may be offset with *respect to any obligations of the Seller under this Agreement and/or obligations of the Seller under the SPA.*

The specific verbiage allows for an offset if Defendants failed to perform an obligation, i.e. any action they were obligated to undertake. In fact, Plaintiffs' claims seek to address the then existing status as of 2018.  To that end, Plaintiffs' claims are barred as a matter of law due to the failure to conduct and undertake due diligence as to the roof and as to the resident account wherein the Department for Health and Human Services (DHHS) refused to pay the reimbursement sought.

## STANDARD OF REVIEW

### Federal Rule of Civil Procedure 12(b)(6)

FRCP 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief can be granted. When deciding a motion under this subsection, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." *Bovee v Coopers & Lybrand CPA*, 272 F3d 356, 360 (CA 6, 2001). A complaint must be dismissed under FRCP 12(b)(6) if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp v Twombly*, 550 US 544, 570; 127 S Ct 1955; 167 L Ed 2d 929 (2007). Under FRCP 12(b)(6), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. Although detail is not required, the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.*

While detailed factual allegations are not required, the pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v Iqbal*, 556 US 662, 678; 129 S Ct 1937; 173 L Ed 2d 868 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 US at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 US at 678.

Consideration of a motion to dismiss under Rule 12(b)(6) is confined to the pleadings. *Jones v City of Cincinnati*, 521 F3d 555, 562 (CA 6, 2008). Assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v Int'l Bus Mach Corp*, 607 F3d 1102, 1104 (CA 6, 2010). However, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr, Inc v Illinois Union Ins Co*, 508 F3d 327, 335 (CA 6, 2007) (citing Fed R Civ P 10(c)); see also *Koubriti v Convertino*, 593 F3d 459, 463 n1 (CA 6, 2010).

At bar, Defendants rely on the attached documents to Plaintiffs' First Amended Complaint which are part of the Complaint for purposes and consideration of FRCP 12(b)(6).

## LEGAL ARGUMENT

I. **PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS' CLAIMS OF FRAUD ARE BARRED**

In order to properly assert a claim of Fraud in Michigan, MCR 2.112(B) requires that, "[i]n allegations of fraud or mistake, the circumstances constituting

fraud or mistake must be stated with particularity." Furthermore, the Court in *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (Mich. 1976) held:

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. *__Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery__*. (emphasis added) (citations omitted)
> ...
>
> The burden of proof rests with plaintiffs. Fraud will not be presumed but must be proven by clear, satisfactory and convincing evidence. (citation omitted)

Furthermore, as held in *Nieves v. Bell Indus.*, 204 Mich. App. 459, 464 (Mich. Ct. App. 1994), "A misrepresentation claim requires reasonable reliance on a false representation. (citation omitted) *__There can be no fraud where a person has the means to determine that a representation is not true__*." (emphasis added) (citing *Montgomery Ward & Co v Williams*, 330 Mich 275; 47 NW2d 607 (1951); *Webb v First of Michigan Corp*, 195 Mich App 470, 474; 491 NW2d 851 (1992). In *Nieves*, the court stated, "[A] plaintiff cannot claim to have been defrauded where he had information *__available to him__* that he chose to ignore. *Nieves*, at 464-465. Moreover, the Court of Appeals has repeatedly reaffirmed the necessity of this "reasonable reliance" requirement. See *Seit-Olsen v. Appraisals*, 2006 Mich. App. LEXIS 1493.

The Asset Purchase Agreement (APA) (ECF No. 1-1 PageID.18), Paragraph 5 states in pertinent part as follows:

5.    **<u>Due Diligence; Title Survey; and Licensure.</u>**

(a)    Due Diligence Period.    Purchaser shall have the right, at reasonable times and on reasonable prior notice to Seller to enter upon the Property *to conduct such inspections, investigations, tests and studies as Purchaser shall deem necessary, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and feasibility studies.* …
*Purchaser shall also have the right to tour the facility, to review the books and records related to the financial condition of the operations thereof and to observe the day-to-day operations and management thereof. This Agreement shall be subject to the condition that Purchaser shall determine during the period ending one hundred and ten business days from July 17, 2018, which is December 21, 2018 (the "<u>Due Diligence Period</u>"), that Purchaser is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and operations of the Facility and the transactions contemplated herein. If Purchaser shall not be so satisfied and Purchaser notifies Seller thereof in writing on or prior to the end of the Due Diligence Period, this contract shall be null and void and the Deposit plus any accrued interest thereon shall be returned to the Purchaser. If Purchaser fails to give such notice to Seller, it shall be conclusively presumed that Purchaser is satisfied with its due diligence review, and this Agreement shall continue in full force and effect.*

Additionally, the Stock Purchase Agreement (SPA) (ECF No. 1-2 PageID.47) clearly provides in paragraph 4.i., the same limited period for due diligence of one hundred and ten business days from July 17, 2018 through December 21, 2018. The SPA states:

ii.    Within one hundred and ten business days from July 17, 2018, or

December 21, 2018, *Purchaser shall have completed his due diligence to his satisfaction.*

Paragraph 6 xxi (ECF No. 1-2 PageID.20) of the APA, states as follows:

6.   <u>Conditions to Closing.</u>

(xxi)  *Purchaser has determined during the Due Diligence Period that it is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and operations of the Facility and the transactions contemplated herein, as set forth (sic) Section 5(a).*

Notwithstanding the foregoing language and representations by the Buyer Plaintiffs, Plaintiffs quote paragraph 9.(i), which provides in pertinent part, as follows:

(ii)   <u>Conditions of the Purchased Assets.</u>  There exists no *defective condition, structural or otherwise, with respect to the Purchased Assets.* All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).

What the Plaintiffs of course fail to appreciate, is the following portion of the foregoing clause:

*…All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).*

The roof was in fact in good working order and as would be expected of a used and aged commercial roof, in the ordinary course of business it had to be patched and tarred and maintained. This was not only the condition of the roof

during the Due Diligence period outlined in the written agreement and in the aforementioned paragraphs, but further, several water spots were present on visual inspection on ceiling tiles from prior, patched roof leaks. Plaintiff Friedman walked the roof with Defendant Possanza and the roof was discussed. Pursuant to the aforementioned verbiage, the Plaintiffs were free to perform *any* due diligence they deemed appropriate, *as long as it was performed within the 110 business day period.* Thus had Plaintiffs inspected the premises (if the roof was so bad the Appraisal would have likewise reflected an aged roof in poor or good condition) they would have had opportunity to discover the condition of the roof. Of course, Defendants offered no representation that Plaintiffs were purchasing a building with a new roof. Defendants' sole representation was that the roof was in good working order and in fact it was, it merely required maintenance as do electrical, plumbing, etc.. Moreover, Plaintiffs closed in 2018 and the very first time that notification was provided was December 31, 2021, three years later and the e mail from Plaintiff (ECF No.1-4) clearly reflects that the roof was already replaced and to that end of course, the Defendants have no way of evaluating the condition of the roof, the extent of some alleged damage and of course Defendants have no way to establish or prove that the rood required replacement or did not require replacement. The Plaintiffs *allege* in the Complaint that it was right after Closing on December 31, 2018 that they discovered the defective roof, if so, why wait three

years to make the disclosure and more importantly, why destroy any vestige of Defendants' ability to inspect and ascertain the condition of the roof.

Much the same, Plaintiffs had the absolute right to review any and all financial documentation and information, personally, with professionals or otherwise, to ascertain the financial condition of the entity being sold as well as the propriety of the financial information being provided; *as long as it was performed within the 110 business day period.* The claim for an alleged loss of income was actually a failure by the Plaintiffs to pursue these monies and to file the appropriate documentation with the proper Governmental authorities. Again, this is not the result of Defendants' failures; however, even if it was, Plaintiffs obligation to undertake due diligence *or waive* anything therefrom, is against the Plaintiffs and in turn bars the claims herein.

Further, See *Accord Huron Tool and Engineering Co v Precision Consulting Svcs, Inc,* 209 Mich App 365 (1995) (recognizing that the pleading party must actually set forth specific facts showing the time, place, contents of the misrepresentation, or nature of the misleading act, facts misrepresented and identification of what resulted as a consequence). A review of the Plaintiffs' Complaint shows none of these pre-requisites and it is abundantly clear that the reason Plaintiffs do not provide such information is because it does not exist!

**SILENT FRAUD:**

Plaintiffs' Complaint fails to identify the specific type of fraud that they are pursuing relief for however it appears from reviewing the allegations of the First Amended Complaint that the claim is for a failure to provide information. To that end, although unspecified, Defendants address the issue of Silent Fraud, which by definition is a failure to disclose certain information. "[T]here can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." *Aron Alan, LLC v. Tanfran, Inc.*, 240 Fed. Appx. 678, 682 (6th Cir. 2007) (citing *Webb v. First of Michigan Corp.*, 195 Mich. App. 470, 491 N.W2d 851, 853 (Mich. Ct. App. 1992)). The Court applied the standard regarding the availability of Plaintiff to discover facts pertaining to contractual representations: "Plaintiff either knew or could have readily discovered every material fact that was known by defendants at the time of sale." *Id.*

In *E-Poch Props., LLC v. TRW Auto. U.S., LLC*, 286 Fed. Appx. 276 (6th Cir. 2008): the 6th Circuit case affirmed dismissal of a buyer's claims against seller regarding a damaged roof. The court found the roof's condition was open to observation and discoverable upon reasonable inspection. The buyer failed to reasonably inspect or contact the roofing company despite knowing repairs were done. Thus, the buyer could not justifiably rely on the seller's representations and was barred from asserting misrepresentation claims as to the obvious roof defect.

