**ASSET PURCHASE AGREEMENT**

by and among

IRON RIVER LAND COMPANY, LLC,
a Michigan limited liability company

"Seller"

and

THE CASCADES OF IRON RIVER HOLDINGS, LLC,
an Illinois limited liability company

"Purchaser"

Dated as of: December _31_, 2018

## TABLE OF CONTENTS

**SECTION**                                                     **PAGE**

1. SALE AND PURCHASE OF PURCHASED ASSETS ..................................................... 1
2. LIABILITIES OF SELLER ................................................................................. 2
3. PURCHASE PRICE; ESCROW ........................................................................ 2
4. TIME AND PLACING OF CLOSING ................................................................. 4
5. DUE DILIGENCE; TITLE AND SURVEY; AND LICENSURE. ................................ 4
6. CONDITIONS TO CLOSING ........................................................................... 7
7. APPORTIONMENTS. ................................................................................... 13
8. INTERIM OPERATIONS ............................................................................... 14
9. SELLER'S REPRESENTATIONS AND WARRANTIES ........................................ 14
10. PURCHASER'S REPRESENTATIONS AND WARRANTIES ................................... 19
11. RISK OF LOSS. .......................................................................................... 19
12. INDEMNIFICATION. ................................................................................... 20
13. REMEDIES ................................................................................................ 22
14. NOTICES .................................................................................................. 23
15. CLOSING COSTS ....................................................................................... 24
16. CHOICE OF LAW ....................................................................................... 24
17. MISCELLANEOUS. ..................................................................................... 24

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement"), is made as of the **3[** day of December, 2018 (the "Effective Date"), by and among IRON RIVER LAND COMPANY, LLC, a Michigan limited liability company ("Seller") and THE CASCADES OF IRON RIVER HOLDINGS, LLC, an Illinois limited liability company ("Purchaser").

WHEREAS, Seller is currently the fee owner of the Property (as defined herein), and IRON RIVER CARE SERVICES, INC., a Michigan corporation (the "Operator") is the licensed operator of the Facility (as defined herein) thereon;

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Purchased Assets (as defined herein) and other assets subject to the terms and conditions of this Agreement;

WHEREAS, Purchaser shall enter a lease with Operator, pursuant to which Purchaser shall lease the Facility to Operator, and Operator shall be the operator of the Facility;

WHEREAS, in connection with the foregoing, Benjamin T. Friedman ("Stock Purchaser") shall simultaneously with this agreement enter into that certain Stock Purchase Agreement with Robert W. Possanza Jr., of even date herewith (the "SPA"), which shall provide for acquisition of the Operator;

NOW THEREFORE, in consideration of the mutual covenants and provisions herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.     **Sale and Purchase of Purchased Assets**.     Subject to the provisions set forth herein, Seller hereby agrees to sell, convey, assign, deliver and transfer, free and clear of all claims, liens, deeds of trust, mortgages, easements, restrictions, encumbrances or security interests of any nature whatsoever except for Permitted Exceptions (as herein defined), and Purchaser hereby agrees to purchase, acquire, accept and assume, upon the terms and conditions hereinafter set forth, all of the following assets (collectively, the "Purchased Assets"): (i) the property consisting of those certain plots, pieces or parcels of land located in the city of Iron River, in the State of Michigan, as more particularly described in **Exhibit A** hereto (the "Land"), (ii) all buildings and all other structures, facilities or improvements presently or hereafter located in or on the Land (the "Improvements", and together with the Land, the "Property"), including without limitation, that certain 69 bed skilled nursing facility commonly known as Iron River Care Center, located at 330 Lincoln Avenue, Iron River, Michigan 49935 (the "Facility"), and all other items of furniture, fixtures, equipment and any other personal property attached or appurtenant to, located on or used in connection with the ownership, use, operation or maintenance of the Land, the Improvements and/or the Facility (collectively, the "Personal Property"), (iii) all right, title and interest, if any, of Seller in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof, (iv) all right,

title and interest, if any, of Seller to any unpaid award for (1) any taking by condemnation or (2) any damage to the Land or the Improvements by reason of a change of grade of any street or highway, (v) all easements, licenses, rights and appurtenances relating to any of the foregoing, (vi) all Intangible Property (hereinafter defined) of Seller; (vii) the Warranties (as defined herein), (viii) the Permits (as defined herein), (ix) all of the goodwill symbolized and associated with the Facility, (x) any bed rights and other assets located at or used in connection with the Facility, and (xi) any other assets of Seller, other than those items listed on **Schedule 1**, attached hereto, which shall be specifically excluded from the Purchased Assets (the "Excluded Assets").

"Intangible Property" means all of Seller's right, title and interest in any and all intangible property now or on the Closing Date owned by Seller and used exclusively in connection with the Property, including (i) all rights under Warranties (including those relating to construction or fabrication) (ii) any special use permits from the city in which the Facility is located, if and as assignable, (iii) certificates of need and/or associated bed operating rights associated with the Facility, if and as assignable, (iv) the goodwill associated with the business and the reputation of the Facility; and (v) all site plans, surveys, plans and specifications, construction bids and floor plans in the possession of Seller and which relate to the Real Property.

Notwithstanding anything in this Agreement or the SPA to the contrary, the parties agree that excluded from the Personal Property assets for sale, under both the APA and SPA, are all insurance refunds and dividends and refundable self-insurance reserves accrued up to the date of Closing, all of which shall remain the property of the Seller following Closing.

2.    **Liabilities of Seller**.  Purchaser shall not assume and shall not be liable for, any debts, liabilities or obligations of Seller of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event, including, but not limited to: (i) any liabilities or obligations of Seller to any of their creditors, shareholders or owners, (ii) any liabilities or obligations of Seller with respect to any acts, events or transactions occurring prior to, on or after the Closing Date, or (iii) any liabilities or obligations of Seller for any federal, state, county or local taxes applicable to or assessed against Seller or the assets or business of Seller.  Unless specifically and unambiguously set forth herein to the contrary, Purchaser is not the successor to liability of Seller and is not herein assuming any liability arising from, out of, or relating to, Seller' ownership or operation of the Purchased Assets.  Purchaser does not assume any payable of Seller, governmental claim or charge, malpractice, professional liability, resident rights violations, or violations of employee rights or contracts, whether such claims arise in law, equity, in tort, contract, from statute, common law, or from any other source or precedent.

3.    **Purchase Price; Escrow**.

(a)    Purchase Price.  The purchase price ("Purchase Price") for the Purchased Assets shall be an amount equal to Three Million Two Hundred Fifty Thousand Dollars ($3,250,000), subject to prorations as set forth herein.  The parties shall use best efforts to agree upon a joint allocation of the Purchase Price, as set forth in **Exhibit B** attached

hereto.  Each party agrees (i) to complete jointly and file separately Form 8594 with its federal income tax return consistent with such allocation for the tax year in which the Closing occurs, and (b) that no party shall take a position on any income, transfer, gains or other tax return, or before any federal, state or local governmental or quasi-governmental authority or in any judicial proceeding that is in any manner inconsistent with the terms of such agreed upon allocation.  In addition, Purchaser may elect to allocate some or all of the purchase price under the SPA to be added to the Purchase Price hereunder.

