**STOCK PURCHASE AGREEMENT**
by and between

ROBERT W. POSSANZA JR.

"Seller"

and

BENJAMIN T. FRIEDMAN,

"Purchaser"

Dated as of:  December $31$ , 2018

TABLE OF CONTENTS

SECTION                                                                     **PAGE**

1.    **SALE AND TRANSFER OF STOCK** ..................................................1

2.    **PURCHASE PRICE** ..................................................................1

3.    **CLOSING** ..............................................................................2

4.    **CONDITIONS PRECEDENT** ......................................................2

5.    **LIABILITIES OF SELLER** ..........................................................4

6.    **BANK ACCOUNTS** ...................................................................5

7.    **PATIENT TRUST FUNDS.** .........................................................5

8.    **COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES** ...........6

9.    **CONTRACTS** ..........................................................................7

10.   **EMPLOYEES** ..........................................................................7

11.   **ACCOUNTS RECEIVABLE** .........................................................8

12.   **EMPLOYMENT RECORDS** ........................................................8

13.   **ACCESS TO RECORDS** .............................................................8

14.   **USE OF TEL. NUMBER & WEBSITE; POLICY & PROCEDURE MANUALS** .....9

15.   **INTENTIONALLY OMITTED.** .....................................................9

16.   **COOPERATION; INTERIM OPERATIONS OF THE FACILITY** .........................9

17.   **INDEMNIFICATION.** ...............................................................11

18.   **REPRESENTATIONS AND WARRANTIES OF PURCHASER** ...........................13

19.   **REPRESENTATIONS AND WARRANTIES OF SELLER** ..............................14

20.   **NO JOINT VENTURE** ...............................................................20

21.   **EXHIBITS AND SCHEDULES** .....................................................20

22.   **EVENTS OF DEFAULT; REMEDIES**. ..........................................................................20

23.   **CHOICE OF LAW** ..........................................................................................................21

24.   **JURISDICTION; VENUE** ............................................................................................21

25.   **DEFINITIONS**. ...............................................................................................................21

26.   **GENERAL PROVISIONS**. ............................................................................................22

**EXHIBITS**

A.                        Form of Stock Powers

**SCHEDULES**

5.b                       Designated Payables

7.a                       Resident Trust Funds and Property

9.a                       Contracts

10                        Operator's Employment Expenses

11                        Designated Receivables

19.h                      Litigation

19.i                      Overpayments

19.k                      Licensure

19.l                      Certification

19.q                      Personal Needs Allowance

19.u                      Employee Benefit Plans

19.z                      Financial Materials

<u>**STOCK PURCHASE AGREEMENT**</u>

This **STOCK PURCHASE AGREEMENT** (this "Agreement") is entered into this **3(** day of December 2018 (the "Effective Date") by and between ROBERT W. POSSANZA JR. ("Seller") and BENJAMIN T. FRIEDMAN ("Purchaser").

WITNESSETH:

**WHEREAS**, Seller owns 100% of the stock of IRON RIVER CARE SERVICES, INC., a Michigan corporation (the "Operator"), along with any other rights, claims or interests with respect to ownership of the Operator (collectively, the "Stock");

**WHEREAS**, IRON RIVER LAND COMPANY, LLC, a Michigan limited liability company ("Real Estate Seller") currently owns that certain 69 bed skilled nursing facility commonly known as Iron River Care Center, located at 330 Lincoln Avenue, Iron River, Michigan 49935 (the "Facility"), and all of the furniture, fixtures and equipment and other items of personal property located therein (the "Personal Property" and collectively with the Facility, the "Property"). The Facility is licensed, to the extent required, for 69 skilled nursing facility beds:

**WHEREAS**, The Cascades of Iron River Holdings, LLC, a Michigan limited liability company ("Real Estate Purchaser") is acquiring the Property from Real Estate Seller, under a certain Asset Purchase Agreement by and between Real Estate Seller and Real Estate Purchaser, dated as of even date herewith (the "APA");

**WHEREAS**, Operator is currently leasing the Facility from the Real Estate Seller, and following closing under the APA will continue leasing the Facility, from the Real Estate Purchaser;

**WHEREAS**, in connection with the above, the parties hereto desire to enter into this Agreement.

**NOW, THEREFORE**, for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged by the parties hereto, the parties hereto agree as follows:

1.     <u>**SALE AND TRANSFER OF STOCK**</u>.     Seller hereby agrees to sell, convey and transfer the Stock to Purchaser and, subject to all of the terms and conditions hereof and in reliance on the representations and warranties set forth or referred to herein, Purchaser hereby agrees to purchase the Stock. At the Closing (defined herein) Seller shall transfer one hundred percent (100%) of the Stock to Purchaser through endorsement of the stock powers or stock certificates attached hereto as <u>**Exhibit "A"**</u> (the "Stock Powers").

2.     <u>**PURCHASE PRICE**</u>.     The purchase price for the Stock shall be an amount equal to Two Hundred Thousand Dollars ($200,000), which shall be a portion of the total consideration paid under the APA at Closing in cash or immediately available funds. Upon Purchaser's request, Seller shall fully cooperate in making a "338(h)(10) election" under the

Code (as defined herein), with respect to the transactions set forth herein.

3.  **CLOSING**.   The closing ("Closing") under this Agreement shall occur at a mutually agreed upon time concurrently with and contingent upon the Closing pursuant to the APA, following the satisfaction of all conditions precedent as set forth in Section 4 below (the "Closing Date").  The effectiveness of the Closing shall deemed to have occurred as 12:00 a.m. (beginning of the day) on January 1, 2019.

4.  **CONDITIONS PRECEDENT**.   Purchaser's obligation to consummate the transactions contemplated in this Agreement shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Purchaser or the waiver thereof by Purchaser, which waiver shall be binding upon Purchaser only to the extent made in writing and dated as of the Closing Date:

a.  Seller shall have duly and timely performed and fulfilled all of his duties, obligations, promises, covenants and agreements hereunder;

b.  Each of the representations and warranties of Seller contained in this Agreement shall be true and correct as of the Closing Date;

c.  Seller shall not be in breach of any term, provision or condition of this Agreement;

d.  Seller shall deliver to Purchaser on or before the Closing Date the following, each of which shall be in form and substance satisfactory to Purchaser:

1.  the Stock Powers;

2.  a certificate of Seller, in a form reasonably acceptable to Purchaser, executed by Seller, a duly authorized agent of Seller or his manager, dated the Closing Date, to the effect that the representations and warranties of Seller set forth in this Agreement are true and complete on and as of the Closing Date to the best of such party's knowledge;

3.  a certificate from Seller, executed by Seller, a duly authorized agent of Seller or his manager, certifying the company documents of Seller including, if applicable, the (A) Articles of Formation, (B) operating agreement, and (C) resolutions authorizing the transactions contemplated hereby, and appearing on said certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement (and all documents to be executed and delivered by Seller pursuant hereto (the "Other Documents")); and

4.  written results of searches (the "UCC Searches"), effective as of a date after the date of this Agreement, conducted by a company reasonably acceptable to Purchaser, of the Secretary of State of Michigan and the records of the County Recorder in which the Facility is located, disclosing no Uniform Commercial Code Financing Statements, tax liens or judgments in the name of

2

Operator, the Facility, Property and/or any other name or location reasonably requested by Purchaser that will not be released by Closing.

e.     As of the Closing Date there shall not then be imposed against Operator, nor shall have Operator received notice of:  (a) any civil monetary penalty ("CMP") or other federal, state or local fine and/or penalty ("Penalty"), (b) any withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment, including but not limited to State Bed Tax/Assessment (collectively, "Recapture") or (c) any survey deficiency of the severity level of "G" or worse;

f.     no action or proceeding shall have been instituted, nor any judgment, order or decree entered by any court or governmental body or authority preventing the consummation of the transaction contemplated by this Agreement, or which could materially and adversely affect Operator's ability to operate the Facility as a nursing home facility with the same number of beds as are operating at the Facility on the date hereof;

g.     between the Effective Date and the Closing Date, there shall not have been any material adverse change in the regulatory status and/or condition of any of Operator's licenses, permits and/or certifications, and the Medicare and Medicaid rates of the Facility;

h.     between the Effective Date and the Closing Date, there shall not have been any material adverse change to the business operations and financial condition of the Facility;

i.     within one hundred and ten business days from July 17, 2018, or December 21, 2018, Purchaser shall have completed his due diligence to his satisfaction;

j.     on or before the Closing Date Purchaser shall obtain financing acceptable to the Purchaser for the purchase of the Stock;

k.     on the Closing Date, there shall not be any lawsuits filed or threatened against Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Seller and/or Operator, to restrain or prohibit the consummation of the transactions contemplated hereby;

l.     Purchaser shall have received any applicable MDCH, LARA or any other necessary federal, state or local approval required with respect to the transactions contemplated hereunder, subject to conditions acceptable to Purchaser in his reasonable discretion;

m.     Purchaser shall have approved of any updates to the Schedules and/or Exhibits, pursuant to Section 21 hereof; and

3

n. Real Estate Seller and Real Estate Purchaser shall have entered into, and consummated the transactions contemplated under, the APA.

Seller's obligation to consummate the transactions contemplated in this Agreement shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Seller or the waiver thereof by Seller, which waiver shall be binding upon Purchaser only to the extent made in writing and dated as of the Closing Date:

a. Purchaser shall have duly and timely performed and fulfilled all of his duties, obligations, promises, covenants and agreements hereunder;

b. Each of the representations and warranties of Purchaser contained in this Agreement shall be true and correct as of the Closing Date;

c. Purchaser shall not be in breach of any term, provision or condition of this Agreement;

d. Purchaser shall have executed and delivered to Seller the Other Documents, as applicable; and

e. Real Estate Seller and Real Estate Purchaser shall have entered into, and consummated the transactions contemplated under, the APA.