In *McMullen v. Joldersma*, 174 Mich. App. 207 (Mich. Ct. App. 1988), the Court defined the elements of silent fraud as:

> (1) a material representation which is false; (2) known by defendant to be false, or made recklessly without knowledge of its truth or falsity; (3) that defendant intended plaintiff to rely upon the representation; (4) that, in fact, plaintiff acted in reliance upon it; and (5) thereby suffered injury. . . . The false material representation needed to establish fraud may be satisfied by the failure to divulge a fact or facts the defendant has a duty to disclose. Such an action is one of fraudulent concealment. [Citations omitted.]

The Court of Appeals in *M&D, INC. v. McConkey*, 231 Mich. App. 22, 31 (Mich. Ct. App. 1998) relied on the language of the trial court's opinion when upholding the trial court's dismissal of plaintiff's claims against the defendant seller, stating:

> Our review of Michigan Supreme Court precedent regarding this issue reveals that, in every case, the fraud by nondisclosure was based upon statements by the vendor that were ***made in response to a specific inquiry by the purchaser***, which statements were in some way incomplete or misleading. (emphasis added) (citations omitted)

> In the instant case, the documents of the sale transaction contain the "as is" clause and other explicit statements disclaiming seller representations and warranties about the condition of the property.

In *Bergen v. Baker*, 264 Mich. App. 376, 384 (Mich. Ct. App. 2004), the Court held, "[t]he disclosures required by the act are to be made in 'good faith,' and 'good faith means 'honesty in fact in the conduct of the transaction.'" (quoting MCL 565.960).

It should be noted that Plaintiffs had the absolute right to inspect the subject building and specifically the roof and the Plaintiffs were granted the absolute right to

inspect the financial records *all to the Plaintiffs satisfaction* or Plaintiffs could terminate the transaction. The Plaintiffs waited three years after Closing to give notice and of course the written contract of the parties made it abundantly clear that the failure to undertake the due diligence and/or to perform the due diligence but fail to provide notice terminating the purchase, is a bar and a waiver.

Perhaps if Plaintiffs had in fact inspected the building as the Purchase Agreement provided for, the Inspector would have discovered the alleged roof issue during the inspection which condition of the roof was pointed out to the Plaintiff Friedman when the Defendant Possanza. Plaintiff Friedman walked the roof and walked the building with Defendant Possanze where water stains were apparent on the ceiling tiles from earlier water seepage that had been repaired. Plaintiffs could have objected and walked away based on the due diligence performed; it was the choice of the Plaintiffs not to do so and this failure cannot be attributed to the Defendants or alleged damages sustained seeing how the foregoing acts as a bar to claims by the Plaintiffs as a result of their waiver.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT

"In determining contractual rights and obligations, the Court must look to the intention of the parties and the contract should be construed so as to carry that intention into effect." *Paw Paw Wine Distribs. V. Joseph E. Seagram & Sons*, 34 F. Supp. 2d 550, 554 (W.D. Mich. 1987) (citing *Central Jersey Dodge Truck Ctr. v. Sightseer Corp.*, 608

F.2d 1106 (6th Cir. 1979). An "obligation" generally refers to a duty or something that a person is bound to do or refrain from doing:

> *Obligation generally means a duty, or something that a person is bound to do or refrain from doing. See Obligation, Webster's Third New International Dictionary 1556 (3d ed. 1961) (defining "obligation" as "something that one is bound to do or forbear; a duty arising by contract: a legal liability; "money committed to a particular purpose"); see also Obligation, Black's Law Dictionary 1104 (8th ed. 2009) ("a legal or moral duty to do or not do something" that "may refer to anything that a person is bound to do or forbear from doing, whether the duty is imposed by law, contract, [or] promise"; "[a] formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract").*

*Intuitive Surgical Operations, Inc. v. Midbrook, LLC*, 2018 U.S. Dist. LEXIS 105264, *12-13 (E.D. Mich. June 25, 2018).

As set forth above, Plaintiffs' First Amended Complaint herein, seek to offset the indebtedness under the Note as a result of the following condition 12(d) (PageID.35), for the cost of a new roof, in the amount of $240,000.00 and $37,064.49, for the uncollected accounts receivable. (See Counts I and II of First Amended Complaint). However the provision allows for a set-off *only* for obligations, i.e. undertakings or actions *to be* taken, not for alleged warranty mis-statements or Plaintiffs' failure to undertake due diligence. The specific language states as follows:

> (d)    <u>Note.</u> Amounts due under the Note may be offset with *respect to any obligations of the Seller under this Agreement and/or obligations of the Seller under the SPA.*

Accordingly, it is the verbiage of the subject Agreements executed by the

parties hereto, that bars the relief sought by the Plaintiffs. Moreover, the elements of a breach of contract claim under Michigan law are (1) the existence of a contract between the parties, (2) the terms of the contract require performance of a certain action, (3) a party breached the contract, and (4) the breach caused the other party injury. *Burton v. Beaumont Hosp.*, 373 F.Supp.2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999). While the amount of damages is usually a disputed issue of fact for trial, the existence of some contractual injury or damage is a necessary element for purposes of stating a claim for breach of contract. See *New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 761 N.W.2d 832, 837 (Mich. App. 2008).

In the present matter, Plaintiffs' claims are barred, as Plaintiffs entered into written Agreements that specifically set forth due diligence periods during which time the obligations were incumbent upon the Plaintiffs to review pertinent documents, make inspections, ascertain the conditions of the building and company finances. Failure to do so in accordance with the contractual provisions constitutes a waiver to asserting claims for same in the future. The law is well settled that contract terms must be given their ordinary meaning and where the contract language is clear and unambiguous its interpretation is a question of law for the Court and not a question of fact for the jury. *Comerica Bank v Cohen* 291, Mich App 40, 885 NW2d 544 (2010). *Hoffner v Lonctoe*, 290 Mich App 449, 802 NW2d 648 (2010).

Further, the law is clear that courts cannot read "fairness" or "reasonableness" into an ambiguous agreement. *AFSCME v Bank One*, 267 Mich App 281, 705 NW2d 355 (2005) and *Holland v Trinity Health Care Corp.*, 287 Mich App 524, 791 NW2d 724 (2010). *See also, Wilke v Auto Owners Insurance Company, 469 Mich 41, 664 NW 2d 776 (2003).* Accordingly, this Court cannot read into the parties agreements (ECF No. 1-1 and ECF No. 1-2) additional terms and conditions and of course If a term or condition is not in the written agreement, then it does not apply.

Paragraph 5 of the APA (ECF No. 1-1 PageID.18), states in pertinent part as follows:

5. <u>Due Diligence; Title Survey; and Licensure.</u>

(b) Due Diligence Period.     Purchaser shall have the right, at reasonable times and on reasonable prior notice to Seller to enter upon the Property *to conduct such inspections, investigations, tests and studies as Purchaser shall deem necessary, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and feasibility studies. …*
*Purchaser shall also have the right to tour the facility, to review the books and records related to the financial condition of the operations thereof and to observe the day-to-day operations and management thereof. This Agreement shall be subject to the condition that Purchaser shall determine during the period ending one hundred and ten business days from July17, 2018, which is December 21, 2018 (the "<u>Due Diligence Period</u>"), that Purchaser is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and operations of the Facility and the transactions contemplated herein. If Purchaser shall not be so satisfied and Purchaser notifies Seller thereof in writing on or prior to the end of the Due Diligence Period, this contract shall be null and void and the Deposit plus any*

*accrued interest thereon shall be returned to the Purchaser. If Purchaser fails to give such notice to Seller, it shall be conclusively presumed that Purchaser is satisfied with its due diligence review, and this Agreement shall continue in full force and effect.*

Additionally, the SPA (ECF No. 1-2 Page I.D. No. 47) clearly provides in paragraph 4.i., the same limited period for due diligence of one hundred and ten business days from July 17, 2018 through December 21, 2018. The SPA states:

   iii.   Within one hundred and ten business days from July 17, 2018, or December 21, 2018, *Purchaser shall have completed his due diligence to his satisfaction.*

Paragraph 6 xxi (ECF No. 1-2 PageID.20) of the APA, states as follows:

   6.   <u>Conditions to Closing.</u>

   (xxi)  *Purchaser has determined during the Due Diligence Period that it is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and operations of the Facility and the transactions contemplated herein, as set forth (sic) Section 5(a).*

Notwithstanding the foregoing language and representations by the Buyer Plaintiffs, Plaintiffs quote paragraph 9.(i), which provides in pertinent part, as follows:

   (iii)   <u>Conditions of the Purchased Assets.</u>  There exists no *defective condition, structural or otherwise, with respect to the Purchased Assets.* All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).

What the Plaintiffs of course fail to appreciate, is the following portion of the

foregoing clause:

> ...*All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).* Id.