(b)    Payment of Purchase Price.    Subject to prorations set forth hereunder, the Purchase Price shall be paid as follows:

(i)    The Promissory Note of an entity designated by Purchaser in the principal amount of Six Hundred Fifty Thousand Hundred Thousand Dollars ($650,000.00) in the form attached as Exhibit B-1 hereto (the "Note") to be held by the Seller.  The Note shall have a term of five (5) years, with payment deferred during the first year of the Note, without interest, which thereafter shall provide for forty-eight consecutive monthly payments commencing one year after the effective date of the Note, consisting of principal and interest, subject to such subordination terms and requirements as may be imposed by Purchaser's lender with respect to acquisition of the Facility;

(ii)    At Closing the Seller will issue a credit to Purchaser in an amount equal thereto certain fees, charges and expenses as agreed upon by the parties, including, but not limited to: (1) Loan processing fees, such as the cost of flood certification, wire transfer fees, overnight delivery charges, any cost of consumer credit reports, UCC filing fees, IRS tax verification fee, any cost of commercial credit reports, NRTT Property, Tax Tracking Fee, cost of a commercial appraisal report, fees for environmental reports; (2) Prorations/adjustments, such as city/town taxes, county taxes, PTO, QAS (Bed Taxes) or any other prorations or adjustments set forth herein; (3) Title, escrow or survey fees or costs, such as, settlement or closing fees, loan policy premiums, ATLA fees, escrow charges, survey fees, wire transfer fees; (4) Recording charges, such as recording fees or an assignment of rent: (5) Miscellaneous charges, such as, consulting fees to Anvil Assets, LLC for services provided in identifying, analyzing and preparing Iron River Care Services, Inc. and Iron River Land Company, LLC for appraisal and underwriting, and preparing for operations transfer, Purchaser legal fees and disbursements, licensing legal fees and disbursements, any indemnification guaranties, replacements reserve guaranties-building, replacement reserve guaranties-FF&E, outstanding accounts payable and discount on pending, past due or delinquent accounts receivable, and (6) any other form of credit or discount that be can be included in the foregoing as agreed upon by the parties.

(iii)    The balance, in cash, wire transfer or immediately available funds.

3

(c)      Closing Escrow.  Prior to the Closing Date, Purchaser and Seller shall provide to the Title Company (as defined herein) joint escrow instructions to open an escrow for the consummation of the sale of the Purchased Assets to Purchaser pursuant to the terms of this Agreement in accordance with the general provisions of the usual form of joint escrow instructions used in similar transactions by such holder with special provisions inserted to conform with this Agreement, as shall be mutually acceptable to the parties hereto.  Provided that all conditions to Closing set forth in this Agreement have been satisfied or, as to any condition not satisfied, waived by the party intended to be benefited thereby, on the Closing Date, the Title Company shall conduct the Closing by recording or distributing the following documents and funds in the following manner:

(i)      Record the Deed (as hereinafter defined) in the official records of the county in which the Land is located;

(ii)      Deliver to Purchaser all documents that are required to be delivered by Seller to Purchaser pursuant to Section 6(a) hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing) and such funds, as may be due to Purchaser by reason of credits under this Agreement, less all items chargeable to Purchaser under this Agreement; and

(iii)      Deliver to Seller ($x$) all documents that are required to be delivered by Purchaser to Seller pursuant to Section 6(b) hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing), and ($y$) the Purchase Price and such other funds, if any, as may be due to Seller by reason of credits under this Agreement, less all items chargeable to Seller under this Agreement.

4.      **Time and Placing of Closing**.  The closing of the transactions contemplated hereby (the "Closing") shall take place, subject to satisfaction of closing conditions set forth in Section 6 hereof, on December 28, 2018, or such other time as mutually agreed upon between the parties.  The effectiveness of the Closing shall deemed to have occurred as 12:00 a.m. (beginning of the day) on January 1, 2019.  If such closing conditions are satisfied later than the twentieth (20th) day of a calendar month, Purchaser may elect to postpone the Closing until the last day of the first calendar month following satisfaction of such closing conditions.

5.      **Due Diligence; Title and Survey; and Licensure**.

(a)      Due Diligence Period.  Purchaser shall have the right, at reasonable times and on reasonable prior notice to Seller to enter upon the Property to conduct such inspections, investigations, tests and studies as Purchaser shall deem necessary, including, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and feasibility studies.  To the extent Purchaser hires any third party site inspectors, engineers or other parties that will invasively inspect and/or test the Property, Purchaser will first ensure that such third party(ies) have adequate insurance covering any potential damage

4

done to the Property as a result of such inspection/testing.  Purchaser shall also have the right to tour the Facility, to review the books and records related to the financial condition and the operations thereof and to observe the day-to-day operations and management thereof.  This Agreement shall be subject to the condition that Purchaser shall determine during the period ending one hundred and ten business days from July 17, 2018, which is December 21, 2018 (the "Due Diligence Period"), that Purchaser is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and operations of the Facility and the transactions contemplated herein.  If Purchaser shall not be so satisfied and Purchaser notifies Seller thereof in writing on or prior to the end of the Due Diligence Period, this contract shall be null and void and the Deposit plus any accrued interest thereon shall be returned to the Purchaser.  If Purchaser fails to give such notice to Seller, it shall be conclusively presumed that Purchaser is satisfied with its due diligence review, and this Agreement shall continue in full force and effect.

(b)     Title and Survey.

(i)     Purchaser shall order from Superior Title (the "Title Company") a commitment (the "Title Commitment") for an owner's policy of title insurance as to the Property, insuring or committing to insure, at its ordinary premium rates, Purchaser's good and marketable title in fee simple to the Property and showing all liens, claims, encumbrances, easements, rights of way, encroachments, reservations, restrictions, and any other matters of record affecting the Property. Seller will additionally deliver or cause the Title Company to deliver to Purchaser (i) a true, complete, and legible copy of all documents referred to in the Title Commitment, including, but not limited to, deeds, lien instruments, plats, reservations, restrictions and easements ("Title Documents"); and (ii) the results of UCC financing statement searches of the records of the counties where the Property is located, and the applicable State's Secretary of State (the "UCC Searches").  The Title Policy shall include extended coverage over General Exceptions 1 through 5 inclusive as well as additional endorsements including: contiguity (if there is more than one parcel), access, ALTA 18 series tax parcel (as applicable), ALTA 8.2-06 commercial environmental protection lien, survey, no violation of covenants or restrictions of record, ALTA 3.1-06 zoning completed structure (with parking), any endorsements required by Purchaser's lender, and such other endorsements as Purchaser may reasonably require (the "Title Endorsements").  Seller shall pay the cost of the Title Commitment and the owner's title insurance policy (the "Title Policy") and Purchaser shall pay the cost of Lender's title insurance policy and any endorsements besides extended coverage over general exceptions 1-5; and