In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to his performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to his performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto

5. **LIABILITIES OF SELLER**.

a. Other than with respect to the Designated Payables (as defined herein) Seller shall indemnify Purchaser for, any debts, liabilities or obligations of the Operator that accrue or arise prior to the Closing Date, including, but not limited to: (i) any expenses of the Operator that accrue or arise prior to the Closing Date, (ii) any liabilities or obligations of the Operator to its creditors, shareholders, members or owners that accrue or arise prior to the Closing Date, (iii) any liabilities or obligations of the Operator with respect to any Contracts, acts, events or transactions that accrue or arise prior to the Closing Date, (iv) any liabilities or obligations of the Operator for any federal, state, county or local taxes applicable to or assessed against the Operator or the assets or business of the Operator that accrue or arise prior to the Closing Date, (v) any contingent liabilities or obligations of the Operator, whether known or unknown by the Seller, Operator or Purchaser that accrue or arise prior to the Closing Date, (vi) any other liabilities resulting from any act or failure to act by the Operator or Seller that accrue or arise prior to the Closing Date, (vi) any gain on sale and any withholding, recoupment,

4

repayment, recapture or recovery of any alleged overpayment that may be recognized under the federal Medicare program, the Michigan State Medicaid program and other third party payor programs based on the transaction, arising from the period before the Closing Date, (vii) any amounts due Medicare, Medicaid and other third party payors, as a result of retroactive rate reductions, disallowed services or payments, denials, audits or otherwise, related to services provided by the Facility prior to the Closing Date, (viii) any professional or general liability claims or claims of any kind for events occurring prior to the Closing Date, (ix) any liability relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits or any other employee plans or benefits of any kind for Operator's employees or former employees or both which has accrued prior to the Closing Date, (x) any liability under any employment, severance, retention or termination agreement with any employee of Operator, where the acts giving rise to such liability occurred prior to the Closing Date whether or not the affected employee is retained following the Closing, or (xi) any other liabilities resulting from any act or failure to act by Seller.

   b.   **Schedule 5.b.** hereto sets forth payables of Operator incurred in the ordinary course of business in its operation of the Facility in accordance with past practice, and such schedule shall be updated at Closing to reflect the balances of such payables (but not any other items not previously included on the schedule) as of the Closing (such updated amounts, the "Designated Payables").

   c.   Seller shall cause Operator to maintain property and casualty insurance, worker's compensation insurance and general liability and professional liability insurance for all periods prior to the Closing Date, and, absent an agreement with Purchaser to the contrary, Seller shall maintain insurance in a manner that can be continued to periods following the Closing Date without losing coverage for periods prior to the Closing Date. For all periods on and after the Closing Date, Purchaser shall cause Operator to maintain property and casualty insurance, worker's compensation insurance and general liability and professional liability insurance. Notwithstanding anything in this Agreement or the APA to the contrary, the parties agree that excluded from the sale under both the APA and SPA, are all insurance refunds and dividends and refundable self-insurance reserves accrued up to the date of Closing, all of which shall remain the property of the Seller following Closing.

6.   **BANK ACCOUNTS**.   At the Closing, designees of Purchaser shall be provided with full signature authority over all bank accounts of Operator.

7.   **PATIENT TRUST FUNDS**.

   a.   Prior to the Closing, Seller shall provide to Purchaser a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Seller of any resident trust funds and an inventory of all residents' property held by Operator on the Closing Date for residents at the Facility, a copy of which shall be attached hereto as **Schedule 7.a.** (collectively, the "Resident Trust Funds and Property").

b.      Seller will indemnify, defend and hold Purchaser and Operator harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees: (i) in the event the amount of funds or any property, if any, did not represent the full amount of the funds and/or property delivered held by the Operator as of the Closing Date, or (ii) for claims which arise from actions or omissions of Seller or Operator with respect to the Resident Trust Funds or Property prior to the Closing Date.

c.      Purchaser will indemnify, defend and hold Seller harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Seller with respect to the Resident Trust Funds and Property for claims which arise from actions or omissions of Operator after the Closing Date with respect to the Resident Trust Funds and Property.

8.      **COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES**.

a.      Seller shall assist Purchaser with preparing the appropriate Medicare and Medicaid cost reports in respect to the periods prior to the Closing, as soon as practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by law for the filing of each such cost report under the applicable third party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Seller's failure to timely file such final cost reports. Seller will promptly provide Purchaser with copies of such reports and supporting documentation.

b.      Each party hereto agrees to notify the other within five (5) business days after receipt of any notice of any claim by LARA, MDCH, CMS, OIG or any other governmental or quasi governmental authority with respect to any of the following, relating to periods prior to the Closing: i) an alleged Medicare or Medicaid overpayment, or any other recoupment or adjustment to reimbursement, ii) an alleged underpayment of any tax or assessment or iii) any other governmental or third-party payor claims (collectively "Recapture Claim"). For avoidance of doubt, the failure to provide notification of a Recapture Claim within the foregoing timeframe shall in no way effect a party's rights to indemnification with respect thereto.

c.      In the event LARA, MDCH, CMS, OIG, any other governmental or quasi governmental authority or agency making payments to Operator for services performed at the Facility after the Closing or any other third-party payor makes any Recapture Claim, then Seller hereby agrees to save, indemnify, defend and hold Purchaser harmless from and against any loss, damage, injury or expense incurred by Purchaser arising from or related to any such claim. In connection with the foregoing indemnification obligation, in the event that LARA, MDCH, CMS, OIG or any other governmental or quasi-governmental authority or agency or any other governmental or quasi-governmental authority or agency or other third party payor source withholds amounts from Operator's

6

reimbursement checks as a result of such Recapture Claim, Seller shall pay such amounts to Purchaser within three (3) business days following Purchaser's demand therefor.  In the event Seller fails to pursue any issue or issues relating to appeal of a Recapture Claim, Purchaser may, at Seller's expense, pursue an appeal of such issue or issues and Seller will cooperate fully with Purchaser in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.

 d. Seller shall pay, prior to the Closing, all outstanding Recapture Claims and any other fees and taxes due with respect to the Facility for periods prior to the Closing, and shall provide to Purchaser, on or before the Closing, evidence reasonably satisfactory to Purchaser of the foregoing payments.  Seller shall also remain liable and responsible for the correction of all violations cited by LARA, MDCH, or any other governmental authority in any survey prior to or after the Closing, that result from a condition that existed at the Facility prior to the Closing Date or as a result of an action or inaction of Seller and/or Operator prior to the Closing Date.

Seller shall deliver to Purchaser copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date, for Purchaser's review, at least ten (10) days prior to filing of such reports, and provide Purchaser with reasonable access to the underlying documentation for such reports.

9. **CONTRACTS**.

 a. As soon as practicable after the date hereof, Seller shall deliver to the Purchaser true, accurate and complete copies of all Contracts, a schedule of which is attached hereto as **Schedule 9.a.**  Purchaser and Operator agrees to indemnify and hold harmless Seller from and against any and all liabilities, claims, demands and causes of action of any nature whatsoever asserted against or incurred by Seller arising out of or connected with any liabilities and obligations under any of the retained contracts that shall accrue or relate to periods on or after the Closing Date.

 b. To the extent any third party consent is required in connection with the change of ownership of the Operator pursuant to any Contracts, Seller hereby covenants and agrees to use all reasonable efforts to obtain such third party consent prior to the Closing Date.  To the extent Seller shall be unable to obtain such third party consent, Seller and Purchaser shall cooperate and take such steps as may be necessary in order for Purchaser or Operator to receive the benefits under such Contracts, provided that Purchaser and Operator agrees to fulfill any obligations of Seller that shall arise with respect to such Contracts on and after the Closing Date.

10. **EMPLOYEES**.  On the Closing Date, Seller shall provide Purchaser with a credit of an amount equal to all of the accrued (whether vested, unvested, contingent or mature) paid time off (which shall include all days for which the Operator's employees are paid but do not actually work, such as sick days, vacation days, and holidays) and all other accrued but unpaid payroll obligations including but not limited to all FICA, withholding, unemployment, workmen's compensation or other employment related taxes in connection with the foregoing, if

7

any (the "Operator's Employment Expenses"). Purchaser expressly acknowledges that Purchaser shall assume all obligations related to Operator's Employment Expenses. A schedule of Operator's Employment Expenses is attached hereto as **Schedule 10**, and shall be updated prior to the Closing to reflect amounts outstanding at the Closing. In the event that Purchaser discovers after the Closing Date that the amount credited is less than the amounts required under this Section 10, Seller shall pay to Purchaser, within ten (10) days after Purchaser provides notice thereof, an amount equal to such deficiencies.

11. **ACCOUNTS RECEIVABLE**. All unpaid accounts receivable with respect to the Facility which relate to the period prior to the Closing, including, but not limited to, any accounts receivable arising from rate adjustments which relate to the period prior to the Closing, even if such adjustments occur after the Closing shall remain the property of Operator following the Closing (the "Designated Receivables"). A list of Designated Receivables shall be set forth on **Schedule 11** hereto, as well as a calculation of the ninety five percent (95%) of the face value of the Designated Receivables that are within ninety (90) days of the date of invoice (the "Receivables Base"), and such schedule shall be updated to reflect balances as of the Closing.

12. **EMPLOYMENT RECORDS**. The Operator shall retain all the originals or full and complete copies of all employee records for all employees in its possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "Employee Records"). Seller represents and warrants to Purchaser that the Employee Records retained by the Operator represent all employee records in Seller or Operator's possession or control as of the Closing Date.

13. **ACCESS TO RECORDS**.

a. On the Closing Date, Seller shall deliver to Purchaser all of the records (both in paper form or electronic form) of the Facility, including, but not limited to: corporate records, patient medical and financial records, provided, however, that nothing herein shall be construed as precluding Seller from removing from the Facility on the Closing Date its corporate records or financial records which relate to its operations at the Facility or to its overall corporate operations; and provided, further, that Seller shall give Purchaser access to any information in any such removed records as is necessary for the efficient and lawful operation of the Facility by Purchaser or is otherwise required by law to be maintained at the Facility.

b. Subsequent to the Closing Date, Purchaser shall allow Seller and his agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at his own expense, to the extent reasonably necessary to enable Seller to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns and to verify accounts receivable collections due Seller.

c. Seller shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to Purchaser, for purposes of litigation involving a resident or employee to whom such record relates, as certified to

8

Purchaser in writing prior to removal by an officer of or counsel for Seller in connection with such threatened or actual litigation.  Any record so removed shall promptly be returned to Purchaser following its use.

      d.    Purchaser agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by Purchaser from Seller or otherwise, including patient records and records of patient funds, to the extent required by law, but in no event less than three (3) years.

### 14.   **USE OF TELEPHONE NUMBER AND WEBSITE; POLICY AND PROCEDURE MANUALS**.

      a.    Operator shall retain the present telephone, website, if applicable,  and fax numbers of the Facility;

      b.    Operator shall retain, or as applicable Seller shall convey rights and title to the email addresses maintained with respect to the Facility; and

      c.    Operator shall retain all rights to the name "Iron River Care Center".

### 15.   **INTENTIONALLY OMITTED**.

### 16.   **COOPERATION; INTERIM OPERATIONS OF THE FACILITY**.   Seller agrees to cooperate with Purchaser, and Purchaser agrees to cooperate with Seller to effect an orderly transfer of the operation of the Facility.