The roof was in fact in good working order and as would be expected of a used and aged commercial roof, in the ordinary course of business it had to be patched and tarred and maintained. This was not only the condition of the roof during the Due Diligence period outlined in the written agreement and in the aforementioned paragraphs, but further, present on ceiling tiles were several water spots from where the roof had previously leaked and required patching. The Plaintiff Friedman walked the roof with the Defendant Possanza and the roof was discussed and pursuant to the aforementioned verbiage, the Plaintiffs were free to perform *any* due diligence they deemed appropriate, *as long as it was performed within the 110 business day period.* Thus, had Plaintiffs inspected the premises the inspection would have likewise reflected an aged roof in poor or good condition. Defendants made no representation that the Plaintiffs were purchasing a building with a new roof. The sole representation was that the roof was in good working order and in fact it was, it merely required maintenance as do electrical, plumbing, etc. Moreover, Plaintiffs closed in 2018 and the very first time that notification was provided was December 31, 2021, three years later and the e mail from Plaintiff (ECF No. 1-4) clearly reflects that the roof was already replaced and to that end of course,

the Defendants have no way of evaluating the condition of the roof, the extent of some alleged damage and of course Defendants have no way to establish or prove that the rood required replacement or did not require replacement. The Plaintiffs *allege* in the Complaint that it was right after Closing on December 31, 2018 that they discovered the defective roof, if so, why wait three years to make the disclosure and more importantly, why destroy any vestige of Defendants' ability to inspect and ascertain the condition of the roof to determine if it was as Plaintiffs now allege.

Much the same, Plaintiffs had the absolute right to review any and all financial documentation and information, personally, with professionals or otherwise, to ascertain the financial condition of the entity being sold as well as the propriety of the financial information being provided; *as long as it was performed within the 110 business day period.* The claim for an alleged loss of income was actually a failure by the Plaintiffs to pursue these monies and to file the appropriate documentation with the proper Governmental authorities. Again, this is not the result of Defendants failures, however, even if it was, Plaintiffs obligation to undertake due diligence *or waive* anything therefrom, is against the Plaintiffs and in turn bars the claims herein.

III.  **THIS COURT SHOULD ORDER AN ADVERSE INFERENCE AND UTILIZE SAME IN DETERMINING THE INSTANT MOTION BEFORE IT BASED ON SPOLIATION OF EVIDENCE:**

A party has a duty to preserve evidence where it is reasonable foreseeable that

it is material to a potential legal action and properly discoverable. Spoliation of evidence occurs when a party intentionally alters or destroys relevant evidence before an opposing party has an opportunity to examine it. If a threshold showing of spoliation is made, the burden shifts to the proponent of the evidence to prove that the opponent was not prejudiced by the alteration or destruction. The test for prejudice is whether there is a reasonable possibility, based upon concrete evidence, that access to the destroyed or altered evidence, which is not otherwise obtainable, would produce evidence favorable to the objecting party. *Nationwide Mutual Fire Insurance Company v. Ford Motor Company*, 174 F.3d 801, 804 (6th Cir. 1999). Our circuit has held that "[t]he rules that apply to the spoiling of evidence and the range of appropriate sanctions are defined by state law." *Id.*

Federal law governs spoliation issues in a case pending in federal court. *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009).  A party seeking a spoliation sanction because evidence was destroyed must establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). The court "may impose many different kinds of sanctions for spoliated evidence, including dismissing a case,

granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014) (internal quotation marks omitted). Whether to issue a sanction and its severity is determined on a case-by-case basis, depending in part on the spoliating party's level of culpability. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013).

In a lawsuit pertaining to alleged defects pertaining to an improperly installed pool liner, Defendant argued that spoliation of evidence applied when Plaintiff removed the pool liner before Defendant had the ability to perform a full evaluation of the pool with the liner in place. *City of Livonia v. Aquatic Renovation Sys.*, 2022 U.S. Dist. LEXIS 93072, *11 (E.D. Mich. May 24, 2022).[1] The Court determined that spoliation sanctions were not warranted because Defendant "had employees onsite who could have—and did—attempt to determine the cause of the water underneath the liner and fix it." *Id.* at * 14. The Court distinguished Michigan caselaw that when a necessary test critical to the ultimate theory of liability cannot be duplicated, spoliation sanctions are warranted:

> [Defendant] relies on Bloemendaal v. Town & Country Sports Ctr., Inc., 255 Mich. App. 207, 659 N.W.2d 684 (Mich. App. 2002). In that case, the plaintiff was

---

[1] The Sixth Circuit permits citation of any unpublished opinion. 6 Cir R 32.1(a). Unpublished opinions of this Court are not binding on this Court, but can be persuasive. *McKenzie v Allconnect, Inc*, 369 F Supp 3d 810, 815 (E.D. Ky, 2019). Opinion is attached as Exhibit 1 pursuant to FRCP 32.1; LR 28(b)(2)

> injured while driving a motorcycle that she purchased from defendants. *Id.* at 685.
> While disassembling the motorcycle, plaintiff's experts failed to test a certain part
> of the motorcycle that was essential to their ultimate theory of liability. *Id.* at 687.
> The Michigan Court of Appeals held that, because the test could no longer be
> duplicated, the failure to conduct the test constituted a failure to preserve
> evidence. *Id.* It also held that the trial court did not abuse its discretion in dismissing
> the case as a sanction for spoliation based on the resulting prejudice to the defendant,
> noting that, "[b]ecause defendants were not present at the time of the disassembly,
> they were precluded from gaining [the] evidence [from the test] on their own." *Id.* at
> 688.

*Id.* at * 14-15.  Here, the facts are opposite to that of *Aquatic Renovation Systems* and

more appropriately analogous with *Bloemendaal* as a necessary and critical evaluation

of the ultimate theory of liability here (i.e. whether the roof had substantial defects

that warranted a full replacement based on latent conditions present at the time of

sale that were within the actual knowledge of the seller and not knowable by the

purchaser on reasonable inspection) was unavailable to Defendants herein.

Defendants were not provided notice of the alleged roof defect prior to Plaintiffs

directing remediation.  The failure of Defendants to be able to inspect the roof prior

to remediation to independently determine the necessity of a total replacement

rather than some other remediation or the ability to determine whether the alleged

defects are the product of normal wear and tear is directly relevant to Defendants'

defenses to this action and is materially prejudicial to the ability to put on its

defenses.  Plaintiffs could have and should have provided notice, ***three years earlier***,

of the alleged defects well prior to replacing the entire roof of the subject property

and in advance of this litigation.  Plaintiff stands to gain a windfall, a brand new roof at the expense of Defendants, as a direct result of Plaintiffs' malfeasance with providing notice of any alleged, undisclosed defects with the roof.

### CONCLUSION AND PRAYER FOR RELIEF

Defendants pray this Honorable Court grant their Motion to Dismiss Plaintiff's claims against them without prejudice.

Respectfully submitted,
**Wood, Kull, Herschfus, Obee & Kull, P.C.**

By:   */s/ Brian H. Herschfus*
Brian H. Herschfus (P41567)
*Attorneys for Defendants*
37000 Grand River Ave, Ste 290
Farmington Hills, MI 48335-2881
248-476-2000
bhh@woodkull.com

Dated: February 23, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN (DETROIT) DIVISION

| | | |
|---|---|---|
| THE CASCADES OF IRON RIVER HOLDINGS, LLC | ) | |
| AND | ) | |
| BENJAMIN T. FRIEDMAN, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | CIVIL ACTION NO. 24-CV-10013 |
| -V- | ) | HON. MARK A. GOLDSMITH |
| | ) | MAGISTRATE HON. CURTIS IVY, JR. |
| IRON RIVER LAND COMPANY, LLC | ) | |
| AND | ) | |
| ROBERT W. POSSANZA, JR., | ) | |
| | ) | |
| DEFENDANTS. | | |

## NOTICE OF HEARING

IRON RIVER LAND COMPANY, LLC AND ROBERT W. POSSANZA, JR.'S Motion to Dismiss

Complaint will be brought on for hearing before the Honorable Mark A. Goldsmith

on a date and time to be determined by the Court, or as soon thereafter as counsel

may be heard.

Respectfully submitted,
**Wood, Kull, Herschfus, Obee & Kull, P.C.**

By:   */s/ Brian H. Herschfus*
Brian H. Herschfus (P41567)
*Attorneys for Defendants*
37000 Grand River Ave, Ste 290
Farmington Hills, MI 48335-2881
248-476-2000
Dated: February 23, 2024   bhh@woodkull.com

**LOCAL RULE CERTIFICATION:**

I, Brian H. Herschfus, certify this document follows Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the proper length. Local Rule 7.1(d)(3).

<div style="margin-left:40%">

Respectfully submitted,
**Wood, Kull, Herschfus, Obee & Kull, P.C.**

By:  */s/ Brian H. Herschfus*
Brian H. Herschfus (P41567)
*Attorneys for Defendants*
37000 Grand River Ave, Ste 290
Farmington Hills, MI 48335-2881
248-476-2000
bhh@woodkull.com

</div>

Dated: February 23, 2024

**CERTIFICATE OF SERVICE**

I certify that on February 23, 2024, I caused the foregoing documents to be electronically filed using the United States District Court for the Eastern District of Michigan, Southern Division's ECF e-filing system, which will automatically send notice of such filing to all attorneys of record.