(ii)     Purchaser shall order a current ALTA Survey for the Real Property (the "Survey") dated on or after the Effective Date, from a registered land surveyor acceptable to Purchaser in accordance with the 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Surveys and Table A items 1, 2, 3,

5

4, 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 10(a) and (b) (if applicable), 11(a), 13, 14, 16, 17, 18, 19, 20(a) and 21 in form fully sufficient to cause the Title Company: (i) to delete the standard printed survey exceptions on the Title Commitment; (ii) to issue the Title Policy free from any survey related objections or exceptions that may interfere with the ability to operate the Facility as a skilled nursing facility with 69 beds (the "Licensed Beds"), in the sole discretion of Purchaser; and (iii) to issue ALTA 3.1-06 zoning endorsements with parking. The Survey will be prepared and certified in accordance with generally accepted professional standards, acceptable to the Title Company. For purposes of the property description to be included in the Deeds to be delivered to Purchaser, any field notes prepared by the surveyor will control any conflicts or inconsistencies with the descriptions contained in this Agreement, and such field notes will be incorporated into this Agreement upon their completion and approval by Seller, Purchaser and Title Company. Following such approval of the legal descriptions for the Land, such legal descriptions will be added to Exhibit "A" by the parties. The cost of the Survey shall be paid by Seller, and the Survey shall bear a proper certificate by the surveyor, which certificate shall recite compliance with the laws and standards enumerated above, shall include the legal description of the Property and shall run in favor of Purchaser and the Title Insurance Company.

(c)     Title Defects.  Within fifteen (15) business days following Purchaser's receipt of both the Title Commitment and Survey, Purchaser shall notify Seller of any matters shown on the Title Commitment or the Survey that are not acceptable to Purchaser (such exceptions referred to herein as the "Title Defects"). If any updates to the Title Commitment or Survey shall disclose any additional matters, Purchaser shall have five (5) business days from the receipt of such updates within which to notify Seller thereof, in which case any such matters for which Purchaser provides notice shall also be treated as "Title Defects" hereunder. In the event that any Title Defects have not been cured by the Seller on or before the date that is fifteen (15) business days prior to the Closing, Seller may elect in its sole discretion, by written notice to Purchaser, to either (i) undertake at its expense to cure such Title Defects prior to the Closing (the "Seller's Election"), or (ii) not cure such Title Defects. In the event that Seller does not elect to cure such Title Defects pursuant to the immediately preceding sentence, Purchaser may, by notice to Seller on or prior to Closing (x) terminate this Agreement, in which event the Deposit plus all accrued interest shall be returned to Purchaser and all parties shall be relieved of any further obligations or liabilities hereunder, or (y) indicate to Seller that, notwithstanding the Title Defects described in this Section 5(c), Purchaser shall not terminate this Agreement as a result of such Title Defects (such Title Defects, as well as any matters shown in the Title Commitment or Survey to which Purchaser does not object as permitted herein, being thereafter deemed as "Permitted Exceptions" hereunder); provided, however, that Purchaser's failure to notify Seller of its intentions pursuant to this sentence shall be deemed Purchaser's intention to proceed hereunder. Notwithstanding the foregoing, Purchaser shall not be required to object to, and Seller shall be required to pay off at the Closing, any financing obtained or assumed by Seller

6

and secured by a mortgage covering the Property and to either pay off or cause the Title Company to insure or endorse over any mechanic's or materialmen's liens for work or materials undertaken or acquired by or on behalf of Seller, any tax or judgment lien against Seller, and any other exceptions or encumbrances to title that may be cleared through the payment of money (provided, however, Seller shall be entitled to utilize the Purchase Price proceeds to effectuate any or all of the foregoing).

(d)    Approvals. Purchaser shall take, all steps which may be taken prior to the Closing in order to obtain on or after the Closing all governmental, quasi-governmental and other regulatory approvals that are required as a result of the transactions contemplated in this Agreement and the SPA, including without limitation: (i) any applicable submission to the Michigan Department of Licensing and Regulatory Affairs ("LARA") with respect to the SPA, and (ii) any applicable notifications to the Medicare and Medicaid reimbursement programs.  Seller agrees to, and agrees to cause Operator to, use its best efforts and cooperate with Purchaser in obtaining such Licensure and certifications.

6.    **Conditions to Closing**.

(a)    Purchaser's Conditions.   Purchaser's obligation to consummate the transactions contemplated in this Agreement, pay the Purchase Price and accept title to the Purchased Assets shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Purchaser or the waiver thereof by Purchaser, which waiver shall be binding upon Purchaser only to the extent made in writing and dated on or prior to the Closing Date.

(i)    Seller shall have performed and complied with all covenants and conditions required by this Agreement to be performed or complied with by Seller.

(ii)    Possession of the Property shall be delivered to Purchaser free and clear of all tenancies and other occupancies and the Purchased Assets shall be delivered to Purchaser free and clear of any liens and encumbrances except for any Permitted Exceptions, any occupancy rights of any residents of the Facility. Seller will provide any necessary lease termination agreement for any existing lease by and between Seller and Operator.

(iii)    Seller shall have furnished to Purchaser written results of searches (the "UCC Searches"), effective as of a date after the date of this Agreement, conducted by a company reasonably acceptable to Purchaser, of the records of the County Recorder in which the Facility is located and Michigan Secretary of State, disclosing no Uniform Commercial Code Financing Statements, tax liens or judgments in the name of Seller, the Property and/or any other name or location reasonably requested by Purchaser that will not be released by Closing.

7

(iv)     Seller shall deliver to Purchaser or, if applicable, to the Title Company to be held in escrow in accordance with the terms of this Agreement, on or before the Closing Date the following, each of which shall be in form and substance satisfactory to Purchaser:

(1)     A Special Warranty Deed, in substantially the form annexed hereto as **Exhibit C** (the "Deed") and in proper statutory form for recording, duly executed and acknowledged by Seller, sufficient to convey to Purchaser fee simple title to the Property free of all liens and encumbrances other than the Permitted Exceptions;

(2)     A bill of sale, in substantially the form annexed hereto as **Exhibit D** (the "Bill of Sale"), containing covenants of title, duly executed and acknowledged by Seller, sufficient to convey to Purchaser good and indefeasible title, free of all liens, encumbrances and security interests, in and to the Personal Property;

(3)     An affidavit of title and such other affidavits as may be required by the Title Company in connection with the conveyance of the Property;

(4)     An assignment by Seller, in substantially the form annexed hereto as **Exhibit E** (collectively, the "General Assignment"), of all of Seller's right, title and interest in, to intangible assets transferred hereunder;