From the date of this Agreement until the Closing, Seller shall operate the Facility in substantially the same manner as it has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with third parties and use commercially reasonable best efforts to keep available the services of all of the Facility's employees.  Without limiting the generality of the preceding sentences, until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, Seller shall:

      a.    operate the Facility in the normal course of business and in compliance with all laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

      b.    not make any material change outside of the ordinary course of business in personnel, operations, finance, accounting policies (unless Seller is required to adopt such changes under applicable law, regulation or GAAP). Seller shall not amend, revise or modify any existing lease, for any of the Property. Seller will request that all tenants, any management company or consultants will operate the Facility in the ordinary course of business in the current manner, shall maintain the Property and continue to make ordinary repairs, replacements and maintenance with respect to the Property and shall deliver the Property on the Closing Date in substantially the same condition and repair as in

9

existence on the date hereof, subject to ordinary wear and tear and damage by casualty (as set forth herein). Seller will not, outside of the ordinary course of business, make any change in the operation of the Assets nor sell or agree to sell any items of machinery, equipment or other material assets of the Property nor otherwise enter into an agreement affecting the Property after Closing and outside the ordinary course of business. There will be no change in ownership, operation or control of any of the Property prior to Closing, and Seller will not, outside of the ordinary course of business, take any other action inconsistent with his obligations under this Agreement. Nothing in this Section shall prohibit Seller from disposing of obsolete FF&E or disposing of any broken FF&E, so long as the broken FF&E in excess of $5,000 is replaced with Personal Property in good working order and condition. In the event there are less than an average of 55 residents, with recognized payor sources, at the Facility (the "***Census Threshold***") during the thirty day period ending on the Closing Date, Purchaser shall have the option, as set forth in a written notice to Seller, to either: (1) proceed with Closing (provided all other conditions precedent are then met); (2) terminate this Agreement; (3) receive a credit of Twenty-five Thousand Dollars ($25,000.00) for each resident below the Census Threshold on the Closing Date, or (4) to extend the Closing Date until the first day of the month at least thirty (30) days after the date the Census Threshold is satisfied, so long as the Census Threshold is also satisfied on the seventh (7th) day prior to the extended Closing Date and the extended Closing Date occurs no later than ninety (90) days after the Closing Date (the "***Minimum Census Condition***"). Notwithstanding anything to the contrary herein, in the event the Closing has not occurred by ninety (90) days after the Closing Date of this Agreement due to the Minimum Census Condition not being satisfied on the applicable dates of measurement, then this Agreement shall be deemed terminated without a Seller right to cure.

     c.     provide Purchaser with a written weekly status report, setting forth the current census, new admissions with payor source, and any significant financial or operational developments.

     d.     maintain the Facility's licensure status in substantial compliance with all applicable laws, rules and regulations;

     e.     not sell, transfer or otherwise dispose of any of the Personal Property except in the ordinary course of business consistent with the prior practices of Seller, in which event Seller shall replace the same with similar property of equal quality, value and usefulness;

     f.     not enter into any contract which shall become the obligation of Purchaser nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any Contract which exists at present without Purchaser's prior written consent;

     g.     not decrease the private pay rates of the residents of the Facility without the prior written consent of Purchaser;

     h.     maintain records in accordance with all applicable federal and state laws

and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

      i.      not increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any of the employees of the Facility without the prior written consent of Purchaser;

      j.      not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated;

      k.      will use commercially reasonable efforts to preserve the present residency occupancy levels of the Facility and the goodwill with all of the suppliers, Facility residents and others having business relations with Seller or the Facility;

      l.      perform all of his obligations in respect of the Facility whether pursuant to any contracts, or other requirements, including payment before the same shall become due of all taxes, duties and other governmental charges that accrue prior to the Closing Date; and

      m.      promptly inform Purchaser in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against including delivery to Operator within three (3) business days of: (A) copies of all surveys and inspection reports from any governmental agencies received after the date hereof; and (B) notices received of any action pending, threatened or recommended by the appropriate state or federal agency having jurisdiction thereof to revoke, withdraw or suspend any right of Operator to operate the Facility, to terminate the participation of the Facility in the Title XVIII or Title XIX of the Social Security Act programs, to terminate or fail to renew any provider agreement related to the Facility, to terminate or fail to renew any material contract related to the Facility, or to take any action that would have a material adverse effect on Purchaser's ability to purchase and operate the Facility as a skilled nursing home facility and conduct their other business.

## 17.    **INDEMNIFICATION**.

      a.      In addition to and not in lieu, place, stead or substitution of any other indemnity set forth elsewhere herein, Purchaser hereby agrees to indemnify, save, protect, defend and hold harmless Seller, his employees, representatives and agents, from and against all liabilities, claims, losses, demands and causes of action of any nature whatsoever (collectively, "Losses") arising out of: i) Operator's operation of the Facility subsequent to the Closing, ii) any breach by Purchaser of his obligations, representations, warranties or covenants hereunder, or iii) injury to or death of persons or loss of or damage to property occurring on or at the Facility or in any manner growing out of or connected with the use or occupancy of the Facility or the condition thereof, or the use of any adjoining sidewalks, streets or ways subsequent to the Closing. Purchaser further agrees to pay any reasonable attorney's fees and expenses incident to the defense by Seller of any such Losses.

b.      In addition to and not in lieu, place, stead or substitution of any other indemnity set forth elsewhere herein, Seller hereby agrees to indemnify, save, protect, defend and hold harmless, Purchaser and his employees and agents, from and against all Losses incurred by such parties and/or Operator, arising out of: i) Operator's operation of the Facility prior to the Closing Date, ii) any breach by Seller of his obligations, representations, warranties or covenants hereunder, iii) any Recoupment Claim, iv) any liabilities, claims, demands and causes of action of any nature whatsoever for injury to or death of persons or loss of or damage to property occurring on or at the Facility or in any manner growing out of or connected with the use or occupancy of the Facility or the condition thereof, or the use of any adjoining sidewalks, streets or ways prior to the Closing or v) any resident present at the Facility on the Closing Date, for whom a recognized payor source cannot be obtained following the Closing. Seller further agrees to pay any reasonable attorney's fees and expenses incident to the defense by Purchaser of any such Losses.

c.      In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement ("Indemnitee's Claim") is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder, said Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend the Indemnified Claim. Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim.   Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent.  Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder.  In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim (or in the event sufficient funds are not available for such indemnification) and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to,

immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

d. Obligations of Seller under this Agreement shall be secured by and may also be offset against amounts due under the Note (as defined in the APA); provided that not more than the amount of Two Hundred Fifty Thousand Dollars ($250,000) may be offset against the Note with respect to such obligations (for purposes of which any amounts offset against the Note pursuant to the APA shall be included in such calculation) and that offset against the Note shall be made only with respect to claims made in writing during the period of thirty-six (36) months following the Closing..

e. For avoidance of doubt, Seller has agreed that Purchaser's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by Purchaser.

f. The parties' obligations under this Section 17 shall survive the Closing.

18. **REPRESENTATIONS AND WARRANTIES OF PURCHASER**. As an inducement to Seller to enter into this Agreement, Purchaser covenants and makes the following representations and warranties set forth below, which are true and correct as of the date hereof and which shall be true and correct on the Closing Date:

a. Organization and Authority. If applicable, Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Michigan and as of the Closing Date will have, all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so. This Agreement has been duly and validly executed and delivered by Purchaser and is enforceable against Purchaser in accordance with its terms.

b. No Violations. Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by Purchaser will:

i. violate any provision of his organization documents, if any; or

ii. be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which Purchaser is a party.

c. Accuracy of Representations and Warranties of Purchaser. No representation or warranty by or on behalf of Purchaser contained in this Agreement and

no statement by or on behalf of Purchaser in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Seller by or on behalf of Purchaser pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

      d.    Survival of Representations and Warranties of Purchaser.   Each representation and warranty of Purchaser hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing.

      19.    **REPRESENTATIONS AND WARRANTIES OF SELLER**.   As     an inducement to Purchaser to enter into this Agreement, Seller covenants and makes the following representations and warranties, which are true and correct as of the date hereof and which shall be true and correct as of the Closing Date:

      a.    Organization and Authority.  Operator is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Michigan, and has all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by Seller and is enforceable against Seller in accordance with its terms.

      b.    No Violations.  Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by Seller will:

      i.    violate any provision of his organization documents, if any;

      ii.    be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which Seller or Operator is a party or which pertains to the Property or the Facility; and

      iii.    result in the creation or imposition of any security interest, lien or other encumbrance upon any of the Property.

      c.    Ownership.  Seller is the sole owner of the Stock, free and clear of any liens, claims, charges or encumbrances, there is no outstanding option to purchase (or otherwise acquire) or similar agreement pertaining to the Stock, and there is no other outstanding Stock issued by the Operator.

      d.    Stock.  The Stock constitutes one hundred percent (100%) of the ownership rights and after the sale and assignment of the Stock, Purchaser shall be entitled to one hundred percent (100%) of all rights as stockholder in Operator including but not limited to, voting rights and rights to receive distributions made by the Operator, whether from income, sale of property or any other source.

14

e.     Organization.  Operator is a corporation duly incorporate, validly existing and in good standing under the laws of the State of Michigan, and has all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.

f.     Personal Property.  Each and every item constituting a portion of the Personal Property are owned by Operator free and clear of all liens and claims of all other parties.  The Personal Property is sufficient in quantity for the proper conduct and operation of the Facility as a skilled nursing home of at least 69 beds in substantial compliance with all applicable laws, ordinances, rules and regulations, including, without limitation, the minimum standards of LARA.

g.     No Consent Required.  No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Seller of this Agreement, or the performance by Seller of this Agreement, prior to, or as of or at the Closing Date, or as a consequence thereof, or with the consummation by Seller of transactions contemplated hereby to be consummated prior to, as of or at the Closing Date.

h.     Litigation.  Except as set forth in **Schedule 19.h.**, there are no pending, nor threatened claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit described in below, involving the Facility or the operation thereof before any court, agency or other judicial, administrative or other governmental body or arbitrator.

i.     Overpayments.  Except as set forth on **Schedule 19.i.**, there are no pending, nor, threatened claims, demands or other notices of or action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demanding the return of such alleged overpayments by any third party payor, nor is Seller aware of any grounds for such claim or demand.

j.     Audits.  To Seller's knowledge, there are no current desk audits or full audits by the United States Centers for Medicare and Medicaid ("CMS"), or any other applicable governmental regulatory agency in connection with any Medicaid or Medicare cost reports filed by Operator.  Seller agrees to fully cooperate with Purchaser in connection with any audit by LARA, MDCH, CMS or other applicable governmental regulatory agency in connection with any Medicaid or Medicare cost reports filed by Operator relating to periods prior to the Closing, including but not limited to providing Purchaser with any and all necessary documentation, supporting schedules and personnel in his or the Facility's possession in order to properly support the dollar figures and classifications/characterizations contained in Operator's cost reports relating to periods prior to the Closing, so that Operator's Medicaid or Medicare reimbursements with respect to periods following the Closing, are maximized.

k.     Licensure.  The Facility is and shall on the Closing Date be licensed by LARA as a 69 bed skilled care nursing home facility. Such license is and shall on the