<div style="margin-left:40%">

By:   */s/ James E. Bobcik*

</div>

# EXHIBIT 1



**User Name:** James Bobcik
**Date and Time:** Friday, February 23, 2024 3:44:00PM EST
**Job Number:** 217889778

## Document (1)

1. *City of Livonia v. Aquatic Renovation Sys., 2022 U.S. Dist. LEXIS 93072*

   **Client/Matter:** Possanza
   **Search Terms:** City of Livonia v. Aquatic Renovation Sys., 2022 U.S. Dist. LEXIS 93072
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |



Cited
As of: February 23, 2024 8:44 PM Z

## *City of Livonia v. Aquatic Renovation Sys.*

United States District Court for the Eastern District of Michigan, Southern Division

May 24, 2022, Decided; May 24, 2022, Filed

Case No. 20-10737

**Reporter**
2022 U.S. Dist. LEXIS 93072 *; 2022 WL 1651655

CITY OF LIVONIA, Plaintiff, v. AQUATIC RENOVATION SYSTEMS, INC., D/B/A RENOSYS CORPORATION, et al., Defendants.

## Core Terms

liner, pool, installation, Merchants, reply, underneath, spoliation, bubbling, reliable, leak, performance bond, expert testimony, qualifications, express warranty, Concurrence, warranty, inspect, motion for leave, asserts, offers, contends, modified, testing, denies, summary judgment motion, punctuation, damages, vortex, entitled to summary judgment, methodology

**Counsel:** **[*1]** For Livonia, City of, Plaintiff: Paul Bernier, LEAD ATTORNEY, Flood Lanctot Connor Stablein PLLC, Royal Oak, MI; Leo D. Neville, City of Livonia, Law Department, Livonia, MI.

For Aquatic Renovation Systems, Inc. d/b/a Renosys Corporation, Defendant: Robert Haynes, John G. Mitchell, Secrest Wardle, Troy, MI; William J. Stapleton, Hooper, Hathaway,, Ann Arbor, MI.

For Merchants Bonding Company, Defendant: William J. Stapleton, Hooper, Hathaway,, Ann Arbor, MI.

For Aquatic Renovation Systems, Inc. d/b/a Renosys Corporation, Counter Claimant: Robert Haynes, John G. Mitchell, Secrest Wardle, Troy, MI; William J. Stapleton, Hooper, Hathaway,, Ann Arbor, MI.

For Aquatic Renovation Systems, Inc. d/b/a Renosys Corporation, Counter Defendant: Robert Haynes, John G. Mitchell, Secrest Wardle, Troy, MI; William J. Stapleton, Hooper, Hathaway,, Ann Arbor, MI.

**Judges:** HON. MARK A. GOLDSMITH, United States District Judge.

**Opinion by:** MARK A. GOLDSMITH

## Opinion

**OPINION & ORDER (1) GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A RESPONSE TO DEFENDANT MERCHANTS BONDING COMPANY'S CONCURRENCE AND SUPPLEMENTAL REPLY (Dkt. 45), (2) DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE A RESPONSE TO DEFENDANT AQUATIC RENOVATION SYSTEM'S REPLY (Dkt. 46), [*2] AND (3) DENYING DEFENDANT AQUATIC RENOVATION SYSTEM'S MOTION TO DISMISS AS A SANCTION FOR SPOLIATION, MOTION TO DISQUALIFY PLAINTIFF'S EXPERT, MOTION TO STRIKE THE EXPERT'S REPORT, AND MOTION FOR SUMMARY JUDGMENT (Dkt. 35)**

This matter is before the Court on two motions filed by Plaintiff City of Livonia and four motions filed by Defendant Aquatic Renovation Systems, Inc. d/b/a RenoSys Corporation (RenoSys). The City filed a motion for leave to file a response to Defendant Merchants Bonding Company's (Merchants') concurrence with RenoSys's reply and supplemental reply (Dkt. 45). It also filed a motion for leave to file a response to RenoSys's reply (Dkt. 46). Renosys filed a motion to dismiss as a sanction for spoliation, motion to disqualify the City's expert, motion to strike the expert's report, and motion for summary judgment (Dkt. 35).[1] For the foregoing reasons, the Court grants the City's motion for leave to file a response to Merchants' reply and denies the City's motion to file a response to RenoSys's reply. It denies each of RenoSys's motions.[2]

_____

[1] RenoSys filed all of these motions in a single document.

[2] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See *E.D. Mich. LR 7.1(f)(2)*; *Fed. R. Civ. P. 78(b)*. In addition to the motions, the briefing includes the following: the City's response to the motions (Dkt. 41), Merchants' notice of joinder/concurrence in the motions (Dkt. 36), the City's

2022 U.S. Dist. LEXIS 93072, *2

## I. BACKGROUND

This action arises from RenoSys's installation of a pool liner in one of the City's pools. Compl. (Dkt. 1). In 2019, the **[*3]** City opened a bid process, through which it accepted proposals for conducting work on a large leisure pool located in a recreation center that the City owns and operates. Scope of Work (SOW)-1 (Dkt. 35-1). The pool has lap lanes; a zero-depth entry; a lazy river, which has moving water that creates a current that one can swim against or float along; a plunge area; a "vortex," which has water that moves in a circular motion; and a bubble bench. Davis Dep. at 11-12 (Dkt. 35-1). The Scope of Work stated that all projects must be complete by August 31, 2019. SOW-1.

The City awarded RenoSys a contract to install a 60-millimeter PVC liner in the pool, and on March 11, 2019, the City and RenoSys entered into a contract that provided that RenoSys would install the liner in the pool. Aquatic Renovation Systems Contract (Dkt. 41-2).[3] The City's pool had previously been lined with marcite, which is a plaster-like compound. Davis Dep. at 9. RenoSys completed the installation of the liner in early September 2019. Id. at 38.

The day after the installation was complete, the City contacted RenoSys and reported that the liner was "bubbling" in certain areas of the pool. Emails Between Stephanie Manoogian **[*4]** and Tyler Blattner at PageID.131 (Dkt. 35-1). RenoSys dispatched Tom Krepel, the lead installer for the project, to the pool. 11/13/19 Letter to Michael Fisher from Jeffery Wells at PageID.136 (Dkt. 35-1). Krepel informed Stephanie Manoogian, the Aquatics Supervisor for the City, that the bubbling was likely trapped air underneath the liner, which is common after a pool with a new liner has first been refilled, and that this bubbling usually dissipates. Id. In addition, Manoogian informed Tyler Blattner, an operations manager at RenoSys who helped oversee the installation, of the bubbling in an email and phone call. Manoogian Dep. at 12 (Dkt. 35-1). Blattner offered the same explanation as Krepel, stating that the

bubbling was likely trapped air, which is common and would dissipate. Emails Between Stephanie Manoogian and Tyler Blattner at PageID.133. Krepel and Blattner also described to the City a process it could use to remove air from underneath the liner. Manoogian Dep. at 12. The bubbling in the zero-depth entry was in fact air, and the City was able to remove it. Id. at 13. However, the bubbling in the vortex and plunge area grew larger, and Manoogian and other City employees **[*5]** deemed it noticeable that water was underneath the liner. Id.

In September 2019, Krepel visited the pool again, and he stated that the bubbling in the vortex and plunge area was due to water underneath the liner. Id. at 12-13; Davis Dep. at 39-40. Krepel recommended that the pool staff shut down the lazy river and vortex pump and see what effect this had on the accumulation of water. Davis Dep. at 52; Krepel Dep. at 65 (Dkt. 35-1). He also recommended that the City retain a testing company to perform a pressure test. Davis Dep. at 14. In addition, RenoSys requested that the pool be drained to fully evaluate the issue with the liner, and the City and RenoSys determined dates on which the pool would be closed, drained, and examined. 11/13/19 Letter to Michael Fisher from Jeffery Wells at PageID.136. In mid-October 2019, the liner separated from the bottom of the pool, requiring RenoSys to visit and examine the pool earlier than initially planned. Davis Dep. at 44. RenoSys checked seams, replaced flanges, and pumped water out from underneath the liner. Davis Dep. at 47; 11/13/19 Letter to Michael Fisher from Jeffery Wells at PageID.137.

The City hired a company to perform a pressure test **[*6]** after it drained the pool. Manoogian Dep. at 14. The pressure test revealed a buried water-return inlet, which had been covered over with marcite. Id. Both the City and RenoSys were previously unaware of this water-return inlet. Id. at 15. The inlet was uncovered and sealed with a flange. Baruzzini Aquatics Report (Dkt. 41-4).

The City then refilled the pool in early November. Manoogian Dep. at 16. Within 24-36 hours of refilling the pool, the vortex and plunge area again showed signs of bubbling in the same places as the initial bubbling appeared. Id. at 16-17.

RenoSys returned to the pool in January 2020, and it performed testing and replaced flanges. Jan. 2020 Service Records (Dkt. 41-8). After the repairs, the City refilled the pool. Email Communications at 79 (Dkt. 41-

---

response to the notice of joinder/concurrence (Dkt. 42), RenoSys's reply (Dkt. 43), Merchants' concurrence with RenoSys's reply and supplemental reply (Dkt. 44), and the City's response to Merchants' concurrence with RenoSys's reply and supplemental reply (Dkt. 45-1).

[3] The contract specifically provided that RenoSys would install a new "RenoSys Rec Dec," new deck drains, a pool floor, and pool gutters. Id.

3). Within 24 hours of refilling the pool, bubbling appeared under the liner in the vortex and plunge area. Id. Jeffery Wells, the vice president of operations at RenoSys, informed Stephanie Manoogian that he wanted to schedule a leak detection company to visit the pool because the issues appeared to be due to a "pressurized source." Id. at 80. American Leak Detection visited the pool and performed testing on the pool **[*7]** while it was filled. ALD Records (Dkt. 41-6). This test involved injecting a dye between the old marcite floor and walls in the pool and the commercial liner so that dye would emerge at leaking points in the liner. Id. at 1. American Leak Detection reported that, although its test did not cover the entire pool, dye emerged at different areas, indicating that they were not completely sealed. Id.