(5)     All licenses, permits, and certificates of occupancy, if any, issued by any federal, state, municipal or local governmental authority relating to the use, maintenance, occupancy or operation of the Facility running to, or in favor of, Seller, to the extent legally assignable (including all modifications thereto or renewals thereof) (collectively, the "Permits"), except to the extent the same are required to be and are affixed at the Property, and of variances issued by any municipal, state or federal agency or authority relating to the ownership, use, occupancy, operation or maintenance of the Property;

(6)     Counterpart copies of all guaranties or warranties then in effect, if any, with respect to the Improvements and the Personal Property (the "Warranties");

(7)     A complete set of keys for the Improvements, appropriately tagged for identification;

(8)     The Foreign Investment in Real Property Tax Act affidavit in substantially the form annexed hereto as **Exhibit F**;

8

(9)     A form 1099 identifying Seller's gross proceeds and Seller's tax identification number, as required by the Title Company;

(10)     The duly executed certificate of an authorized officer of Seller or its managing constituent, dated as of the Closing Date, to the effect that (A)  Seller is validly existing under the laws of the State of Michigan, (B)  Seller has all requisite power and authority to perform the terms of this Agreement, (C) this Agreement and all documents to be executed and delivered pursuant hereto (the "Other Documents") have been duly authorized, executed and delivered by Seller pursuant to all necessary resolutions or consents of the appropriate governing body of Seller, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents on behalf of Seller, (E) the executing persons are fully authorized to act on behalf of Seller or its constituent partners or members, as applicable and (F) as of the Closing Date, the representations and warranties of Seller set forth in this Agreement are true and complete and Seller is otherwise in full compliance with the terms and conditions of this Agreement;

(11)     Payoff letters and UCC terminations from the holders or claimants of, or with respect to, any encumbrance or monetary lien affecting the Property, other than Permitted Exceptions, stating the cash amount required to be paid and where and to whom such amount is to be paid (by bank wire instruction) in order to satisfy and discharge of record such encumbrances; and,

(12)     Such other customary closing documents required in the State of Michigan, in the cities and counties where the Facility is located

(v)     Purchaser shall receive from the Title Company the most recent form of ALTA  owner's policy of title insurance, in an amount equal to the Purchase Price, dated, or updated to, the Closing Date, insuring, or committing to insure Purchaser's good and marketable title in fee simple to the Property subject only to the Permitted Exceptions and shall include extended coverage over General Exceptions 1 through 5 inclusive and contain the Title Endorsements.

(vi)     Purchaser shall have received the Survey as required under Section 5(b)(ii).

(vii)     Stock Purchaser and Robert W. Possanza Jr. shall have entered into the SPA, and the closing thereunder shall be prepared to occur concurrently with the Closing.

(viii)     Operator shall have received adequate assurance of obtaining all applicable governmental and quasi-governmental licenses and approvals to be

effective as of the Closing Date, with respect to the transactions contemplated under the SPA (the "SPA Approval");

(ix)    On the Closing Date there shall not be any lawsuits filed or threatened against Seller that are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Seller, to restrain or prohibit the consummation of the transactions contemplated hereby, or which could materially and adversely affect Operator's ability to operate the Facility with 69 beds. There are no orders which are entered after execution of this Agreement and prior to Closing and which shall result in the immediate forced closing of the Facility prior to the Closing Date.

(x)    As of the Closing Date, there shall have been no material and adverse change from the date hereof in the condition of any of the Purchased Assets, or any portion thereof, or in the Facility's operations, Applicable Laws (as defined herein), Permitted Exceptions, contractual relations, regulatory status, or any other circumstances affecting the Purchased Assets previously approved by Purchaser, including without limitation, the operations and/or the status of the Facility as a licensed 69 bed skilled nursing facility.

(xi)    Purchaser shall have approved of any updates to the Schedules and/or Exhibits, pursuant to Section 17(e).

(xii)    There shall not have been disclosed any adverse environmental conditions, on Phase I studies ordered by Purchaser and/or its lender.

(xiii)    There shall be an average of at least fifty-five (55) residents, with recognized payor sources, at the Facility over the period of thirty (30) days prior to the Closing. In the event there are less than an average of 55 residents, with recognized payor sources, at the Facility (the "Census Threshold") during the thirty day period ending on the Closing Date, Purchaser shall have the option, as set forth in a written notice to Seller, to either: (1) proceed with Closing (provided all other conditions precedent are then met); (2) terminate this Agreement; (3) receive a credit of Twenty-five Thousand Dollars ($25,000.00) for each resident below the Census Threshold on the Closing Date, or (4) to extend the Closing Date until the first day of the month at least thirty (30) days after the date the Census Threshold is satisfied, so long as the Census Threshold is also satisfied on the seventh (7th) day prior to the extended Closing Date and the extended Closing Date occurs no later than ninety (90) days after the Closing Date (the "Minimum Census Condition"). Notwithstanding anything to the contrary herein, in the event the Closing has not occurred by ninety (90) days after the Closing Date of this Agreement due to the Minimum Census Condition not being satisfied on the applicable dates of measurement, then this Agreement shall be deemed terminated

without a Seller right to cure.

(xiv)   All transactional documents in any way related to the transfer of the Property to Purchaser shall be mutually satisfactory to each of the parties hereto and shall be fully executed.

(xv)   Seller shall not be in default under any mortgage, contract, lease or other agreement affecting or relating to the Purchased Assets.

(xvi)   Purchaser shall have received from Seller a letter or letters from the Michigan Department of Revenue certifying that Seller has no tax due to the State of Michigan (the "Tax Clearance Letter").

(xvii)   Purchaser shall receive a zoning compliance letter reflecting full compliance with respect to the Property and permitting the continued operation of the Facility as a skilled nursing facility that includes the Licensed Beds by Purchaser or Operator.  There shall not be any change in the use of the Facility since the issuance of the zoning compliance letter made available to Purchaser.

(xviii)  All Personal Property shall be located at the Facility on the Closing Date.  Unless specifically permitted pursuant to the terms of this Agreement, Seller shall not have removed any supplies or items of Personal Property from the Facility.

(xix)   There has been no change in the ownership or control of the Property between the Effective Date and the Closing Date.

(xx)   There shall be no outstanding zoning, building or other life safety code violations that shall not have been corrected as of three (3) business days prior to the Closing Date.

(xxi)   Purchaser has determined during the Due Diligence Period that it is satisfied in every respect with the Purchased Assets and all improvements thereon, as well as the financial condition and operations of the Facility and the transactions contemplated herein, as set forth Section 5(a).

(xxii)  On or before the Closing Date Purchaser shall have obtained financing acceptable to the Purchase for the purchase of the assets as set forth herein.

(xxiii)  The representations and warranties of Seller contained in this Agreement shall be true and complete as of the Closing Date and Seller shall be in full compliance with the terms and provisions of this Agreement, in each case subject only to exceptions permitted by this Agreement.