Closing Date be unrestricted, unconditional, in good standing and in full force and effect and subject to no waivers or limitations. Except as set forth on **Schedule 19.k.,** Operator has not received any written notice from the LARA, MDCH, or any other governmental agency requiring the correction of any condition with respect to such license which has not been the subject of a plan of correction for which compliance has been affected and Seller has no reason to believe that the good standing of any such license is in jeopardy. The Facility is not currently within any open survey cycle.

l.     Certification.   The Facility is, and shall be on the Closing Date, certified for participation of the Medicare and Medicaid reimbursement programs.   Such certification is and shall on the Closing Date be in good standing and full force and effect and subject to no restrictions or limitations.   Operator has not received any notice from LARA, MDCH, CMS or any other governmental agency requiring the correction of any condition with respect to such certification which has not been the subject of a plan of correction for which compliance has been affected and Seller has no reason to believe that the good standing of such certification is in jeopardy.   Seller shall promptly comply with any violation notices concerning the Facility received after the date hereof and before the Closing Date to the extent that any such notice requires compliance activities. In addition to, and not in any manner limiting the generality of, the foregoing, during the three-year period prior to the Closing Date, except as set forth in **Schedule 19.l.,** Operator has not received any of the following with respect to the Facility:

1.     A notice of "immediate jeopardy" violations;

2.     A notice of termination of the license issued by LARA to operate the Facility as a 69 bed skilled nursing facility;

3.     A notice of termination of the certification issued by MDCH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

4.     A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs

5.     Imposition of a Corporate Integrity Agreement; and

6.     A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.

m.     Cost Reports.   Operator has filed, or will file, within the appropriate reporting period and with the appropriate authority, all cost reports required to be filed with respect to periods prior to the date hereof relating to the Facility.   All such reports have been or will be prepared in all respects in accordance with all applicable laws, rules and regulations.

n.     Life Care Contracts.   The Facility is not a party to any life care contract with respect to any resident of the Facility.

16

o.      Resident Transfers.   There shall be no transfer of residents from the Facility to a skilled nursing facility owned, operated or managed by Seller or an affiliate of Seller, nor shall there be any voluntary transfers by Operator of residents from the Facility to any other nursing facility, where such transfer is not in the ordinary course of business and not for reasons relating to the health and well-being of the resident transferred or otherwise required by law.

p.      Personal Property and Residents.   Unless specifically permitted pursuant to the terms of this Agreement, Seller shall not remove any items of personal property from the Facility nor shall it transfer residents from the Facility to a skilled/intermediate care nursing home facility owned or operated by an entity which is owned in whole or part, directly or indirectly, by the principals of Seller.  The information set forth in the admission agreements and patient rolls pertaining to residents of the Facility is true and correct in all material respects as of the respective dates of such admission agreements and patient rolls, and there are no patient care agreements with respect to any resident of the Facility which differs materially from the standard form used at the Facility.

q.      Personal Needs Allowance.   Operator is currently in material compliance with all state and federal regulations relating to maintaining and accounting for the personal needs allowance ("PNA") for residents who request the establishment of a PNA account.  Except as set forth in **Schedule 19.q.**, Seller has no knowledge of and has not received any notice from any governmental authority citing or alleging any violation by Operator or the Facility of any state or federal PNA regulations.

r.      Furniture.   There are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility license.  Each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by LARA.  For each such bed, there also exists the minimum furnishings, fixtures and other accessories required by LARA.

s.      Labor Unions.   Operator is not party to any collective bargaining agreement with any labor union or similar organization, nor does Seller know of any such organization which represents or claims to represent any of Operator's employees or intends to organize any of Operator's employees.

t.      Multi-Employer Plans.   Operator does not, and is not required to, contribute (and has not ever contributed or been required to contribute) to any multi-employer plan, as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") with respect to the Current Employees.

u.      Employee Benefit Plans.  Except as provided in **Schedule 19.u.**:

i.      Operator does not maintain or contribute to any non-qualified deferred compensation or retirement plans, contracts or arrangements;

ii.     Operator does not maintain or contribute to any qualified defined contribution plans (as defined in Section 3(34) of ERISA, or Section

17

414(i) of the Internal Revenue Code of 1986, as amended (the "Code"));

iii.   Operator does not maintain or contribute to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of the Code);

iv.   Operator does not maintain or contribute to any employee welfare benefit plans (as defined in Section 3(1) of ERISA); and

v.   Operator has not entered into, nor has Operator established or maintained, any change-in-control or severance agreements or plans.

v.   Environmental Condition.  Operator has not generated, stored or disposed of any Hazardous Substances on the Facility or the Property, nor has there been any previous generation, storage, disposal or existence of any hazardous waste on the Facility or the Property, except in such quantities that is customary in the operation of a skilled nursing facility and in all events in accordance with all Environmental Laws.

w.   Compliance with Applicable Laws.  The Property has been and is presently used and operated in compliance in all respects with, and in no way violates any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Property or any part thereof, and any rules or regulations promulgated thereunder, as well as any thereof relating to wages, hours, hiring, promotions, retirement, working conditions, nondiscrimination, health, safety, pensions and employee benefits, but not including any Environmental Laws.  Any representations or warranties related to Environmental Laws under this Agreement are contained in Section 19.v. above.  In addition, no waivers have been obtained or are required to make the representations contained in this Section 19 fully true and correct.

x.   Taxes. Operator has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns. Seller shall cause Operator to file all tax returns and reports, including any short year returns, resulting from this transaction, and pay any such taxes or amounts due resulting from same.

y.   Sprinklers.    There is present at the Facility a sprinkler system that is in full compliance with all applicable legal and regulatory requirements.

z.   Financial Materials.  All materials and/or documents relating to the financial condition and/or census of the Facility, provided by Seller to Purchaser, are true and complete in all material respects, and are not misleading in any material respect. Operator has no liabilities or obligations of any kind other than those contained in **Schedule 19.z.** hereto.

aa.   Patriot Act Compliance.  Neither Seller nor any person, group, entity or nation that Seller is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property

18

and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Seller is not engaging in the transaction contemplated by this Agreement, directly or indirectly, on behalf of, or instigating or facilitating the transaction contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation. Seller is not engaging in the transaction contemplated by this Agreement, directly or indirectly, in violation of any laws relating to drug trafficking, money laundering or predicate crimes to money laundering. None of the funds of Seller has been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners comprising Seller are prohibited by law or that the transaction contemplated by this Agreement or this Agreement is or will be in violation of any law. Seller has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.

bb.     Solvency. Operator is, and shall be on the Closing Date and following the Closing Date, solvent. For the purpose hereof, the term "solvent" means that (i) the fair saleable value of Operator's tangible assets is in excess of the total amount of its liabilities, and (ii) Operator is and will be able to pay its debts or obligations in the ordinary course as they mature.

cc.     HIPAA. Operator has not received notice that it is not in material compliance with the Health Insurance Portability and Accountability Act of 1996.

dd.     Government Investigations. Operator has received no written notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under the False Claims Act (31 U.S.C. Section 3729 et seq.), the Anti-Kickback Act of 1986 (41 U.S.C. Section 51 et seq.), the Federal Health Care Programs Anti-Kickback statute (42 U.S.C. Section 1320a-7a(b)), the Ethics in Patient Referrals Act of 1989, as amended (Stark Law) (42 U.S.C. 1395nn), the Civil Money Penalties Law (42 U.S.C. Section 1320a-7a), or the Truth in Negotiations (10 U.S.C. Section 2304 et seq.), Health Care Fraud (18 U.S.C. 1347), Wire Fraud (18 U.S.C. 1343), Theft or Embezzlement (18 U.S.C. 669), False Statements (18 U.S.C. 1001), False Statements (18 U.S.C. 1035), and Patient Inducement Statute and equivalent state statutes or any rule or regulation promulgated by a Governmental Authority with respect to any of the foregoing healthcare fraud laws affecting Operator with respect to the Facility.

ee.     Contracts. **Schedule 9.a** attached hereto includes a complete list of the Operator's existing contracts and agreements and there are no other agreements (written or oral) in place for which the Operator is a party or may be bound, and there has been no material breach by the Seller of any of the terms and conditions of the contract and agreement listed on **Schedule 9.a.**

ff.     S Corporation. The Operator has elected under Section 1362(a) of the

19

Code to be a business taxed as an S corporation for federal and state income tax purposes and has not taken any action, nor has any shareholder made any transfers or taken any action, that has caused or would cause the Operator's S Election to terminate and for the Operator to be taxed as a corporation for tax purposes.

gg.   <u>Accuracy of Representations and Warranties of Seller</u>.  No representation or warranty by or on behalf of Seller contained in this Agreement and no statement by or on behalf of Seller in any certificate, list, exhibit or other documents or materials furnished or to be furnished to Purchaser by or on behalf of Seller contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

hh.   <u>Survival of Representations and Warranties of Seller</u>.  Each representation and warranty of Seller hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing Date.

20.   **NO JOINT VENTURE**.   Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof.  The parties hereto do not intend that any third party shall have any rights under this Agreement.

21.   **EXHIBITS AND SCHEDULES**.  If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date.  Purchaser's obligations to close pursuant to this Agreement shall be conditioned upon Purchaser approving all exhibits and schedules within seven (7) days of submission thereof to Purchaser.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

22.   **EVENTS OF DEFAULT; REMEDIES**.  Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by either party ("Defaulting Party") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within five (5) business days of the earlier of said Defaulting Party's receipt or refusal of written notice of the same from the other party ("Non-Defaulting Party") hereto shall automatically and without further notice hereunder be an immediate event of default ("Event of Default") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder or in law or equity, including seeking specific performance and/or monetary damages.  The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief.  The Non-Defaulting

Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party.

23. **CHOICE OF LAW**.   THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF MICHIGAN AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

24. **JURISDICTION; VENUE**.  EXCEPT AS PROVIDED OTHERWISE IN THIS AGREEMENT, IN THE EVENT ANY DISPUTE BETWEEN THE PARTIES HERETO RESULTS IN LITIGATION, ALL SUCH ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN SHALL BE LITIGATED IN COURTS HAVING SITUS IN DETROIT, MICHIGAN, OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT ON MICHIGAN, SOUTHERN DIVISION.  EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.   THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION, AND ALSO WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH LITIGATION.

25. **DEFINITIONS**.  For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

*"CMS"* shall mean the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.

*"Contracts"* shall mean all contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of Seller's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which the Seller or his predecessors or agents is a party and which relate to the Facility and the operations thereof.

*"Environmental Laws"* shall mean all federal, state and local environmental, health, or safety laws or regulations now or hereafter enacted.