RenoSys returned to the pool later in January. Email Communications at 91. It removed and resealed all flanges and termination strips, and it resealed all seams. Id. at 88. According to the City, however, after a total of four repairs, RenoSys was unable to resolve the bubbling, and the pool was not fully operational. Manoogian Dep. at 42; 2/5/20 Letter to Jeffery Wells from Michael Fisher at PageID.183 (Dkt. 35-1).

On February 4, 2020, the City made a claim on the performance bond issued by Merchants for the amount necessary to satisfactorily complete the pool. 2/4/20 Letter to Larry Taylor from Michael Fisher at PageID.181 (Dkt. 35-1). On February 5, 2020, the City formally requested that RenoSys leave the worksite and told RenoSys that it was terminating their relationship. 2/5/20 Letter to **[*8]** Jeffery Wells from Michael Fisher at PageID.183. The City ultimately removed the liner and hired another company to remarcite the pool. Davis Dep. at 81; Manoogian Dep. at 45.

The City brings claims of breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness. Compl. ¶¶ 8-52. It also alleges that RenoSys obtained a performance bond from Merchants as surety and that, pursuant to the performance bond, Merchants is obligated to compensate the City for the damages it sustained as a result of RenoSys's failure to perform. Id. ¶¶ 55, 61.

## II. ANALYSIS

The Court first discusses the City's motions for leave to file responses to Defendants' replies. It then discusses RenoSys's motions.

### A. Motion to File Response to Merchants' Concurrence and Supplemental Reply and Motion to File Response to RenoSys's Reply

The City seeks leave to file a response to Merchants' concurrence and supplemental reply, asserting that in the concurrence and supplemental reply, Merchants for the first time offers arguments and evidence in support of its contention that it is entitled to summary judgment on the performance bond claim. Mot. for Leave **[*9]** to File Resp. to Merchants' Concurrence and Supp. Reply at 3. The City also seeks leave to file a response to RenoSys's reply, stating that in the reply, RenoSys offers arguments beyond those included in its motion for summary judgment. Mot. for Leave to File Resp. to RenoSys's Reply at 3. According to the City, these new arguments are that, because the City removed the liner from the pool, RenoSys could not have its experts inspect the liner and pool together and that the Court should grant summary judgment on the performance bond claim. Id.

The decision to grant or deny leave to file a sur-reply—which describes what the City seeks to file—is committed to the court's discretion. *Mirando v. U.S. Dep't of Treasury, 766 F.3d 540, 549 (6th Cir. 2014)*. A sur-reply may be appropriate "[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated." *Key v. Shelby Cnty., 551 F. App'x 262, 265 (6th Cir. 2014)* (punctuation modified). When the moving party submits in a reply brief new reasons and evidence in support of its motion for summary judgment, the district court should allow the nonmoving party an "adequate opportunity" to respond. *Seay v. Tenn. Valley Auth., 339 F.3d 454, 481 (6th Cir. 2003)*.

Because Merchants offers in their reply new evidence and arguments related to the performance bond **[*10]** claim, to which the City should be afforded an adequate opportunity to respond, the Court grants the City's motion for leave to file a response to Merchants' reply. RenoSys, however, does not offer new evidence or arguments in its reply. In its motion for summary judgment, it contended that the City's removal of the pool liner precluded it from having an expert evaluate the pool with the liner in place, while the pool was filled and emptied. See Mot. at 11. It also argued that summary judgment was warranted on the performance bond claim because the claim was premised on the assertion that the poor quality of the materials and workmanship constituted a failure to perform, and there

was nothing in the record to support that assertion. Id. at 24. Therefore, the Court denies the City's motion for leave to file a response to RenoSys' reply. See *Modesty v. Shockley, 434 F. App'x 469, 472 (6th Cir. 2011)* (affirming a district court's denial of leave to file a sur-reply when the opposing party's reply did not offer new arguments or introduce new evidence).

Next, the Court turns to RenoSys's motions. It addresses each of RenoSys's motions in turn.

## B. Motion to Dismiss as a Sanction for Spoliation

RenoSys contends that the City engaged in spoliation when **[*11]** it removed the liner from the pool before giving RenoSys the opportunity to have an expert perform a full evaluation of the pool with the liner in place—and that this removal prejudiced RenoSys. Mot. at 9-13. It states that the City's theory of liability is either that the liner itself was faulty or that the liner was improperly installed, but that either theory can be assessed only by examining the liner and the pool together, while the pool is both filled and emptied. Id. at 10. As a sanction for spoliation, it seeks dismissal of the case with prejudice pursuant to the Court's inherent powers. Id. at 12-13.

"Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *United States v. Boxley, 373 F.3d 759, 762 (6th Cir. 2004)*. If a party destroys evidence in anticipation of litigation, district courts have inherent authority to impose sanctions based on spoliation of evidence. *Applebaum v. Target Corp., 831 F.3d 740, 744 (6th Cir. 2016)*. Federal law governs spoliation issues in a case pending in federal court. *Adkins v. Wolever, 554 F.3d 650, 651 (6th Cir. 2009)*.

The United States Court of Appeals for the Sixth Circuit has explained that a district court may sanction a litigant for spoliation of evidence if three conditions are met. *Byrd v. Alpha Alliance Ins. Corp., 518 F. App'x 380, 383-384 (6th Cir. 2013)*. First, the party with control **[*12]** over the evidence had an obligation to preserve the evidence at the time of its destruction. *Id. at 384*. A party has an obligation to preserve evidence when it "should have known that the evidence may be relevant to future litigation." *Beaven v. U.S. Dep't of Justice, 622 F.3d 540, 553 (6th Cir. 2010)*. Second, the evidence was destroyed with a culpable state of mind. *Byrd, 518 F. App'x at 384*. "The culpable state of mind factor is satisfied by a showing that the evidence was destroyed

knowingly, even if without intent to breach a duty to preserve it, or negligently." *Beaven, 622 F.3d at 554* (punctuation modified). Third, the destroyed evidence was relevant to a claim or defense. *Byrd, 518 F. App'x at 384*. Evidence is relevant to the other side's claim or defense if the evidence is such that "a reasonable trier of fact could find that it would support that claim or defense." Id. The party seeking the sanction carries the burden of establishing these facts. Id.

When the above conditions are met, federal courts have "broad discretion to craft proper sanctions for spoliated evidence." *Adkins, 554 F.3d at 651*. The Sixth Circuit has explained that dismissal as a sanction for spoliation—which RenoSys seeks—is a "particularly severe sanction" that is "usually justified only in circumstances of bad faith or other like action." *Arch Ins. Co. v. Broan-NuTone, LLC, 509 F. App'x 453, 458 (6th Cir. 2012)*. When the conduct is less culpable, **[*13]** dismissal as a sanction may be appropriate, but it "should rarely be imposed and only when significant prejudice results from the evidence's destruction." *Byrd, 518 F. App'x at 386*. For example, under the "extreme circumstance[e]" in which spoliation denies a defendant access to "the only evidence from which it could develop its defenses adequately," dismissal of an action may be a proper sanction. *Arch Ins. Co., 509 F. App'x at 458* (punctuation modified).

The City contends that it did not engage in spoliation because the liner remains in storage and available for inspection. Resp. at 10. It also states that it removed the liner because, after six months of waiting for RenoSys to fix the water underneath the liner with no resolution, it wanted to render the pool fully usable to the public. Id. at 12.

The City had an obligation to preserve the liner because it should have known that the liner may be relevant to future litigation, and that the liner is relevant to RenoSys's claim or defense. However, even if the City did engage in spoliation by knowingly or negligently removing the liner from the pool, such a degree of fault would not merit the severe sanction of dismissal. RenoSys contends that the City knew this matter was headed for litigation **[*14]** when it removed the liner from the pool. Mot. at 12. But it does not state, and there is no evidence to otherwise indicate, that the City acted in bad faith in removing the liner. And RenoSys has not shown that the City's actions were so prejudicial that they substantially denied RenoSys the ability to defend itself. RenoSys asserts that it cannot have an expert test the pool and liner together. But before the

City filed this action, RenoSys had multiple opportunities over approximately six months to inspect the pool and liner together, while the pool was filled and empty. RenoSys had employees onsite who could have—and did—attempt to determine the cause of the water underneath the liner and fix it.

In contending that dismissal is appropriate when significant prejudice results from the destruction of evidence, RenoSys relies on *Bloemendaal v. Town & Country Sports Ctr., Inc., 255 Mich. App. 207, 659 N.W.2d 684 (Mich. App. 2002)*. In that case, the plaintiff was injured while driving a motorcycle that she purchased from defendants. *Id. at 685*. While disassembling the motorcycle, plaintiff's experts failed to test a certain part of the motorcycle that was essential to their ultimate theory of liability. *Id. at 687*. The Michigan Court of Appeals held that, because the test could no longer be duplicated, the **[*15]** failure to conduct the test constituted a failure to preserve evidence. Id. It also held that the trial court did not abuse its discretion in dismissing the case as a sanction for spoliation based on the resulting prejudice to the defendant, noting that, "[b]ecause defendants were not present at the time of the disassembly, they were precluded from gaining [the] evidence [from the test] on their own." *Id. at 688*.