11

(b)     Seller's Conditions.  Seller's obligation to consummate the transactions contemplated in this Agreement and deliver title to the Property shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Seller or the waiver thereof by Seller, which waiver shall be binding upon Seller only to the extent made in writing and dated as of the Closing Date.

(i)     Purchaser shall deliver the balance of the Purchase Price due hereunder, subject to prorations as provided herein.

(ii)     Purchaser shall deliver the following:

(1)     the duly executed certificate of an authorized representative of Purchaser or its managing constituent, dated as of the Closing Date, to the effect that (A)  Purchaser has been duly organized and is validly existing in good standing under the laws of the State of Michigan, and is authorized to do business in the state in which the Property is located, (B) Purchaser has all requisite power and authority to perform the terms of this Agreement, (C) this Agreement and all documents (collectively, the "Other Documents") have been duly authorized, executed and delivered by Purchaser pursuant to all necessary resolutions or consents of the appropriate governing body of Purchaser, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents on behalf of Purchaser, (E) the executing persons are fully authorized to act on behalf of Purchaser or its constituent partners or members, as applicable and (F) as of the Closing Date, the representations and warranties of Purchaser set forth in this Agreement are true and complete and Purchaser is otherwise in full compliance with the terms and conditions of this Agreement; and

(2)     counterparts of the Other Documents as applicable, duly executed and acknowledged by Purchaser, as and to the extent herein provided.

(iii)     The representations and warranties of Purchaser contained in this Agreement shall be true and complete as of the Closing Date and Purchaser shall be in full compliance with the terms and provisions of this Agreement, in each case subject only to exceptions permitted by this Agreement.

(iv)     Stock Purchaser and Robert W. Possanza Jr. shall have entered into and consummated the transactions contemplated under the SPA.

(c)     Waiver.  In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a

waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

7.   **Apportionments**.

(a)   Closing Prorations.   The following items shall be apportioned at the Closing between periods prior to Closing and periods following Closing, as of the Closing Date, and, if not subject to the terms of Section 3(b)(ii) above, the Purchase Price may be increased in the amount of any such items that relate to periods following the Closing, and decreased in the amount of any such items that related to periods prior to the Closing.

(i)   Real estate taxes, assessments (other than special assessments), personal property taxes, and water, vault and sewer charges, as well as any other governmental charges or taxes assessed on the Property or the other Purchased Assets, based on the rates and assessed valuation applicable in the fiscal year for which assessed; provided that if the Closing shall occur before the real estate tax rate or personal property tax rate is fixed, the apportionment of said taxes shall be based one hundred and fifteen percent (115%) of the most recently ascertainable real estate tax fiscal year and shall be re-prorated following receipt of the actual bill with respect to the applicable period.   Allocation of real estate taxes billed with respect to the Property to yearly periods shall be determined in accordance with local custom, as determined by the Title Company.   If, at the Closing, the Property or any part thereof is affected by an assessment which, at the option of Seller, is payable in installments and the first installment is then a charge or lien, or has been paid, then all unpaid installments of such assessments, including those which are to become due and payable after Closing, shall be deemed to be due and payable and to be a lien upon the Property and shall be paid and discharged by Seller at Closing, or, alternatively, a credit to the Purchase Price shall be given to Purchaser of an amount equal to such unpaid installments.

(ii)   All charges and payments for utility services; provided that if there is no meter or if the current bill for any of such utilities has not been issued prior to the Closing Date, then such charges shall be adjusted at the Closing on the basis of the charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued; provided further, to the extent possible, Seller shall terminate its accounts with the utility service providers and Purchaser shall establish its accounts with such utility service providers effective on the Closing Date, in which event, there shall be no proration for such utility services.

(b)   Target Amount. At the Closing, the parties shall calculate the amount of the Receivables Base and the Designated Payables as of the Closing Date, and in the event of any excess of the Designated Payables over the Receivables Base, the amount of

such excess shall be deducted from the Purchase Price as set forth in Section 3(b)(iii) above, or otherwise.

(c)     Survival.  The obligations of the parties hereto under this Section 7 shall survive the Closing.

8.     **Interim Operations**.  From the Effective Date until Closing, Seller shall (a) maintain the Purchased Assets in substantially the same condition as they existed on the Effective Date, and not allow any deterioration of value to occur with respect to the Purchased Assets; (b) maintain its current insurance policies in full force and effect through the Closing Date; (c) not create any lien or encumbrance upon or affecting title to the Property or the Purchased Assets except Permitted Exceptions, without Purchaser's prior written consent; (d) not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated without the prior written consent of Purchaser, which consent shall be provided or denied within ten (10) business days after request therefor; (e) perform all of their obligations in respect of the Purchased Assets whether pursuant to any contracts, or other requirements affecting the Purchased Assets; (f) promptly inform Purchaser in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Purchased Assets, whether or not insured against; and (g) not solicit, accept or provide factual information or negotiate with respect to, any offer to purchase any of the Purchased Assets from any person or entity other than Purchaser.  Wherever Purchaser's consent is required hereunder, such consent shall not be unreasonably withheld or delayed.

9.     **Seller's Representations and Warranties**.   Seller hereby makes the representations and warranties contained in this Section 9, to Purchaser.  These representations and warranties are made as of the date hereof, and shall be deemed remade as of the Closing Date.

(a)     Organization and Authority.  Seller is a limited liability company that validly exists under the laws of Michigan, and is duly qualified to own and operate the Property and the Facility and conduct business in the State of Michigan.

(b)     Seller has full power and right to enter into and perform its obligations under this Agreement and the Other Documents, including, without being limited to, conveying the Property and the other Purchased Assets.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (1) have been duly authorized by all necessary action on the part of Seller, (2) do not require any governmental or other consent and (3) will not result in the breach of any agreement, indenture or other instrument to which Seller is a party or is otherwise bound.  This Agreement and the Other Documents are the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

(c)     Necessary Action.  Seller has taken all necessary action required under its organizational documents necessary to enter into this Agreement and to carry out the

terms of this Agreement. The Agreement has been, and the other documents to be executed by Seller when delivered at Closing will have been, duly executed and delivered by Seller.

(d)     Agreements; No Default. Seller has not entered into any contract, lease or other agreement with any third party that will survive Closing and be binding on the Purchased Assets or Purchaser other than in the ordinary course of business. There is no default by Seller with respect to any obligations under any mortgage, contract, lease or other agreement affecting or relating to any of the Purchased Assets.

(e)     Non-Foreign Status. Seller is a "non-foreign person" within the meaning of Section 1445 of the United States Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

(f)     Patriot Act Compliance. Neither Seller nor any person, group, entity or nation that Seller is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Seller is not engaging in the transaction contemplated by this Agreement, directly or indirectly, on behalf of, or instigating or facilitating the transaction contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation. Seller is not engaging in the transaction contemplated by this Agreement, directly or indirectly, in violation of any laws relating to drug trafficking, money laundering or predicate crimes to money laundering. None of the funds of Seller has been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Seller are prohibited by law or that the transaction contemplated by this Agreement or this Agreement is or will be in violation of any law. Seller has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.