*"Hazardous Substances"* shall mean any toxic or hazardous waste or pollutants, or substances, including, without limitation, asbestos, PCB's, petroleum products and by products, substances defined or listed as: "Hazardous Substances " or "Toxic Substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA.") as amended, 42 U.S.C. § 9601, et seq., "Hazardous Materials" in the Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq., "Hazardous Waste" in The Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2061, et seq., any "Toxic Pollutant" under the Clean Water Act, 33 U.S.C. §125 1, et seq., as amended, any "Hazardous Air Pollutant" under the Clean Air Act, 42 U.S.C. § 7401, et seq., and any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local Environmental Laws.

*"LARA"* shall mean the Michigan Department of Licensing and Regulatory Affairs.

*"MDCH"* shall mean the Michigan Department of Community Health.

*"OIG"* shall mean the United States Department of Health and Human Services, Office of Inspector General

26. **GENERAL PROVISIONS**.

  a. Each party hereto agrees to use commercially reasonable efforts to cause the conditions to his obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date. Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder. Each party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

  b. All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by facsimile or e-mail (followed by delivery by one of the other means identified in (i)-(iii)) each addressed as follows:

If to Seller:  Robert W. Possanza Jr.
      540 West Hagerman Lake Road
      Iron River, MI 49935
      Email: robkelly@fast-air.net

With a copy to:  Polich Law Office
Roy Polich
117 W Genesee Street
P.O. Box 7
Iron River, MI 49935
Email: roy@roypolichlaw.com


If to Purchaser:  Benjamin T. Friedman
3336 W. North Shore Avenue
Lincolnwood, IL 60712
btf@anvilassetsgroup.com


With a copy to:  James E. Tompert, Esq.
Detroit Renaissance Center
400 Renaissance Center Drive
Suite 2600
Detroit, MI 48243
jamestompert@aol.com


Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in, the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; and any such notice delivered via facsimile shall be deemed delivered upon the notifying party's receipt of facsimile confirmation provided that the notifying party follows up such facsimile transmission with one of the other means identified above. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change his address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

     c.    Each party hereto shall bear his own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement, the Schedules hereto and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

     d.    The parties hereto acknowledge that they have been represented by independent legal counsel of their own choosing throughout the negotiations which preceded the execution of this Agreement, and that each party has executed this Agreement with the advice and consent of such independent legal counsel.

     e.    This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between

the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

f.      This Agreement may not be modified or amended except in writing signed by the parties hereto.

g.      No waiver of any term, provision or condition of this Agreement, if any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

h.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, including without limitation that Purchaser may designate a party, or parties, to acquire the stock of the Operator at Closing.  Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede

i.      All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

j.      This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

k.      All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof

l.      Each party hereto agrees to use such party's reasonable best efforts to cause the conditions to such party's obligations herein set forth to be satisfied at or prior to the Closing. Each of the parties agrees to execute and/or deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by any other party to assist with consummation of the transactions contemplated herein, or to evidence his rights hereunder.

m.      The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made apart hereof as if fully set forth herein.

n.      All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "or" "including" shall mean "including without limitation.

o.      If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

p.      The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

**IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

**SELLER:**                                 **PURCHASER:**

_____        _____
ROBERT W. POSSANZA JR.        BENJAMIN T. FRIEDMAN

26

<u>STOCK SELLER'S CERTIFICATE</u>

The undersigned (the "Seller") being all the stockholders of Iron River Care Services, Inc., a Michigan corporation (the "Company"), hereby certifies as follows:

1.  Management of the Company is vested in Robert W. Possaza Jr., as its President.

2.  On and as of the Closing Date, the representations and warranties of Seller set forth in that certain Stock Purchase Agreement (the "Agreement") between the Seller and Benjamin T. Friedman (the "Purchaser") are true and complete and the Seller is otherwise in full compliance with the terms and conditions set forth in the Agreement

3.  The company documents of Seller including, if applicable, the Articles of Formation and resolutions authorizing the transactions contemplated thereby; and signatures appearing on said documents are the true and correct signatures of all authorized persons who have executed the Agreement and all documents executed and delivered by Seller pursuant thereto (the "Other Documents").

In WITNESS WHEREOF, the undersigned has caused this Certificate to be executed as of December _____ **31** , 2018

SELLER

Signed: _____

Robert W. Possanza Jr., as President of Iron River Care Services, Inc.

## EXHIBIT A
## Form of Stock Powers

### IRREVOCABLE STOCK POWER

FOR VALUE RECEIVED, the undersigned, Robert W. Possanza Jr., as President of Iron River Care Services Inc., does hereby sell, assign and transfer to: Benjamin T. Friedman, 100 shares of voting stock of Iron River care Services Inc., a Michigan corporation represented by Stock Certificate No. 1, delivered herewith, standing in the name of the undersigned, on the books of Company.

The undersigned does hereby irrevocably constitute and appoint Benjamin T. Friedman of the Company, as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company.

Dated as of December ___31___, 2018

Signed: _____

Robert W. Possanza Jr., as President of Iron River Care Services, Inc.



# IRON RIVER CARE SERVICES, INC.

Certificate 1                                                                          **100** Shares

THIS IS TO CERTIFY THAT   Robert W. Possanza Jr.                                is the owner of   One Hundred (100)         fully paid and non-assessable shares of Common Stock One Dollar ($1.00) par value of

IRON RIVER CARE SERVICES, INC.

(INCORPORATED UNDER THE LAWS OF THE STATE OF MICHIGAN)

transferable only by the holder in person or by duly authorized attorney, upon surrender of this certificate properly endorsed.

The authorized Common shares of the Corporation represented hereby are all of one class with equal voting power, and each such share is equal to every other such share. This certificate and the shares represented hereby are issued and shall be subject to all the provisions of the Articles of Incorporation of the Corporation and of the amendments thereto, to all of which the holder, by the acceptance hereof, assents.

WITNESS the seal of the Corporation and the signature of its duly authorized officer.

Dated:  January 1, 2005

Robert W. Possanza, Jr., President

(See legend on reverse side)

© 1996 GOES 4520
All Rights Reserved

Date: Dec 28, 2018
Time: 06:39:51 CT
User: Robert Possanza

Schedule 5.b
Designated Payables

**Iron River Care Center**
**AP Trial Balance - NEW**
**as of close of period 1 - Jan of 2019**



Page # 1   of   1

| Vendor (Code) | Prepayments | 0-30 | 31-60 | 61-90 | 91+ | Total |
|---|---|---|---|---|---|---|
| Angeli Foods (10) | $0.00 | $0.00 | $89.75 | $0.00 | $0.00 | $89.75 |
| Aramark Uniform Services (11) | $0.00 | $0.00 | $4,899.72 | $0.00 | $0.00 | $4,899.72 |
| Aspirus Iron River (labs) (142) | $0.00 | $0.00 | $126.06 | $67.53 | $0.00 | $193.59 |
| Bigari Hardware (22) | $0.00 | $0.00 | $540.33 | $0.00 | $0.00 | $540.33 |
| Delta Dental (55) | $0.00 | $1,963.83 | $0.00 | $0.00 | $0.00 | $1,963.83 |
| Direct Supply (59) | $0.00 | $0.00 | $249.04 | $0.00 | $0.00 | $249.04 |
| Earthgrains Baking Companies Inc (64) | $0.00 | $0.00 | $299.41 | $0.00 | $0.00 | $299.41 |
| Great Lakes Home Med / Rotech (78) | $0.00 | $0.00 | $311.58 | $0.00 | $0.00 | $311.58 |
| Guardian Pest Control Inc. (81) | $0.00 | $0.00 | $75.08 | $0.00 | $0.00 | $75.08 |
| HCAM-Health Care Assoc of Michigan (86) | $0.00 | $1,109.52 | $0.00 | $0.00 | $0.00 | $1,109.52 |
| Iron County Internal Medicine Associates (309) | $0.00 | $0.00 | $0.00 | $115.00 | $0.00 | $115.00 |
| Jilbert Dairy Inc (115) | $0.00 | $0.00 | $883.98 | $0.00 | $0.00 | $883.98 |
| Kelly Possanza (197) | $0.00 | $0.00 | $139.85 | $0.00 | $0.00 | $139.85 |
| Krist Oil (127) | $0.00 | $0.00 | $125.38 | $0.00 | $0.00 | $125.38 |
| McKesson Medical-Surgical (140) | $0.00 | $0.00 | $4,934.81 | $0.00 | $0.00 | $4,934.81 |
| Reinhart Foodservice (206) | $0.00 | $0.00 | $9,896.13 | $0.00 | $0.00 | $9,896.13 |
| Staples Advantage (369) | $0.00 | $0.00 | $41.12 | $0.00 | $0.00 | $41.12 |
| State of Michigan (Lic.Plate) (150) | $0.00 | $0.00 | $495.00 | $0.00 | $0.00 | $495.00 |
| **Grand Total** | **$0.00** | **$3,073.35** | **$23,107.24** | **$182.53** | **$0.00** | **$26,363.12** |