This case is distinguishable, as the liner was not destroyed before RenoSys had an opportunity to inspect it. RenoSys was present at the pool multiple times for the purpose of inspecting the liner, and, therefore, it was not precluded from gaining evidence or testing the pool and liner together on its own.

Accordingly, the Court denies RenoSys's motion to dismiss as a sanction for spoliation.

## C. Motion for Disqualification of the City's Expert

RenoSys also filed a motion pursuant to *Federal Rule of Evidence 702* requesting that the Court find the City's expert, Richard Story, unqualified, and preclude the City from relying on Story's unreliable opinions or findings. Mot. at 13-18.

Story is a professional pool installer. Story Dep. at 10 (Dkt. 35-1). The City contacted him based upon a recommendation from Baruzzini Aquatics, **[*16]** which conducted the pressure test in the pool in 2019. John Robertson Aff. at 3 (Dkt. 41-12). The City informed Story that it had water under the liner and asked him to inspect the pool. Story Dep. at 17.

Story visited the City's pool in early 2020 when the liner was still installed and after RenoSys's last attempted repair. Id. at 18. He observed that "there was a lot of water under the liner," inspected areas that he thought would permit water to get underneath the liner, and found several such areas. Id. at 19. Story identified what he considered to be several issues with RenoSys' installation of the liner, including: (i) numerous cracked faceplates—used to make a watertight seal—that would allow water to get underneath the liner; (ii) lack of gaskets—used to create a mechanical bond between the PVC liner and the floor—in the pool, including around the main drain, which is particularly likely to contribute to water underneath the liner; (iii) another gasket that was not properly adhered to the floor or to the liner itself; (iv) the termination of the liner below the waterline; (v) the use of plastic anchors that were not epoxied; and (vi) excessive use of silicone in the vortex area **[*17]** to prevent leaking. Id. at 21-24, 28-29, 31. In addition, Story stated that he observed uneven cuts in the liner and lack of quality and workmanship. Id. at 45-46. Story inspected the pool while it was empty, and he testified that it would not have been useful to inspect the pool while it was filled to help determine the source of any potential leak. Id. at 19.

According to Story, there are three ways that water may get behind a vinyl liner: (i) plumbing, (ii) groundwater, and (iii) leaks in the liner. Id. at 52-53. Story stated that plumbing is "first and foremost at the top of the list" and that a pressure test is used to identify whether plumbing is the source of a leak. Id. at 52. The City asserts that Baruzzini's and American Leak Detection's testing had already ruled out plumbing as a cause for the liner bubbling. Resp. at 16. And, according to Story, because the pool is inside, groundwater was likely not the cause. Story Dep. at 52-53. Therefore, the City relies on Story's testimony to establish that leaks in the liner were the source of the bubbling.

The testimony of experts is governed by *Federal Rule of Evidence 702*. That rule states the following:

> A witness who is qualified as an expert by knowledge, **[*18]** skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*Fed. R. Evid. 702*.

The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under *Rule 702*. *In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528-529 (6th Cir. 2008)*. First, "the witness must be qualified by knowledge, skill, experience, training, or education." *Id. at 529* (punctuation modified). Second, "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue." Id. (punctuation modified). Third, "the testimony must be reliable." Id. The party offering the expert testimony must prove the expert's qualifications by a preponderance of the evidence. See *Sigler v. Am. Honda Motor Co., 532 F.3d 469, 478 (6th Cir. 2008)*.

"[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal, 527 F.3d at 530*. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction **[\*19]** on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993)*. Accordingly, "*Rule 702* should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 919 (6th Cir. 1984)*.

RenoSys contends that Story is not qualified and that his conclusions were not based on reliable principles and methods. The Court first discusses Story's qualifications and then discusses reliability. It finds that Story is qualified and that his testimony is reliable.

## 1. Qualifications

Before an expert may give an opinion, the witness must be qualified to do so. *Berry v. City of Detroit, 25 F.3d 1342, 1348-1350 (6th Cir. 1994)*. To establish an expert's qualification, the proponent of the testimony must establish those factors related to the expert's "background that make[e] [his or her] knowledge 'specialized,' that is, beyond the scope of the ordinary juror." *Zuzula v. ABB Power T & D Co., Inc., 267 F. Supp.2d 703, 713 (E.D. Mich. 2003)*. In addition, those qualifications must be relevant to the opinion sought. Id. Courts determine whether the witness is qualified to

testify about a particular issue by looking to the witness'"knowledge, skill, experience, training, or education." *Fed. R. Evid. 702*. The question is not whether an expert is "the best qualified expert [p]laintiffs could have called upon" **[\*20]** but rather whether the expert "[meets] *Rule 702*'s basic qualifications requirement." *Burgett v. Troy-Bilt LLC, 579 F. App'x 372, 378 (6th Cir. 2014)*.

To determine whether Story's qualifications meet the requirements of *Rule 702*, the Court first must evaluate "the purpose for which the testimony is offered." *Meemic Ins. Co. v. Hewlett-Packard Co., 717 F. Supp. 2d 752, 762 (E.D. Mich. 2010)*. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994)*. The City offers Story's expert opinion on two issues: (i) whether leaks in the liner were the source of the water behind the liner, and (ii) whether the liner was improperly installed. Accordingly, Story must be qualified to provide expert opinions as to those two issues.

Story is the president and owner of R. Story Development, which installs pool liners and does landscape construction. Story Dep. at 10. Eighty percent of the company's business consists of landscape construction, and 20 percent consists of the installation of pool liners. Id. at 11. Story estimates that his company installs an average of zero to four commercial pool liners per year and the same number of residential liners per year. Id. He has been installing pool liners for about eight to nine **[\*21]** years. Id. at 12. He has a certification through Elbtal USA, a supplier of 60-millimeter pool membranes, which is the same type of liner that RenoSys installs. Id. at 6. The certification involved learning Elbtal's techniques for installing pool liners, doing hands-on work, and passing a test. Id. at 7.

RenoSys notes that, in his deposition, Story stated that he does not consider himself an expert. Mot. at 14 (citing Story Dep. at 8). However, "that self-assessment is, standing alone, insufficient to conclude that [an expert] may not give expert testimony on specific causation." *Thomas v. Novartis Pharm. Corp., 443 F. App'x 58, 62 (6th Cir. 2011)*. RenoSys also seems to challenge Story's qualifications based on the fact that he has a high school degree and that he has never installed a liner in a pool with features such as a vortex and lazy river. Mot. at 14. But "[a]n expert can be qualified even without a relevant diploma." *Buren v.*

*Crawford Cnty., No. 13-cv-14565, 2016 U.S. Dist. LEXIS 131151, 2016 WL 5369597, at *2 (E.D. Mich. Sept. 26, 2016)*. Lack of academic training, a college degree, and previous expert witness experience does not render expert testimony inadmissible. See *Zuzula v. ABB Power T & D Co., Inc., 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003)*. Likewise, an expert "need not have complete knowledge about the field in question." *Mannino v. Int'l Mfg. Co., 650 F.2d 846, 850 (6th Cir. 1981)*. Rather, the expert "need only be able to aid the jury in resolving a relevant issue." Id.

Story's training **[*22]** and experience installing residential and commercial pool liners for eight to nine years qualify him to offer opinions on the source of the water underneath the liner in the City's pool and the installation of the liner. See *Rose v. Truck Ctrs., Inc., 388 F. App'x 528, 534 (6th Cir. 2010)* (finding that proffered expert's "experiences as a mechanic give him specialized knowledge in the areas of truck mechanics and steering gears"); *In re E.I. du Pont de Nemours & Co. C-8 Personal Inj. Litig., 345 F. Supp. 3d 897, 902 (S.D. Ohio 2015)* ("It is well established that experience-based testimony satisfies *Rule 702* admissibility requirements."). This training and experience give him specialized knowledge—meaning knowledge that is "beyond the scope of the ordinary juror," see *Zuzula, 267 F. Supp. 2d at 713*—in the installation of 60-millimeter pool liners and the various features of such liners. This knowledge can assist the trier of fact in understanding the evidence in this case.

The scope of Story's expertise—such as whether he has experience installing liners in pools with specific features found in the City's pool—goes to the weight and credibility of his testimony, rather than its admissibility. See *First Tenn. Bank Nat'l Ass'n v. Barreto, 268 F.3d 319, 333 (6th Cir. 2001)* ("[T]o the extent that [the expert] may have lacked familiarity with some aspects of banking relationships, the district court correctly reasoned that such unfamiliarity merely affected the **[*23]** weight and credibility of his testimony, not its admissibility."); *Dilts v. United Grp. Servs., LLC, 500 F. App'x 440, 446 (6th Cir. 2012)* ("An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact.").

## 2. Reliability

In addition to being qualified, an expert must offer testimony that is reliable. *Fed. R. Evid. 702*; *United States v. Cunningham, 679 F.3d 355 (6th Cir. 2012)*. District courts have "broad latitude" in determining whether a particular expert's testimony is reliable. *United States v. Demjanjuk, 367 F.3d 623, 633 (6th Cir. 2004)*.