(g)     HIPAA. Seller has not received notice that it is not in material compliance with the Health Insurance Portability and Accountability Act of 1996.

(h)     Government Investigations. Seller has received no written notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under the False Claims Act (31 U.S.C. Section 3729 et seq.), the Anti-Kickback Act of 1986 (41 U.S.C. Section 51 et seq.), the Federal Health Care Programs Anti-Kickback statute (42 U.S.C. Section 1320a-7a(b)), the Ethics in Patient Referrals Act of 1989, as amended (Stark Law) (42 U.S.C. 1395nn), the Civil Money Penalties Law (42 U.S.C. Section 1320a-7a), or the Truth in Negotiations (10 U.S.C. Section 2304 et seq.), Health Care Fraud (18 U.S.C. 1347), Wire

15

Fraud (18 U.S.C. 1343), Theft or Embezzlement (18 U.S.C. 669), False Statements (18 U.S.C. 1001), False Statements (18 U.S.C. 1035), and Patient Inducement Statute and equivalent state statutes or any rule or regulation promulgated by a Governmental Authority with respect to any of the foregoing healthcare fraud laws affecting Seller with respect to the Facility.

      (i)    <u>Condition of the Purchased Assets</u>.  There exists no defective condition, structural or otherwise, with respect to the Purchased Assets.  All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).  In addition, Seller has not received any written notice from any insurance company which has issued a policy with respect to Purchased Assets or from any board of fire underwriters (or other body exercising similar functions) and any governmental authority or any other third party claiming any defects or deficiencies in Purchased Assets or suggesting or requesting the performance of any repairs, alterations or other work to the Purchased Assets.  The Assets shall be delivered at the time of the Closing in the same condition as they are in on the date hereof, ordinary wear and tear excepted.  The sprinkler system at the Facility, and all other fire and life safety systems, are in full operational compliance with all applicable governmental code, requirements and standards.

      (j)    <u>Title</u>.  Seller can convey to Purchaser the fee simple title to the Property, which shall be conveyed free and clear of all liens, security interests, charges, claims, or encumbrances, restrictions, leases, tenancies, licenses, claims and options.  All of the Purchased Assets shall be conveyed free and clear of all liens, security interests, charges, claims or encumbrances.  To Seller's Knowledge, Seller knows of no reason why the Purchaser shall be unable to obtain a Title Policy for the full amount of the Purchase Price allocable to the Property with all of the Title Endorsements.

      (k)    <u>Environmental Condition</u>.  Seller has not generated, stored or disposed of any hazardous waste on the Property, and there is not currently any hazardous waste on the Property.  The term "hazardous waste" shall mean "hazardous waste", "toxic substances" or other similar or related terms as defined or used from time to time in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6921, *et seq.*) and regulations adopted thereunder.

      (l)    <u>Special Assessments</u>.  There are no (1) pending or threatened special assessments affecting the Purchased Assets or (2) any contemplated improvements affecting the Purchased Assets that may result in special assessments affecting the Purchased Assets.  There are no tax abatements, phase-ins or exemptions affecting the Purchased Assets.

(m)     Access to Property; Utilities; Adjacent Property.  Seller has no knowledge of any federal, state, county, municipal or other governmental plans to change the highway or road system in the vicinity of the Property or to restrict or change access from any such highway or road to the Property. All utility services, including heat, air conditioning, hot and cold water, telephones, gas and electricity are available at the Property in quantities sufficient for Seller's present use of the Facility. Seller does not own or possess any right, title or interest with respect to any real property adjacent to the Land.

(n)     Existing Mortgages.  Other than any mortgage or deed of trust that shall be paid off by Seller at the Closing, there are no mortgages or deeds of trust currently encumbering the Property, recorded or otherwise.  Except for the Permitted Exceptions, there are no liens, encumbrances, covenants, conditions or restrictions affecting the Property or the other Purchased Assets.  In addition there are no mechanic's liens, materialman's liens or similar claims or liens claimed or which may be claimed against any of the Property or the other Purchased Assets for work performed or commenced prior to the Closing Date.

(o)     Rights with Respect to Property.  Other than the existing operating lease, there are currently, and as of the Closing Date there shall be, no occupancy rights (written or oral), leases or tenancies presently affecting the Property or any Facility and the portion of the Property which they located, other than the Facility Leases, which shall be terminated as of the Closing Date, and any occupancy rights of any residents of the Facility.  There are no agreements, options or commitments granting to any person or entity the right to acquire any of Seller's right, title and interest in or to any of the Purchased Assets to be acquired hereunder, which will not be terminated concurrent with Closing.

(p)     Permits.  The Permits as listed on **Schedule 9(p)** hereto are all of the material certificates, licenses and permits from governmental authorities held by Seller in connection with the ownership, use, occupancy, operation and maintenance of the Purchased Assets and the Facility, and are all of the certificates, licenses, accreditations and permits necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

(q)     Zoning.  The Property and Facility are in compliance with all zoning requirements to which they are subject and such zoning requirements permit the continued use by Purchaser and Operator of the Facility as a skilled nursing facility with the Licensed Beds.

(r)     Intellectual Property.  Other than the trade names "Iron River Care Center" Seller does not own any intellectual property in connection with or applicable to the Property or the other Purchased Assets, including any registered trade names, logotypes, trademarks or copyrights.

17

(s)     Required Consents.   No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Seller of this Agreement, or the performance of the transactions contemplated thereunder, except (1) any applicable approval by LARA of the Licensure, and (2) such consents, certifications or licenses from the LARA, United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") or any other governmental agency with jurisdiction over the Facility as are necessary to permit Operator to operate the Facility following the Closing Date.

(t)     Sufficiency of Assets.   The Purchased Assets are sufficient for operation of the Facility as a licensed 69 bed skilled nursing facility, in compliance with all Applicable Laws.

(u)     Litigation.   Except as set forth in **Schedule 9(u)**, there are no pending or threatened litigation, investigations, claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit, involving the Purchased Assets, or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator.   No event has occurred or circumstance exists that to the knowledge of Seller is reasonably likely to give rise to or serve as a basis for the commencement of any claim against the Purchased Assets or the Seller.

(v)     Compliance with Applicable Laws.   The Property (including any parking areas or facilities) and the other Purchased Assets have been and are presently used and operated in compliance with, and in no way violate any applicable statute, law, regulation, rule, licensing requirement, ordinance, code, order or permit of any kind whatsoever affecting the Purchased Assets or any part thereof, including without limitation, any statutes or laws pertaining to the services and care provided for the residents at the Facility, and any rules or regulations promulgated thereunder ("Applicable Laws"), or any Permitted Exceptions.   In addition, no waivers have been obtain or are required to make the representations contained in this Section 8(n) fully true and correct.