Date: Dec 12, 2018
Time: 10:35:49 CT
User: Robert Possanza

**Iron River Care Center**
**AP Trial Balance - NEW**
as of close of period 12 - Dec of 2018

Schedule 5.b
Designated Payables

Page # 1   of   1

| Vendor (Code) | Prepayments | 0-30 | 31-60 | 61-90 | 91+ | Total |
|---|---|---|---|---|---|---|
| AFLAC (1) | $0.00 | $0.00 | $1,771.93 | $0.00 | $0.00 | $1,771.93 |
| Andrew F. Davis, P.C. (237) | $0.00 | $0.00 | $560.00 | $0.00 | $0.00 | $560.00 |
| Angeli Foods (10) | $0.00 | $0.00 | $188.45 | $0.00 | $0.00 | $188.45 |
| Aramark Uniform Services (11) | $0.00 | $1,636.20 | $8,186.57 | $0.00 | $0.00 | $9,822.77 |
| Aspirus Iron River (labs) (142) | $0.00 | $0.00 | $227.76 | $0.00 | $0.00 | $227.76 |
| Bigari Hardware (22) | $0.00 | $125.02 | $203.38 | $0.00 | $0.00 | $328.40 |
| City of Iron River (29) | $0.00 | $6,923.11 | $1,648.10 | $0.00 | $0.00 | $8,571.21 |
| Classic Engraving (32) | $0.00 | $0.00 | $28.50 | $0.00 | $0.00 | $28.50 |
| Cooper Office Equipment (43) | $0.00 | $781.45 | $0.00 | $0.00 | $0.00 | $781.45 |
| Culligan Water Conditioning (48) | $0.00 | $25.71 | $95.36 | $0.00 | $0.00 | $121.07 |
| Direct Supply (59) | $0.00 | $249.04 | $626.82 | $0.00 | $0.00 | $875.86 |
| Dr. Robert Han (342) | $0.00 | $1,000.00 | $0.00 | $0.00 | $0.00 | $1,000.00 |
| DTE Energy (61) | $0.00 | $0.00 | $2,282.53 | $0.00 | $0.00 | $2,282.53 |
| Earthgrains Baking Companies Inc (64) | $0.00 | $203.21 | $605.20 | $96.47 | $0.00 | $904.88 |
| Great Lakes Home Med / Rotech (78) | $0.00 | $111.58 | $261.58 | $0.00 | $0.00 | $373.16 |
| Guardian Pest Control Inc. (81) | $0.00 | $0.00 | $75.08 | $0.00 | $0.00 | $75.08 |
| GuideOne Insurance (82) | $0.00 | $1,080.50 | $0.00 | $0.00 | $0.00 | $1,080.50 |
| HealthCap RRG (253) | $0.00 | $2,552.34 | $0.00 | $0.00 | $0.00 | $2,552.34 |
| Healthcare Services Group, Inc. (95) | $0.00 | $14,034.84 | $0.00 | $0.00 | $0.00 | $14,034.84 |
| Iron County Internal Medicine Associates (309) | $0.00 | $0.00 | $115.00 | $0.00 | $0.00 | $115.00 |
| Iron County Reporter (173) | $0.00 | $0.00 | $78.00 | $0.00 | $0.00 | $78.00 |
| IRS (109) | $0.00 | $13,934.77 | $0.00 | $0.00 | $0.00 | $13,934.77 |
| Jilbert Dairy Inc (115) | $0.00 | $440.42 | $1,184.12 | $0.00 | $0.00 | $1,624.54 |
| Krist Oil (127) | $0.00 | $87.38 | $114.41 | $0.00 | $0.00 | $201.79 |
| McKesson Medical-Surgical (140) | $0.00 | $2,162.22 | $4,638.55 | $0.00 | $0.00 | $6,800.77 |
| Midwest Business Systems, Inc. (157) | $0.00 | $0.00 | $222.57 | $0.00 | $0.00 | $222.57 |
| North Country Drain Cleaning & Inspec. (367) | $0.00 | $125.00 | $0.00 | $0.00 | $0.00 | $125.00 |
| Omnicare, Inc (374) | $0.00 | $0.00 | $4,249.29 | $0.00 | $0.00 | $4,249.29 |
| Performance Health Supply (210) | $0.00 | $0.00 | $76.81 | $0.00 | $0.00 | $76.81 |
| PointClickCare (192) | $0.00 | $1,431.28 | $0.00 | $0.00 | $0.00 | $1,431.28 |
| Possanza,Robert Jr (196) | $0.00 | $0.00 | $0.00 | $0.00 | $128,048.80 | $128,048.80 |
| ProSure Fund (87) | $0.00 | $3,295.00 | $0.00 | $0.00 | $0.00 | $3,295.00 |
| Reinhart Foodservice (206) | $0.00 | $5,600.05 | $12,090.22 | $0.00 | $0.00 | $17,690.27 |
| RF Technologies Inc. (207) | $0.00 | $0.00 | $599.90 | $0.00 | $0.00 | $599.90 |
| Staples Advantage (369) | $0.00 | $132.78 | $320.57 | $0.00 | $0.00 | $453.35 |
| Stericycle, Inc. (234) | $0.00 | $150.68 | $0.00 | $0.00 | $0.00 | $150.68 |
| Teck Solutions, Inc. (239) | $0.00 | $232.14 | $0.00 | $0.00 | $0.00 | $232.14 |
| U.P. Rehab Services LLC (255) | $0.00 | $0.00 | $24,622.41 | $0.00 | $0.00 | $24,622.41 |
| Upper Peninsula Power Company (257) | $0.00 | $0.00 | $2,459.08 | $0.00 | $0.00 | $2,459.08 |
| USbank (258) | $0.00 | $0.00 | $221.53 | $0.00 | $0.00 | $221.53 |
| Verizon Wireless (260) | $0.00 | $0.00 | $328.90 | $0.00 | $0.00 | $328.90 |
| Waste Management of WI-MN (265) | $0.00 | $1,000.99 | $0.00 | $0.00 | $0.00 | $1,000.99 |
| **Grand Total** | **$0.00** | **$57,315.71** | **$88,082.62** | **$96.47** | **$128,048.80** | **$253,543.60** |

Error. OLD DEBT
Needs to be removed

## Schedule 7.a
## Resident Trust Funds

### IRON RIVER CARE SERVICES INC.
### 330 LINCOLN AVE
### IRON RIVER, MI 49935
### 906-265-5168

December 12, 2018

We hereby confirm that we have prepared and delivered to you a detailed accounting, in the form attached hereto, prepared in the manner required by law or appropriate regulatory authority of all resident trust funds being transferred to you associated with Iron River Care Center, 330 Lincoln Avenue, Iron River, Michigan (the facility) and that the total balance of such funds as of the opening of business on January 1, 2019 for such facility is $ _6102.93_. We have provided you with a list of the resident and final reconciled accountings of the amount held for each resident and are transferring the funds to you incident to the sale of the facility. We have delivered written accountings of funds held to each resident or their designated representative.

Robert W. Possanza Jr.
President            *Robert R*      *President*    12/31/18

I acknowledge such receipt of resident trust funds and confirm their current accuracy based on the facilities reporting.

Benjamin T. Friedman
President           *President*    12/31/18

Date: Dec 31, 2018
Time: 07:47:58 CT
User: Robert Possanza

**Iron River Care Center**
**Trust - Current Account Balance**
**as of 12/31/2018 by Effective Date**

Page # 1

| Client Account: All | Control Account: All | Status: All |
|---|---|---|

| Client Account | Current Balance |
|---|---|
| **Anderson, Joyce (1206)** | |
| Resident Funds | $60.27 |
| **Asplund, Marion (869)** | |
| Resident Funds | $107.91 |
| **Barry, Josephine (949)** | |
| Resident Funds | $176.03 |
| **Barry, Margaret (1201)** | |
| Resident Funds | $390.09 |
| **Bemis, Kathleen (867)** | |
| Resident Funds | $881.51 |
| **Benson, Virginia (979)** | |
| Resident Funds | $8.67 |
| **Bigari, Helen (1149)** | |
| Resident Funds | $35.12 |
| **Brozovich, Beatrice (1165)** | |
| Resident Funds | $69.06 |
| **Carlson, Evelyn (1195)** | |
| Resident Funds | $69.05 |
| **Christensen, Glenn (1196)** | |
| Resident Funds | $63.04 |
| **Colberg, Cecilia (880)** | |
| Resident Funds | $18.09 |
| **Colberg, Beatrice (1158)** | |
| Resident Funds | $40.65 |
| **Gallup, Fannie (870)** | |
| Resident Funds | $9.10 |
| **George, Gloria (1101)** | |
| Resident Funds | $125.48 |
| **Glines, Norma (1135)** | |
| Resident Funds | $49.71 |
| **Goodman, Mavis (1169)** | |
| Resident Funds | $105.68 |
| **Hagberg, Elizabeth (1150)** | |
| Resident Funds | $51.63 |
| **Hicks, Victoria (1147)** | |
| Resident Funds | $378.01 |
| **Hill, Kathleen (1032)** | |
| Resident Funds | $50.22 |
| **Hill, Oswald (1092)** | |
| Resident Funds | $28.50 |
| **Holmes, Joyce (1060)** | |
| Resident Funds | $65.95 |
| **Horne, Marion (1097)** | |
| Resident Funds | $59.45 |
| **Jackson, Leland (792)** | |
| Resident Funds | $84.19 |
| **Jones, Helen (982)** | |
| Resident Funds | $61.78 |
| **Kangas, Joyce (1093)** | |
| Resident Funds | $62.02 |
| **LaFountain, Theresa (1140)** | |
| Resident Funds | $100.82 |
| **Lang, LeRoy (1138)** | |
| Resident Funds | $27.66 |
| **Magnuson, Helen (860)** | |
| Resident Funds | $56.34 |
| **McCarthy, Daniel (1059)** | |
| Resident Funds | $228.00 |
| **McGreaham, Jacqueline (1162)** | |
| Resident Funds | $158.80 |
| **Nora, Bessie (873)** | |
| Resident Funds | $365.03 |
| **Novak, Lois (689)** | |
| Resident Funds | $362.07 |

Trust – Current Account Balance

**Novak, Lillian (1154)**
   Resident Funds                             $283.77
**Otto, MaryJane (847)**
   Resident Funds                                $82.54

Date: Dec 31, 2018
Time: 07:47:58 CT
User: Robert Possanza

**Iron River Care Center**
**Trust - Current Account Balance**
**as of 12/31/2018 by Effective Date**

Page # 2

| Client Account | Current Balance |
|---|---|
| **Petty, Cash (misc)** | |
| Resident Funds | $304.00 |
| **Saigh, Lorraine (814)** | |
| Resident Funds | $127.73 |
| **Scalcucci, Ruby (1003)** | |
| Resident Funds | $109.70 |
| **Schauwecker, Lois (1186)** | |
| Resident Funds | ($2.44) |
| **Seymour, Rose (871)** | |
| Resident Funds | $70.07 |
| **Skrivanie, Steve (849)** | |
| Resident Funds | $915.72 |
| **Smith, Eileen (1199)** | |
| Resident Funds | $25.20 |
| **Uren, Daryl (933)** | |
| Resident Funds | $90.70 |
| **Vande Hey, Kerry (1183)** | |
| Resident Funds | $50.01 |

## Client Account Summary

| | |
|---|---|
| Resident Funds | $6,406.93 |
| Total | $6,406.93 |

## Control Account Summary

| | |
|---|---|
| Trust Bank | $6,102.93 |
| Trust Petty Cash | $304.00 |
| Total | $6,406.93 |

Schedule 9.a
Contracts 

# IRON RIVER CARE SERVICES INC.
## 330 LINCOLN AVE
## IRON RIVER, MI 49935
## 906-265-5168

## CONTRACT LIST

December 14, 2018

| | | |
|---|---|---|
| Ahern | Kitchen Hood Suppression | Annual |
| Aramark | Linens | Month to Month |
| BC/BS | Employee Insurance | Renewal 4/1/2019 |
| Cooper Office | Copier Lease | Expires  2021 |
| Dr. Robert Han | Medical Director | Month to Month |
| GuideOne Ins. | Building Insurance | Expires 3/31/2019 |
| HealthCap Ins. | Professional Liability | Expires 3/31/2019 |
| Healthcare Services | Housekeeping/Laundry | Month to Month |
| MatrixCare | Payroll Software | Expires 12/1/2021 |
| Omnicare | Pharmacy | Expires 6/24/2019 |
| Point Click Care | Medical Software | Month to Month |
| ProSure Fund | Workers Comp | Expires July 2019 |
| Dale Schmeisser | Registered Dietician | Month to Month |
| UP Rehab | Therapy | Month to Month |
| Waste Management | Trash Removal | Month to Month |