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal, 527 F.3d at 529-530*. Courts must assess whether the reasoning or methodology underlying the testimony is "valid" according to the discipline upon which it is based, *Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012)*, and "'whether that reasoning or methodology properly can be applied to the facts in issue,'" *United States v. Langan, 263 F.3d 613, 621 (6th Cir. 2001)* (quoting *Daubert, 509 U.S. at 592-593*)). Thus, reliability focuses on principles and methodology rather than results. *Superior Prod. Partnership v. Gordon Auto Body Parts Co., Ltd., 784 F.3d 311, 323 (6th Cir. 2015)*.

The inquiry of determining whether expert testimony is reliable "is a flexible one." *Daubert, 509 U.S. at 594*. When non-scientific expert testimony is involved, "the relevant reliability concerns may **[*24]** focus upon personal knowledge or experience." *First Tenn. Bank Nat'l Ass'n, 268 F.3d at 335* (punctuation modified).

In contending that Story's testimony is unreliable, RenoSys asserts the following: when Story visited the pool, he conducted a perfunctory investigation without any particular methodology; he examined the pool only when it was drained; he did not take notes during his investigation; he was not able to determine the source of any leaking in the pool; he did not review any pool drawings, the RenoSys contract, or the RenoSys liner specifications, which would have revealed that certain issues he had with the installation were part of the project; and he does not perform pressure testing or leak testing. Mot. at 13-18. RenoSys conducts a granular review of Story's testimony, but the specific statements or inactions that it identifies as flaws go to the weight and credibility of Story's testimony, not its admissibility.

Story inspected various areas of the pool, identified what he believed to be deficiencies in the installation of the liner, and then, based on his knowledge of 60-millimeter pool liners and experience installing them, drew conclusions about how these deficiencies could

have contributed to water getting underneath **[\*25]** the liner. Methodology based on prior experience satisfies _Rule 702_, and Story's testimony "rests upon a reliable foundation, as opposed to, say, unsupported speculation." _In re Scrap Metal, 527 F.3d at 529-530_. With his inspection of the pool, knowledge, and experience, Story's testimony is supported by "good grounds, based on what is known." _Daubert, 509 U.S. at 590_.

RenoSys's assertions that Story did not take notes during his investigation, examined the pool only when it was drained, or did not review pool drawings refer to purported weaknesses in his methodology. "Any weaknesses in his methodology will affect the weight that [an expert's] opinion is given at trial, but not its threshold admissibility." _Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 182 (6th Cir. 2009)_. RenoSys also focuses on the fact that Story does not himself perform pressure tests or leak detection, but Story need not have experience with every aspect of leaks in pool liners for his testimony to be reliable. See _Palatka v. Savage Arms, Inc., 535 F. App'x 448, 453 (6th Cir. 2013)_ (explaining that an expert's lack of testing of a proposed alternative could be highlighted on cross-examination to question the weight that should be given to the opinion but did not render the opinion inadmissible). Moreover, Story acknowledged the importance of conducting a pressure test when he explained alternative sources for **[\*26]** the water underneath the liner.

Because Story is qualified and his testimony is reliable, the Court denies RenoSys's motion to disqualify Story as an expert.

### D. Motion to Strike Expert Report

RenoSys seeks to strike Story's expert report, contending that it does not comply with _Rule 26_. Mot. at 18-21.

Under _Rule 26_, a witness who is retained or specially employed to provide expert testimony in a case must submit a signed written report that contains the following:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;
(ii) the facts or data considered by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

_Fed. R. Civ. P. 26(a)(2)(B)_.

_Rule 26_ requires a report to "be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial." _R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 271 (6th Cir. 2010)_. It must be sufficiently complete "to shorten or decrease **[\*27]** the need for expert depositions and thus to conserve resources." Id. Therefore, expert reports must include "'how' and 'why' the expert reached a particular result," rather than the expert's conclusory opinions. Id. An expert report must "set forth facts and in doing so, outline a line of reasoning arising from a logical foundation." _Brainard v. Am. Skandia Life Assur. Corp., 432 F.3d 655, 664 (6th Cir. 2005)_ (punctuation modified).

If a party fails to provide information as required by _Rule 26(a)_, "the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or harmless." _Fed. R. Civ. P. 37(c)(1)_. To assess whether a party's omitted or late disclosure is "substantially justified" or "harmless," the Sixth Circuit considers five factors: (i) the surprise to the party against whom the evidence would be offered; (ii) the ability of that party to cure the surprise; (iii) the extent to which allowing the evidence would disrupt the trial; (iv) the importance of the evidence; and (v) the nondisclosing party's explanation for its failure to disclose the evidence. _Howe v. City of Akron, 801 F.3d 718, 747-748 (6th Cir. 2015)_. The party in violation of _Rule 26_ bears the burden to prove harmlessness or substantial justification. _Roberts ex rel. Johnson v. Galen of Va., Inc., 325 F.3d 776, 782 (6th Cir. 2003)_ (punctuation modified).

Story's report does not comply with **[\*28]** _Rule 26_. The one-page report contains conclusory statements, such as "[t]he liner should have been terminated above the waterline in the gutter" and "[d]ue to the lack of quality, workmanship and incorrect installation techniques, the possibility for water to continually get behind the liner is very high." Story Report at PageID.217 (Dkt. 35-1). It also offers opinions without explaining their implications, such as the statements that Story "[o]bserved multiple cracks and broken Faceplates & Flanges" and

"[m]ultiple examples of uneven cuts in the liner." Id. The report offers opinions without giving the basis and reasons for them or the facts or data considered in forming them. Moreover, the report does not list exhibits that will be used to support the opinions, Story's qualifications, other matters in which Story has testified, or compensation.

The City, therefore, can use Story's opinions only if the failure to comply with _Rule 26_ is substantially justified or harmless. The Court finds that the report's non-compliance with _Rule 26_ is harmless. While Story's report lacks some information required under _Rule 26_, RenoSys has, by now, had an opportunity to gather the missing information. As the City points out, **[\*29]** RenoSys received the report before conducting Story's deposition, and it questioned Story about the report during the deposition. Story's deposition covered all of the statements contained in his report.

Further, there is little surprise to RenoSys from the report; RenoSys had the ability to cure any surprise; and permitting the report would not disrupt trial. See _Roberts, 325 F.3d at 782_ (finding that the lack of an expert report was harmless because the plaintiff knew the expert's identity and the substance of the expert's testimony and noting that the plaintiff waited five months to voice an objection after not receiving the required disclosures); _Mallco Co. v. Universal Granite & Marble, Inc., No. 16-10010, 2017 U.S. Dist. LEXIS 25952, 2017 WL 733247, at \*4 (E.D. Mich., Feb. 24, 2017)_ (finding that party could not claim it was surprised by proposed expert's testimony when it knew the expert's identity and substance of his testimony months before objecting to a late disclosure). Specifically, several statements in Story's report, such as that the liner was terminated below the water line, that plastic anchors were installed, and that no gaskets were installed on the penetrations, have been apparent to RenoSys from the beginning. RenoSys also received the report before the deadline to file motions for summary judgment and before trial. It knows **[\*30]** Story's identity and the substance of his testimony. And RenoSys waited over a year after receiving the report to object to it.

In addition, Story's testimony is important for the City, given that the City relies on it to rule out alternative explanations for the water underneath the liner and to contend that the liner was improperly installed.

The factors, therefore, weigh in favor of finding the City's non-compliance with _Rule 26_ to be harmless. The Court denies RenoSys's motion to strike Story's report.

## E. Motion for Summary Judgment [4]

RenoSys states that it is entitled to summary judgment as to each of the City's claims. It asserts that all of the City's claims depend on the same factual assertions: (i) that RenoSys installers were either incompetent or installed the liner in an improper manner; (ii) that the liner was defective or of inferior quality; and (iii) that RenoSys did not use proper hardware for the installation. Mot. at 22. It states that there is no genuine dispute as to these facts. Id. at 22-24. The Court addresses each of the City's claims in turn.

## 1. Breach of Contract

The City asserts a breach of contract claim, alleging that RenoSys breached the contract with the City by failing **[\*31]** to complete its work by the scheduled deadline, failing to install the liner in a proper manner, and failing to prepare the pool properly for the liner. Compl. ¶¶ 18-19, 28. It alleges that, as a result of RenoSys's failure to properly install the liner, it sustained damages in the form of water usage associated with refilling the pool after RenoSys's attempted repairs, lost business revenue, loss of use of the leisure pool, and costs associated with removing the liner and remarciting the pool. Id. ¶¶ 22-23, 26, 29.

Under Michigan law, a party asserting a breach of contract must establish by a preponderance of the evidence that (i) there was a contract (ii) that the other party breached, (iii) thereby resulting in damages to the party claiming breach. _Miller-Davis Co. v. Ahrens Const., Inc., 848 N.W.2d 95, 104 (Mich. 2014)_.

RenoSys focuses on the second and third elements. It argues that without Story's testimony and report, there is

---

[4] In assessing whether Defendant is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in _Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)_. The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. _Fed. R. Civ. P. 56(a)_. If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. _Celotex Corp. v. Catrett, 477 U.S. 317, 324-325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)_.

2022 U.S. Dist. LEXIS 93072, *31

nothing to indicate that the liner was improperly installed or defective. Mot. at 23. But even if the Court qualified Story and considered his report, it states, Story indicated that it appeared that RenoSys followed the "PVC Membrane Swimming Pool Lining System Specifications," which sets forth the proper installation procedure. **[*32]** Id. at 22. Kreppel, the lead installer for the project, testified to the same. Id. RenoSys also contends that there is no evidence of a causal nexus between (i) installation and/or the liner and (ii) the City's alleged damages. Id.