(w)     Taxes.   Seller has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns.   Purchaser is not assuming under this Agreement any tax liabilities owed by Seller as a result of the ownership or operation of the Purchased Assets prior to the Closing Date.

(x)     Solvency.   Seller is, and shall be on the Closing Date and following the Closing Date, solvent.   For the purpose hereof, the term "solvent" means that (i) the fair saleable value of Seller's tangible assets is in excess of the total amount of its liabilities, and (ii) Seller is and will be able to pay its debts or obligations in the ordinary course as they mature.

18

(y)    <u>Truth and Accuracy of Representations and Warranties</u>.  No representation or warranty by or on behalf of Seller contained in this Agreement and no statement by or on behalf of Seller in any certificate, list, exhibit or other instrument furnished or to be furnished to Purchaser by or on behalf of Seller pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

(z)    <u>Survival of Representations and Warranties</u>.  The representations and warranties of Seller contained herein shall survive the Closing.

10.    **Purchaser's Representations and Warranties**.  Purchaser hereby makes the representations and warranties contained in this <u>Section 10</u>, to Seller.  These representations and warranties are made as of the date hereof, and shall be deemed remade as of the Closing Date.

(a)    <u>Organization and Authority</u>.  Purchaser is a limited liability company that has been duly organized and validly exists under the laws of the State of Michigan and is duly qualified to do business in the State in which the Property is located.  Purchaser has full power and right to enter into and perform its obligations under this Agreement and the Other Documents.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (1) have been duly authorized by all necessary action on the part of Purchaser, (2) do not require any governmental or other consent (except as otherwise provided herein), and (3) will not result in the breach of any agreement, indenture or other instrument to which Purchaser is a party or is otherwise bound.

(b)    <u>Survival of Representations and Warranties</u>.  The representations and warranties of Purchaser contained herein shall survive the Closing.

11.    **Risk of Loss**.

(a)    <u>Fire or Other Casualty</u>.  The risk of any loss or damage to any of the Purchased Assets by fire or other casualty before the Closing hereunder is assumed by Seller.  Seller shall give Purchaser written notice of any fire or other casualty within three (3) days of the occurrence of same, which notice shall include a description thereof in reasonable detail and an estimate of the cost of and time to repair.  In the event that the Purchased Assets shall suffer any fire or other casualty or any injury and Purchaser does not elect to cancel this Agreement as hereinafter provided, Seller agrees to repair the damage at its sole cost and expense before the date set for delivery of the Deed hereunder or, in the alternative, the Purchase Price shall be reduced based on a reasonable approximation of the cost of such repair as agreed by the parties, and Seller shall assign to Purchaser the proceeds of or claims in respect of any loss of income insurance or equivalent coverage maintained by them.  In the event of any material damage or destruction of the Purchased Assets, Purchaser, at any time thereafter, by written notice to Seller, shall have the option to cancel this Agreement.  For the purposes hereof,

19

"material" damage or destruction shall include any damage or destruction that would require more than Ten Thousand Dollars ($10,000.00) to repair (including in said amount the amount of any revenues lost as a result of said fire or other casualty).  If Purchaser so elects to cancel this Agreement, this Agreement shall terminate and be of no further force and effect, Purchaser shall be refunded the Deposit plus accrued interest and neither party shall have any liability to the other hereunder.

(b)     Eminent Domain.  The risk of any loss or damage to the Purchased Assets by condemnation before the Closing Date hereunder is assumed by Seller.  In the event any condemnation proceeding is commenced or threatened, Seller shall give Purchaser written notice thereof within three (3) days after the occurrence of same, together with such reasonable details with respect thereto as to which Seller may have knowledge.  As soon as the portion or portions of the Purchased Assets to be taken are reasonably determinable, Seller shall give Purchaser written notice thereof together with Seller's estimate of the value of the portion or portions of the Purchased Assets to be so taken.  In the event of any material taking of the Purchased Assets, Purchaser, by written notice to Seller at any time thereafter, shall have the option to cancel this Agreement, in which event this Agreement shall terminate and be of no further force and effect, Purchaser shall be refunded the Deposit plus accrued interest and neither party shall have any liability to the other hereunder.  For the purposes hereof, a "material" taking shall include: (i) any taking (1) the effect of which would be to require more than Ten Thousand Dollars ($10,000.00) to repair the balance of the Purchased Assets or (2) materially impair the use or operation of the Purchased Assets; or (ii) any threat of a taking or any reasonably equivalent indication on the part of a condemning authority of such intention where there is no reasonable basis to conclude that the actual taking would not be material.  If Purchaser shall not so elect to cancel this Agreement, then the sale of the Purchased Assets shall be consummated as herein provided that the Purchase Price provided for herein (without abatement) and Seller shall assign to Purchaser at the Closing all of Seller's right, title and interest in and to all awards made in respect of such condemnation and any claims in respect of any rent insurance or equivalent coverage maintained by it, and shall pay over to Purchaser all amounts theretofore received by Seller in connection with such taking or insurance.  Purchaser shall be entitled to participate in any such condemnation proceeding, and Seller shall cooperate with Purchaser in such respect.

(c)     Survival.  The parties' obligations, if any, under this Section 11 shall survive the Closing.

12.     **Indemnification**.

(a)     By Purchaser.  In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Purchaser shall indemnify, save, protect, defend and hold harmless Seller, its employees, members, managers, shareholders, officers, directors, representatives and agents, from and against all claims, liabilities, losses, demands and causes of action of any nature whatsoever ("Losses")

20

arising out of: i) any breach by Purchaser of its obligations, representations, warranties, agreements or covenants hereunder, and ii) Purchaser's ownership of the Purchased Assets following the Closing. Purchaser further agrees to pay any reasonable attorneys' fees and expenses of Seller arising from any indemnification obligation hereunder.

(b)     By Seller. In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Seller shall indemnify, save, protect, defend and hold harmless, Purchaser, and its members, managers, employees, shareholders, officers, directors, representatives and agents, from and against all Losses arising out of: i) any breach by Seller of their obligations, representations, warranties, agreements or covenants hereunder, ii) any broker or finder claiming to have been retained in connection with the transactions contemplated by this Agreement, and iii) Seller's ownership of the Facility prior to the Closing. Seller further agrees to pay any reasonable attorneys' fees and expenses of Purchaser arising from any indemnification obligation hereunder.