**Schedule 10**
**Accrued PTO**

12/18/2018

| NAME | | ANNIV DATE | UNUSED SICK | UNUSED VACA | HOURLY | COST | FICA | | State | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adams | Christine | 11/8/2018 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Armstrong | Roberta | 8/2/2010 | 8 | 120 | 12.78 | $1,635.84 | 7.65% | $125.14 | 4.25% | $69.52 | $1,830.50 |
| Austin | Catherine | 6/28/2018 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Bekkala | Richard | 4/1/2011 | 42 | 72 | 24.55 | $2,798.70 | 7.65% | $214.10 | 4.25% | $118.94 | $3,131.75 |
| Bender | Teri | 11/8/2018 | 0 | 0 | 28.28 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Brenes | Irene | 4/26/2012 | 32 | 105 | 12.59 | $1,724.83 | 7.65% | $131.95 | 4.25% | $73.31 | $1,930.08 |
| Bryan | Ashley | 4/9/2018 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Burton | Margaret | 9/11/2008 | 0 | 0 | 24.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Bussiere | Debra | 6/29/1989 | 48 | 64 | 13.66 | $1,529.92 | 7.65% | $117.04 | 4.25% | $65.02 | $1,711.98 |
| Carlson | Jessica | 5/25/2017 | 42 | 35 | 18.00 | $1,386.00 | 7.65% | $106.03 | 4.25% | $58.91 | $1,550.93 |
| Coble | Andrew | 11/30/2016 | 48 | 80 | 12.00 | $1,536.00 | 7.65% | $117.50 | 4.25% | $65.28 | $1,718.78 |
| Dalby | Susan | 4/9/2018 | 0 | 0 | 26.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Dixon | Samantha | 5/14/2014 | 48 | 56 | 18.73 | $1,947.92 | 7.65% | $149.02 | 4.25% | $82.79 | $2,179.72 |
| Dutcher | Elaina | 11/29/2018 | 0 | 0 | 10.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Engebos | Marilyn | 7/22/2004 | 0 | 160 | 11.81 | $1,889.60 | 7.65% | $144.55 | 4.25% | $80.31 | $2,114.46 |
| Faehling | Linda | 8/4/2009 | 40 | 88 | 13.34 | $1,707.52 | 7.65% | $130.63 | 4.25% | $72.57 | $1,910.71 |
| Fortin | Emily | 6/23/2011 | 24 | 88 | 12.74 | $1,426.88 | 7.65% | $109.16 | 4.25% | $60.64 | $1,596.68 |
| Gude | Kristen | 12/7/2017 | 18 | 30 | 12.00 | $576.00 | 7.65% | $44.06 | 4.25% | $24.48 | $644.54 |
| Gursky | Marsha | 3/20/2012 | 32 | 36 | 16.75 | $1,139.00 | 7.65% | $87.13 | 4.25% | $48.41 | $1,274.54 |
| Haile | Wendy | 3/2/2017 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Harmon | Julie | 1/7/2010 | 16 | 0 | 15.20 | $243.20 | 7.65% | $18.60 | 4.25% | $10.34 | $272.14 |
| Hoffart-Holm | Ashley | 1/24/2006 | 39 | 44 | 14.95 | $1,240.85 | 7.65% | $94.93 | 4.25% | $52.74 | $1,388.51 |
| Holm | Sadie | 2/19/2018 | 0 | 0 | 36.06 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Hurt | Michael | 11/8/2018 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Johnson | Anastasia | 12/1/2011 | 18 | 90 | 10.34 | $1,116.72 | 7.65% | $85.43 | 4.25% | $47.46 | $1,249.61 |
| Kataja | Carmen | 2/16/1998 | 16 | 72 | 32.81 | $2,887.28 | 7.65% | $220.88 | 4.25% | $122.71 | $3,230.87 |
| Koski | Leanne | 5/25/2016 | 7 | 50 | 18.00 | $1,026.00 | 7.65% | $78.49 | 4.25% | $43.61 | $1,148.09 |
| Kot | Deborah | 4/29/2010 | 40 | 40 | 30.77 | $2,461.60 | 7.65% | $188.31 | 4.25% | $104.62 | $2,754.53 |
| Krieser | Linda | 7/9/1984 | 43 | 56 | 17.03 | $1,685.97 | 7.65% | $128.98 | 4.25% | $71.65 | $1,886.60 |
| LaFountain | Christine | 9/19/2002 | 40 | 120 | 22.97 | $3,675.20 | 7.65% | $281.15 | 4.25% | $156.20 | $4,112.55 |

| NAME | | ANNIV DATE | UNUSED SICK | UNUSED VACA | HOURLY | COST | FICA | | State | | Total |
|------|------|-----------|-------------|-------------|--------|------|------|------|-------|------|-------|
| Lapp | Nancy | 9/21/2017 | 45 | 37 | 11.00 | $902.00 | 7.65% | $69.00 | 4.25% | $38.34 | $1,009.34 |
| Linthicum | Marissa | 8/23/2018 | 0 | 0 | 9.25 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Lowden | Barbara | 1/17/1994 | 48 | 16 | 24.19 | $1,548.16 | 7.65% | $118.43 | 4.25% | $65.80 | $1,732.39 |
| Marcell | Judy | 9/5/2000 | 48 | 160 | 12.62 | $2,624.96 | 7.65% | $200.81 | 4.25% | $111.56 | $2,937.33 |
| Matthews | Lisa | 10/26/2017 | 5 | 35 | 12.00 | $480.00 | 7.65% | $36.72 | 4.25% | $20.40 | $537.12 |
| Mattson | Cynthia | 4/5/2013 | 0 | 56 | 12.33 | $690.48 | 7.65% | $52.82 | 4.25% | $29.35 | $772.65 |
| Mattson | Tabitha | 3/9/2016 | 48 | 32 | 9.50 | $760.00 | 7.65% | $58.14 | 4.25% | $32.30 | $850.44 |
| Mercier | Patricia | 5/25/2017 | 0 | 0 | 27.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Miatech | Kathleen | 4/13/2018 | 0 | 0 | 9.75 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Michael | Lori | 1/26/1983 | 48 | 40 | 18.91 | $1,664.08 | 7.65% | $127.30 | 4.25% | $70.72 | $1,862.11 |
| Mickelson | Deanna | 8/1/2005 | 6 | 60 | 14.06 | $927.96 | 7.65% | $70.99 | 4.25% | $39.44 | $1,038.39 |
| Pryor | Cynthia | 12/14/1989 | 18 | 100 | 16.81 | $1,983.58 | 7.65% | $151.74 | 4.25% | $84.30 | $2,219.63 |
| Quarford | Kristal | 9/26/2013 | 10 | 90 | 18.00 | $1,800.00 | 7.65% | $137.70 | 4.25% | $76.50 | $2,014.20 |
| Randall | Christine | 10/1/2007 | 37 | 110 | 13.73 | $2,018.31 | 7.65% | $154.40 | 4.25% | $85.78 | $2,258.49 |
| Recla | Georgia | 3/3/2011 | 0 | 0 | 18.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Roberts | Marsha | 10/1/2018 | 0 | 0 | 10.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Rogers | Malgorzata | 2/15/1999 | 0 | 0 | 14.77 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Rozine | Olivia | 7/7/2017 | 4 | 10 | 12.00 | $168.00 | 7.65% | $12.85 | 4.25% | $7.14 | $187.99 |
| Sarafiny | Zane | 3/9/2018 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Shively | Jolene | 12/21/2016 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Spitza | Jennifer | 4/24/2017 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Stiffe | Marion | 9/18/2000 | 0 | 0 | 14.89 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Stram | Michael | 8/24/2015 | 48 | 80 | 12.27 | $1,570.56 | 7.65% | $120.15 | 4.25% | $66.75 | $1,757.46 |
| Sunn | Jacqueline | 6/6/2002 | 48 | 101 | 19.23 | $2,865.27 | 7.65% | $219.19 | 4.25% | $121.77 | $3,206.24 |
| Thompson | Marianna | 12/1/2011 | 14 | 75 | 22.30 | $1,984.70 | 7.65% | $151.83 | 4.25% | $84.35 | $2,220.88 |
| Todhe | Stacy | 7/21/2016 | 34 | 44 | 12.00 | $936.00 | 7.65% | $71.60 | 4.25% | $39.78 | $1,047.38 |
| Wegner | Beth | 9/17/2015 | 48 | 56 | 12.00 | $1,248.00 | 7.65% | $95.47 | 4.25% | $53.04 | $1,396.51 |
| Willison | Michaela | 11/8/2016 | 0 | 0 | 9.50 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| Yates | Maeghan | 8/23/2018 | 0 | 0 | 12.00 | $0.00 | 7.65% | $0.00 | 4.25% | $0.00 | $0.00 |
| | | | | | TOTAL | $57,807.09 | | | | TOTAL | $64,686.13 |

12/30/17

**Iron River Care Services Inc**
**Check Register Totals**

1

### Taxes

| Description | Amount |
|---|---|
| Federal | $6,341.68 |
| FICA | $4,158.95 |
| Medicare | $972.70 |
| State | $2,655.37 |
| Local | $0.00 |
| EIC | $0.00 |
| **Totals** | **$14,128.70** |

### Summary

| Description | Amount |
|---|---|
| Gross Pay | $70,979.10 |
| Deductions | $5,529.00 |
| Taxes | $14,128.70 |
| **Net Pay** | **$51,321.40** |
| **Checks Count** | **61** |

### Tax Deposit

| Description | Amount |
|---|---|
| Federal Tax | $6,341.68 |
| Employee FICA | $4,158.95 |
| Employer FICA | $4,158.95 |
| Employee Medicare | $972.70 |
| Employer Medicare | $972.70 |
| Earned Income Credit | $0.00 |
| **Tax Deposit** | **$16,604.98** |

### Earnings

| Description | Hours | Amount |
|---|---|---|
| Bonus | 13.00 | $445.00 |
| Birthday | 2.00 | $24.00 |
| Holiday | 385.00 | $5,272.83 |
| Overtime | 152.00 | $3,292.43 |
| Regular | 3,364.25 | $58,417.60 |
| Sick | 90.00 | $1,161.40 |
| Vacation | 169.00 | $2,365.84 |
| **Totals** | **4,175.25** | **$70,979.10** |

### Deductions

| Description | Amount |
|---|---|
| AFLAC Insurance - After | $324.35 |
| IRA - Fixed | $700.00 |
| Child Support | $484.97 |
| Health Insurance-Pre Tax | $3,050.00 |
| Dental Insurance-Pre Tax | $374.00 |
| Vision Insurance-Pre Tax | $111.00 |
| AFLAC Insurance-Pre Tax | $364.93 |
| S-Corp MP | $0.00 |
| Garnishment - Fixed | $119.75 |
| **Totals** | **$5,529.00** |