There is a genuine factual dispute, which precludes granting summary judgment on the breach of contract claim, as to whether the liner was properly installed and whether the installation resulted in the City's claimed damages. The City offers Story's testimony, which identified what he deemed to be deficiencies in RenoSys's installation that could contribute to water underneath the liner and which the City—in conjunction with other evidence, such as a pressure test performed in the pool—relies on to rule out explanations for the water underneath the liner other than the liner itself. Even without Story's opinions, the City offers sufficient evidence to establish a dispute as to either whether the liner was properly installed or whether the liner itself was defective, thereby resulting in damages. This evidence includes testimony of City employees that indicated that both the City and RenoSys knew there was water underneath the liner, that the liner separated **[*33]** from the bottom of the pool, that a leak-detection test identified leaks, and that RenoSys made several repairs to the liner but that the bubbling persisted. In fact, several factual disputes that bear on the breach of contract claim remain. The parties present evidence establishing a dispute as to the impact of the pool's return lines on the water underneath the liner; the findings and implications of the pressure and leak-detection test; and whether the use of plastic anchors, the lack of gaskets, and the termination of the liner below the water line constituted deficient installation. Therefore, RenoSys is not entitled to summary judgment on the breach of contract claim.

## 2. Breach of Express Warranty

The City alleges that RenoSys breached its express warranties in the following ways: using a liner that was of inferior quality and not fit for installation in the City's pool; hiring or assigning unqualified installers; and failing to use anchors, fasteners, and other materials that were not fit for the uses expressed in the

specifications and contract. Compl. ¶ 37.

Under Michigan law, a seller of goods can create an express warranty in the following ways:

(a) An affirmation of fact or **[*34]** promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model

Mich. Comp. L. § 440.2313(1). "An express warranty may be created only between a seller and a buyer, and any such express warranty becomes a term of the contract itself." _Heritage Res., Inc. v. Caterpillar Fin. Servs. Corp., 284 Mich. App. 617, 774 N.W.2d 332, 341 (Mich. Ct. App. 2009)_. The plaintiff bears "the burden of establishing that defendants breached the written limited warranty, i.e., that during the period of the warranty defendants were notified of a defect that they failed to repair." _Gorman v. Am. Honda Motor Co., Inc., 302 Mich. App. 113, 839 N.W.2d 223, 226 (Mich. Ct. App. 2013)_.

RenoSys contends that nothing in the record supports the assertion that the liner itself was in any way defective. Mot. at 23. It also argues that the testimony of Krepel, whom it states has been installing 60-millimeter PVC liners for decades and has not been sued, establishes that the installers were competent. Id. at 23. **[*35]**

However, neither Krepel's testimony nor his past experience establishes the lack of a genuine dispute of material fact as to whether RenoSys used a defective liner on this specific occasion or did not properly install this specific liner. With the testimony of Story and other City employees, the leak detection and pressure test reports, and the sequence of events in which RenoSys made several repairs to the liner but that the bubbling persisted, there is sufficient evidence to establish a material factual dispute as to whether RenoSys breached its express warranty by failing to install a watertight liner. Therefore, RenoSys is not entitled to summary judgment on the breach of express warranty claim.

### 3. Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness

The City alleges that RenoSys breached its implied warranty of merchantability and fitness because the liner was of such poor quality that it was not reasonably fit for its intended purpose in the pool and because it used anchors, fasteners, and materials that were improper and not reasonably fit for use in the pool. Id. ¶¶ 41-43, 50.

Generally, "a warranty that the goods shall be merchantable is implied **[*36]** in a contract for their sale if the seller is a merchant with respect to goods of that kind." Mich. Comp. L. § 440.2314(1). Thus, "[e]very contract for the sale of goods carries an implied warranty of merchantability unless such warranty is excluded or modified." *Davis v. LaFontaine Motors, Inc., 271 Mich. App. 68, 719 N.W.2d 890, 895 (Mich. Ct. App. 2006)*. Michigan courts have explained that the implied warranty of merchantability "requires that the goods sold be of average quality within the industry." *Guaranteed Constr. Co. v. Gold Bond Prods., 153 Mich. App. 385, 395 N.W.2d 332, 335 (Mich. Ct. App. 1986)*. "Merchantable is not a synonym for perfect." *Id. at 332*. Under implied warranty theory, a defect is established by proof that a product is not reasonably fit for its intended, anticipated, or reasonably foreseeable use. *Elsasser v. Am. Motors Corp., 81 Mich. App. 379, 265 N.W.2d 339 (Mich. Ct. App. 1978)*.

While the warranty of merchantability requires that the goods sold be of average quality within the industry, the warranty of fitness for a particular purpose requires that the goods sold be fit for the purpose for which they are intended. *Guaranteed Constr. Co., 395 N.W.2d at 335*. To take advantage of this type of warranty, the seller must know at the time of sale the particular purpose for which the goods are required and that the buyer is relying on the seller to select or furnish suitable goods. Id.

RenoSys again argues that there is nothing in the record to indicate that the liner or the materials used were not reasonably fit or **[*37]** to connect the liner or the materials to the City's alleged damages. Id. at 24. As noted, however, there is sufficient evidence to establish that material factual disputes exist regarding whether the liner was either defective or improperly installed and, therefore, not of average quality and not fit for use in the City's pool. Therefore, RenoSys is not entitled to summary judgment on the breach of implied warranty of

merchantability claim or the breach of implied warranty of fitness claim.

### 4. Performance Bond

The contract between the City and RenoSys required RenoSys to obtain a performance bond as security for its "faithful performance" of the contract, and Merchants issued a performance bond. Aquatic Renovation Systems Contract at GC-10; Performance Bond (Dkt. 44-2). The City alleges that the materials and workmanship that RenoSys provided were of such poor quality and so deficient as to constitute a failure to perform. Compl. ¶ 56. It alleges that, pursuant to the performance bond, Merchants is obligated to compensate the City for the damages it sustained as a result of RenoSys's failure to faithfully perform. Id. ¶ 61.

Michigan courts have explained that "[a] suretyship contract **[*38]** requires three parties; a principal, an obligee, and a surety." *Will H. Hall & Son, Inc v. Ace Masonry Constr, Inc., 677 NW2d 51, 55 (Mich. Ct. App. 2003)*. "A surety is one who undertakes to pay money or take any other action if the principal fails therein." Id. The liability of a surety is limited by "the scope of the liability of its principal and the precise terms of the surety agreement." Id. The liability of the surety is also coextensive with the liability of the principal in the bond. *City of Ferndale v. Florence Cement Co., 269 Mich. App. 452, 712 NW2d 522, 528 (Mich. Ct. App. 2006)*.

Merchants offers two primary arguments related to the performance bond. First, the City never provided Merchants an opportunity to perform on the bond. Merchants' Concurrence and Supp. Reply at 1-2. Second, when the City terminated the contract with RenoSys and entered into a separate contract with another entity to remarcite the pool, the City changed Merchants' obligations under the bond, and the obligations were thereby discharged. Id. at 4.

Neither assertion indicates that Merchants is entitled to summary judgment on the performance bond claim. There is a genuine factual dispute as to what type of notice the City provided Merchants regarding issues with the liner and with RenoSys's performance. While Merchants states that the City did not provide Merchants an opportunity to complete **[*39]** performance, see Merchants' Concurrence and Supp. Reply at 1-2, the City states that, through multiple communications, it kept Merchants informed of issues with RenoSys's performance but that Merchants failed

2022 U.S. Dist. LEXIS 93072, *39

to act, see Resp. to Merchants' Concurrence and Supp. Reply at 2-6.

In addition, the evidence does not indicate that Merchants' obligations under the bond were discharged. Merchants relies on *§ 41(b)(i)* of the Restatement (Third) of Suretyship and Guaranty in asserting that the City formed a substituted contract when it entered into a separate contract with another entity to remarcite the pool and, therefore, "fundamentally changed" and released Merchants from its obligations.[5] Merchants' Concurrence and Supp. Reply at 4. But this provision applies when "the principal obligor and the obligee agree to a modification . . . of the principal obligor's duties pursuant to the underlying obligation." *Restatement (Third) of Suretyship and Guaranty § 41(b)(i)*. The evidence does not suggest that the City and RenoSys agreed to a modification of the contract.

Merchants is not entitled to summary judgment on the performance bond claim.

## III. CONCLUSION

For the reasons stated above, the Court grants the City's motion for leave to file a response to Merchants' concurrence with RenoSys's reply and supplemental reply (Dkt. 45). It denies the City's motion for leave to file a response to RenoSys's reply (Dkt. 46). It denies RenoSys's motion to dismiss as a sanction for spoliation, motion to disqualify the City's expert, motion to strike the expert's report, and motion for summary judgment (Dkt. 35).

SO ORDERED.

Dated: May 24, 2022

Detroit, Michigan

/s/ Mark A. Goldsmith

MARK A. GOLDSMITH

United States District Judge

---

**End of Document**

---

[5] This provision of the Restatement states the following:

If the principal obligor and the obligee agree to a modification, other than an extension of time or a complete or partial release, of the principal obligor's duties pursuant to the underlying obligation: **[*40]** . . .

(b) the secondary obligor is discharged from any unperformed duties pursuant to the secondary obligation:

(i) if the modification creates a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification[.]

*Restatement (Third) of Suretyship and Guaranty § 41(b)(i)*.

James Bobcik