(c)     In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement ("Indemnitee's Claim") is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder, said Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend the Indemnified Claim. Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall, in its sole, absolute and unreviewable discretion, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent. Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder. In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim and/or to diligently pursue the same to its conclusion, in the event that Indemnitor cannot produce documentation establishing the availability of funds sufficient to cover its obligations with respect to Indemnitee's Claim or in the event that Indemnitor fails to timely report to Indemnitee the status of its

efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any of the foregoing conditions, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

(d)     Note.  Amounts due under the Note may be offset with respect to any obligations of the Seller under this Agreement and/or obligations of the Seller under the SPA; provided that not more than the amount of Two Hundred Fifty Thousand Dollars ($250,000) may be offset against the Note with respect to such obligations (for purposes of which any amounts offset against the Note pursuant to the SPA shall be included in such calculation) and that offset against the Note shall be made only with respect to claims made in writing during the period of thirty-six (36) months following the Closing.

(e)     No Waiver of Representations and Warranties.  For avoidance of doubt, Seller has agreed that Purchaser's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by Purchaser.

(f)     Survival.  The parties' obligations under this Section 12 shall survive the Closing.

13.     **Remedies**.

(a)     Seller's Default.  If, prior to the Closing, Seller shall default under any covenant or obligation or breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser), or any of the Closing Conditions of Purchaser pursuant to Section 6(a) shall not be satisfied or prepared to  be satisfied (any of the foregoing, a "Seller Failure"), then Purchaser shall have the right, at any time to (1) terminate this Agreement by written notice to Seller and receive a refund of the Deposit plus any accrued interest, or (2) specifically enforce this Agreement.  In all events Purchaser shall additionally have the right to seek damages for any and all losses incurred by Purchaser as a result of any such default of Seller.

(b)     Purchaser's Default.  If, prior to the Closing,  Purchaser shall default under any covenant or obligation or breach any representation or warranty set forth herein (which default is not waived in writing by Seller), or any of the Closing Conditions of Seller pursuant to Section 6(b) shall not be satisfied or prepared to  be

22

satisfied (any of the foregoing, a "Purchaser Failure"), then Seller shall have the right to declare this Agreement terminated by written notice to Purchaser, in which case provided that no Seller Failure has occurred, the Deposit plus any accrued interest shall be paid to Seller as liquidated damages, as Seller's sole remedy.

14.    **Notices**.  All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (i) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a business day, on the business day next following such date), or (ii) on the third (3rd) business day next following the date of its mailing by certified mail, postage prepaid, at a post office maintained by the United States Postal Service, or (iii) upon the receipt by facsimile or email transmission as evidenced by a receipt transmission report, addressed as follows:

if to Seller:          Robert W. Possanza Jr.
                       540 West Hagerman Lake Road
                       Iron River, MI 49935
                       Email: robkelly@fast-air.net

with a copy to:        Polich Law Office
                       Roy Polich
                       117 W Genesee Street
                       P.O. Box 7
                       Iron River, MI 49935
                       Email: roy@roypolichlaw.com

if to Purchaser:       Benjamin T. Friedman
                       Manager
                       The Cascades of Iron River Holdings, LLC
                       3336 W. North Shore Avenue
                       Lincolnwood, IL 60712
                       Email: btf@anvilassetgroup.com

with a copy to:        James E. Tompert, Esq.
                       Detroit Renaissance Center
                       400 Renaissance Center Drive
                       Suite 2600
                       Detroit, MI 48243
                       Email:  jamestompert@aol.com

Either party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.

15. **Closing Costs**. Seller shall bear the cost to record any instrument to clear Seller's title to the extent Seller is required to do so pursuant to this Agreement. State, county and municipal transfer taxes if any shall be paid as set forth in the applicable ordinance, or, if not so set forth, by local custom. Unless otherwise specified herein, and subject to Section 3(b)(ii) above, Seller shall pay all costs and fees customarily paid by sellers in a real estate sale transaction in the jurisdiction where the Facility is located. Unless otherwise specified herein, and subject to Section 3(b)(ii) above, Purchaser shall pay all other costs and fees customarily paid by purchasers in a real estate sale transaction in the jurisdiction where the Facility is located. Unless otherwise specified herein, and subject to Section 3(b)(ii) above, each of Seller on one side and Purchaser on the other agree to pay its own attorneys' fees incurred in connection with the negotiation, preparation and consummation of the transactions contemplated hereby.

16. **Choice of Law**. THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF MICHIGAN AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

17. **Miscellaneous**.

    (a)    Entire Agreement. This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire agreement of the parties hereto and may not be modified or canceled except pursuant to the terms hereof or an instrument in writing signed by the parties hereto. The Schedules and Exhibits annexed hereto are hereby incorporated herein by reference as fully as though set forth herein. This Agreement may not be modified or amended except in writing signed by the parties hereto. All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

    (b)    Waiver. No waiver of any term, provision or condition of this Agreement, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

    (c)    Jurisdiction; Venue**.** EXCEPT AS PROVIDED OTHERWISE IN THIS AGREEMENT, IN THE EVENT ANY DISPUTE BETWEEN THE PARTIES HERETO RESULTS IN LITIGATION, ALL SUCH ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN SHALL BE LITIGATED IN COURTS HAVING SITUS IN DETROIT MICHIGAN OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION. EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED

WITHIN SAID CITY AND STATE.  EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.  THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION, AND ALSO WAIVE ABY RIGHT TO A TRIAL BY JURY IN ANY SUCH LITIGATION

(d)     Exhibits and Schedules. If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. Purchaser's obligations to close pursuant to this Agreement shall be conditioned upon Purchaser approving all exhibits and schedules within seven (7) days of submission thereof to Purchaser.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

(e)     Headings.  The headings of the various Sections of this Agreement have been inserted only for the purposes of convenience, are not part of this Agreement and shall not be deemed in any manner to modify, explain, qualify or restrict any of the provisions of this Agreement.

(f)     Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had executed the same document. All such counterparts shall be construed together and shall constitute one instrument.

(g)     Further Assurances.  Each of Seller and Purchaser shall provide to the other such further assurances as may reasonably be required hereunder to effectuate the purposes of this Agreement and, without limiting the foregoing, shall execute and deliver such affidavits, certificates and other instruments as may be provided for  hereunder.

(h)     Severability.  If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

(i)     Review by Counsel. The parties hereto acknowledge that they have been represented by independent legal counsel of their own choosing throughout the negotiations which preceded the execution of this Agreement, and that each party has executed this Agreement with the advice and consent of such independent legal counsel.

(j)     <u>Usage</u>.   All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" "including" shall mean "including without limitation.

(k)     <u>No Strict Construction</u>.   The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

(l)     <u>Assignment</u>.   This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, including without limitation that Purchaser may designate a party, or parties, to take title to the Purchased Assets at the Closing.

*[Remainder of this page left intentionally blank.  Signature page follows.]*

26

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed as of the day and year first above written.

**SELLER:**

IRON RIVER LAND COMPANY, LLC,
a Michigan limited liability company

By: _____

Name:  Robert W. Possanza Jr.

Its:    Manager

**PURCHASER:**

THE CASCADES OF IRON RIVER HOLDINGS, LLC
an Illinois limited liability company

By: _____

Name:  Benjamin T. Friedman

Its:    Manager