Payroll Period
Dec 17 - 30  2017

Thursday, December 27, 2018

1:21 PM

| Facility #: | | Iron River Care Center | | | | | | Facility Code: | |
|---|---|---|---|---|---|---|---|---|---|
| Date: Dec 28, 2018 | | A/R Aging Report | | | | | | User: Robert Possanza | |
| Time: 06:40:58 CT | | December 2018 | | | | | | Page 1 of        1 | |

Resident: All Status: Both Aging Type: A/R Aging Age By: Service Date Buckets: PCC Default Balance Filter Options: All Payers: All

| Payer | Total +12/18 | Future Cash | Current 12/18 | 30 11/18 | 60 10/18 | 90 09/18 | 120 08/18 | 150 07/18 | 180 06/18 | 210 +05/18 |
|---|---|---|---|---|---|---|---|---|---|---|
| INSURANCE CO-INSURANCE A (IXA) | $33,012.50 | $0.00 | $13,735.00 | $4,690.00 | $0.00 | $0.00 | $0.00 | $0.00 | $837.50 | $13,750.00 |
| INSURANCE CO-INSURANCE B (IXB) | $928.83 | $0.00 | $0.00 | $144.24 | $45.84 | $0.00 | $0.00 | $0.00 | $738.75 | $0.00 |
| MANAGED CARE PART B (MCT) | $23,521.91 | $0.00 | $0.00 | $1,770.77 | $748.62 | $821.38 | $2,701.42 | $6,140.63 | $2,210.52 | $9,128.57 |
| MEDICAID (MA) | $250,011.94 | $0.00 | $135,083.40 | $16,753.29 | $9,579.53 | $6,925.00 | $7,221.00 | $6,199.00 | $3,126.00 | $65,124.72 |
| MEDICAID CO-INSURANCE A (MXA) | $3,118.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($664.00) | $3,782.00 |
| MEDICAID PENDING (MP) | ($67.05) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($67.05) | $0.00 | $0.00 |
| MEDICARE A (MCA) | $49,027.68 | $0.00 | $38,853.89 | $10,173.79 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| MEDICARE B (MCB) | $6,924.25 | $0.00 | $0.00 | $1,812.38 | $871.56 | $0.00 | $0.00 | $0.00 | $495.01 | $3,745.30 |
| MEDICARE REPLACEMENT (MR) | $6,197.65 | $0.00 | $6,197.65 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PATIENT PAY AMOUNT (PPA) | $10,451.78 | $0.00 | $4,348.00 | ($836.00) | $1.00 | $266.00 | $1,412.00 | $1.00 | $1.00 | $5,258.78 |
| PRIVATE PAY (PP) | $31,627.18 | $0.00 | $10,238.50 | $4,321.00 | $2,739.50 | $5,025.00 | $502.50 | $0.00 | $6,303.00 | $2,497.68 |
| UP MEDICAID HEALTH PLAN (UPM) | $25,545.06 | $0.00 | $14,160.95 | $0.00 | $852.18 | $383.40 | $396.18 | $198.09 | $191.70 | $9,362.56 |
| **Total** | **$440,299.73** | **$0.00** | **$222,617.39** | **$38,829.47** | **$14,838.23** | **$13,420.78** | **$12,233.10** | **$12,471.67** | **$13,239.48** | **$112,649.61** |

Schedule 11
Designated Receivables

| | |
|---|---|
| Facility #: | Iron River Care Center |
| Date: Dec 12, 2018 | A/R Aging Report |
| Time: 10:34:25 CT | December 2018 |

Facility Code:
User: Robert Possanza
Page 1 of    1

Resident: All Status: Both Aging Type: A/R Aging Age By: Service Date Buckets: PCC Default Balance Filter Options: All Payers: All

| Payer | Total +12/18 | Future Cash | Current 12/18 | 30 11/18 | 60 10/18 | 90 09/18 | 120 08/18 | 150 07/18 | 180 06/18 | 210 +05/18 |
|---|---|---|---|---|---|---|---|---|---|---|
| INSURANCE CO-INSURANCE A (IXA) | $33,012.50 | $0.00 | $13,735.00 | $4,690.00 | $0.00 | $0.00 | $0.00 | $0.00 | $837.50 | $13,750.00 |
| INSURANCE CO-INSURANCE B (IXB) | $1,397.23 | $0.00 | $0.00 | $144.24 | $45.84 | $114.02 | $180.78 | $173.60 | $738.75 | $0.00 |
| MANAGED CARE PART B (MCT) | $31,070.16 | $0.00 | $0.00 | $3,611.81 | $1,828.36 | $1,956.09 | $5,343.52 | $6,140.63 | $2,210.52 | $9,979.23 |
| MEDICAID (MA) | $367,029.73 | $0.00 | $135,083.40 | $133,771.08 | $9,579.53 | $6,925.00 | $7,221.00 | $6,199.00 | $3,126.00 | $65,124.72 |
| MEDICAID CO-INSURANCE A (MXA) | $3,118.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($664.00) | $3,782.00 |
| MEDICAID PENDING (MP) | $258.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $258.00 | $0.00 | $0.00 |
| MEDICARE A (MCA) | $50,527.31 | $0.00 | $16,006.61 | $34,520.70 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| MEDICARE B (MCB) | $13,972.70 | $0.00 | $0.00 | $8,860.83 | $871.56 | $0.00 | $0.00 | $0.00 | $495.01 | $3,745.30 |
| MEDICARE REPLACEMENT (MR) | $14,877.31 | $0.00 | $4,779.47 | $10,097.84 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| PATIENT PAY AMOUNT (PPA) | $21,585.78 | $0.00 | $16,078.00 | $189.00 | $1.00 | $266.00 | ($294.00) | $1.00 | $1.00 | $5,343.78 |
| PRIVATE PAY (PP) | $46,434.18 | $0.00 | $18,366.50 | $11,000.00 | $2,739.50 | $5,025.00 | $502.50 | $0.00 | $6,303.00 | $2,497.68 |
| UP MEDICAID HEALTH PLAN (UPM) | $40,079.36 | $0.00 | $14,160.95 | $13,620.50 | $852.18 | $383.40 | $396.18 | $198.09 | $191.70 | $10,276.36 |
| Total | $623,362.26 | $0.00 | $218,209.93 | $220,506.00 | $15,917.97 | $14,689.51 | $13,349.98 | $12,970.32 | $13,239.48 | $114,499.07 |

**Schedule 19.h**
**Litigations**


None.

**Schedule 19.i**
**Overpayments**

# IRON RIVER CARE SERVICES INC.
# 330 LINCOLN AVE
# IRON RIVER, MI 49935

December 20, 2018

I commit to cover the remaining/outstanding monthly Medicaid recovery repayments through April 2019 of $10,928 x 4 months (January-April) which equal $43,712 and to pay the outstanding QAS bill for October, November, and December 2018 of $123,323.40 which has not been billed to the Iron River Care Center as of today and expected to be billed in January 2019.

Robert W. Possanza Jr.
President



STATE OF MICHIGAN

RICK SNYDER
GOVERNOR

DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

NICK LYON
DIRECTOR

May 21, 2018

Administrator
Iron River Care Center
330 Lincoln Avenue
Iron River, MI 49935

RE: Settlement Recovery Schedule
Provider Name: Iron River Care Center
National Provider Identifier Number: 1396724332
Fiscal Year End: Settlement – 12/31/2010 thru 12/31/2016

Dear Administrator:

The facility's request for an extended period of time to repay the Department monies owed has been granted, in accordance with the Medicaid Provider Manual, Nursing Facility Chapter, Cost Reporting and Reimbursement Appendix, Section 7.5.

On May 31, 2018, a reversal of the May 24, 2018 Settlement GACR (totaling $131,136.00) will be processed. The monies owed will be recovered by gross adjustments input per the following schedule:

| | Pay Cycle Date | Amount |
|---|---|---|
| 1. | May 31, 2018 | ($ 10,928.00) |
| 2. | June 28, 2018 | ($ 10,928.00) |
| 3. | July 26, 2018 | ($ 10,928.00) |
| 4. | August 30, 2018 | ($ 10,928.00) |
| 5. | September 27, 2018 | ($ 10,928.00) |
| 6. | October 25, 2018 | ($ 10,928.00) |
| 7. | November 29, 2018 | ($ 10,928.00) |
| 8. | December 27, 2018 | ($ 10,928.00) |
| 9. | January 31, 2019 | ($ 10,928.00) |
| 10. | February 28, 2019 | ($ 10,928.00) |
| 11. | March 28, 2019 | ($ 10,928.00) |
| 12. | April 25, 2019 | ($ 10,928.00) |
| | Total dollar amount of recoveries | ($131,136.00) |

CAPITOL COMMONS CENTER ▪ P.O. BOX 30479 ▪ LANSING, MICHIGAN 48909-7979
www.michigan.gov/mdhhs ▪ 1-517-335-5356



Administrator
Iron River Care Center
May 21, 2018
Page two

The recovery schedule will be revised if our Bureau at any time during the recovery period determines that the Department owes the facility money.  Amounts due the facility will be used to reduce the length of the recovery period.

If you have any questions, please contact this office by mail.

Sincerely,

/S/Sandra M. Pohl, Department Technician
LTC Reimbursement and Rate Setting Section
Bureau of Audit, Reimbursement and Quality Assurance
Financial Operations Administration

36-404

Schedule 19.i
Overpayments

**IRON RIVER CARE CENTER**
**330 LINCOLN AVE**
**IRON RIVER, MI 49935**
**906-265-5168**

April 25, 2018

Mr. Mark West
Section Manager
LTC Reimbursement and Rate Setting Section
Capital Commons Center
P.O. Box 30479
Lansing, MI 48909-7979

Mr. West:

I would like to request a payback plan for the cost reports final settlements received April 25, 2018 for the period of 2009 through 2015. These final settlements have taken a considerable length of time for audit to process and having them all recovered in one to three months will cause a substantial burden on my facility.

Additionally, the initial settlement for cost report year 2016 has not been audited by Gaylord Regional Office. There is a settlement agreement sent to me from auditor Carol Wright being considered in lieu of a field audit which I have not signed yet and still considering.

My average monthly Medicaid warrant check is approximately $125,000. I believe a payback of 12 months would be fair considering the length of time it has taken to get the final settlements done and the fact there are 8 years of audit settlements. The pay back would take away approximately 10% of my monthly warrant if accepted. I would appreciate your consideration in this matter.

Sincerely,

Robert W. Possanza Jr.
President/Administrator

**Schedule 19.k**
**Licensure**

None.

**Schedule 19.l**
**Certification**

None.

**Schedule 19.q**
**Personal Needs Allowance**

None.

**Schedule 19.u**
**Employee Benefit Plans**

None.

**Schedule 19.z**
**Financial Materials**


None.