UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN (DETROIT) DIVISION

| | |
|---|---|
| THE CASCADES OF IRON RIVER HOLDINGS, LLC AND BENJAMIN T. FRIEDMAN,<br><br>    PLAINTIFFS,<br><br>-V-<br><br>IRON RIVER LAND COMPANY, LLC AND ROBERT W. POSSANZA, JR.,<br><br>    DEFENDANTS. | CIVIL ACTION NO. 24-CV-10013<br>HON. MARK A. GOLDSMITH<br>MAGISTRATE HON. CURTIS IVY, JR. |

## DEFENDANTS' REPLY BRIEF

Defendants rely on the Brief already filed with their dispositive Motion; that said, Defendants Iron River Land Company, LLC ("IRLC") and Robert W. Possanza, Jr. ("Possanza") are quite surprised that Plaintiffs dedicate their Response Brief to placing the blame on Defendants when the law and the written agreements places the onus on Plaintiffs. Moreover, the Court will note that many of the issues raised by Defendants in their dispositive Motion were not even addressed by Plaintiffs in their Response Brief, let alone argued with any applicable law that would circumvent the legal support supporting Defendants' absolute defenses, to bar the relief and claims of Plaintiffs.

Plaintiffs, The Cascades of Iron Holdings ("Cascades") and Benjamin T. Friedman ("Friedman") purchased the Nursing Home and the real property from IRLC and Friedman, individually, was purchasing the stock of Iron River Care Services, LLC

1

("IRCS") from Possanza.

Paragraph 5 of the Asset Purchase Agreement ("APA") (ECF No. 1-1 PageID.18), is a thorough and complete Due Diligence process for Plaintiffs. Under this Paragraph, Plaintiffs were entitled to a comprehensive investigation and analysis before finalizing the transaction. Under Paragraph 5, Plaintiffs had between July 17, 2018 and December 21, 2018 to bring any issues to light that they felt were important to the sale.

The Stock Purchase Agreement ("SPA") (ECF 1-2 PageID.47) clearly provides in paragraph 4.i., the same limited period for due diligence. Paragraph 6 xxi (ECF 1-2 PageID.20) of the APA provides that closing would not occur until Purchaser is fully satisfied with the Purchased Assets, financial condition and operations of the Facility.

Notwithstanding the foregoing language and representations by Plaintiffs, Plaintiffs quote paragraph 9.(i), which provides in pertinent part, as follows:

> (i)   **Conditions of the Purchased Assets.** There exists no defective condition, structural or otherwise, with respect to the Purchased Assets. All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).

What Plaintiffs of course fail to appreciate, is the following portion of the foregoing clause:

> ...*All major structural, electrical and mechanical systems and elements are in good working order and condition for their intended uses in all material respects and will be in such good working order and condition on the Closing Date (ordinary wear and tear excepted).*

The roof was in fact in good working order and as would be expected of a used

and aged commercial roof, in the ordinary course of business it had to be patched and tarred and maintained. This was not only the condition of the roof during the Due Diligence period, but further, present on ceiling tiles were several water spots from where the roof had previously leaked and required patching. Friedman walked the roof with Possanza and the roof was discussed. Under the Agreements, Plaintiffs were free to perform *any* due diligence they deemed appropriate, *as long as it was performed within the 110-business day period.* Thus, had Plaintiffs inspected the premises, if the roof was so bad, the inspection would have reflected an aged roof in poor or good condition. Defendants made no representation that Plaintiffs were purchasing a building with a new roof. The sole representation was that the roof was in good working order and in fact it was, it merely required maintenance as does electrical, plumbing, etc. Moreover, Plaintiffs closed in 2018 and the very first time the roof was brought up was December 31, 2021, three years later and the e-mail from Plaintiff (ECF No.1-4) reflects that the roof had been replaced. To that end, Defendants have no possible way of evaluating the condition of the roof as well as having no way to establish or prove whether the roof required replacement. Plaintiffs *allege* in their Complaint that it was right after Closing on December 31, 2018 that they discovered the defects with the roof and spoke with employees that acknowledged roof issues. Query, why did these alleged discussions not take place during the due diligence period when Plaintiffs roamed freely around the facility for days and weeks? Moreover, if Plaintiffs learned right after closing, why wait three years to make the disclosure and more importantly, why destroy any

3

vestige of Defendants' ability to inspect and ascertain the condition of the roof?

Much the same, Plaintiffs had the absolute right to review any and all financial documentation and information, personally, with professionals or otherwise, to ascertain the financial condition of the facility as well as the propriety of the financial information being provided *as long as it was performed within the 110 business day period*. The claim for an alleged loss of income is solely caused by Plaintiffs' failure to pursue these monies and to file the appropriate documentation with the proper Governmental authorities. This is not the result of Defendants' failures; however, even if it was, Plaintiffs' obligation to undertake due diligence *or waive* anything therefrom, is against Plaintiffs and in turn bars the claims herein. In the end, Plaintiffs have abandoned this issue as the Court will note that this issue is not referenced in the Response Brief, let alone argued with applicable law.

Lastly, Plaintiffs' Complaint herein seeks to offset the indebtedness under the Note as a result of the following condition 12(d) statements, however the provision allows for a set-off for obligations, i.e. undertakings or actions *to be* taken, not for alleged warranty misstatements. The specific language states as follows:

> (d)  <u>Note.</u> Amounts due under the Note may be offset with *respect to any obligations of the Seller under this Agreement and/or obligations of the Seller under the SPA.*

The specific verbiage allows for an offset if Defendants failed to perform an obligation, i.e. any action they were obligated to undertake. In fact, Plaintiffs' claims seek to address the then-existing status as of 2018. To that end, Plaintiffs' claims are

barred as a matter of law due to the failure to conduct and undertake due diligence as to the roof and as to the resident account wherein the Department for Health and Human Services (DHHS) refused to pay the reimbursement sought.

**FRAUD:** Relative to the arguments raised by Defendants, Plaintiffs address some generic law relating to fraud. Yet, Plaintiffs totally fail to address the specific requirements as addressed by Defendants in their Brief. Furthermore, as held in *Nieves v Bell Indus*, 204 Mich App 459, 464 (1994), "A misrepresentation claim requires reasonable reliance on a false representation. *There can be no fraud where a person has the means to determine that a representation is not true*." (emphasis added) (citing *Montgomery Ward & Co v Williams*, 330 Mich 275; 47 NW2d 607 (1951); *Webb v First of Michigan Corp*, 195 Mich App 470, 474; 491 NW2d 851 (1992). The onus was clearly on Plaintiffs by virtue of the aforementioned agreements and applicable law and yet, Plaintiffs fail to address this issue at all. Plaintiffs failed to undertake inspections, failed to undertake an inspection by engineers and other professionals and then three years after the fact, provide an e-mail alleging some roof issues some three years earlier. The law does not provide an allowance for a Plaintiff to have the ability to inspect, to perform due diligence and inspections, fail to do so and then come three years after the fact and allege some deficiency attributable to Defendants. This is a commercial building that is not new and requires continued attention and work; when the property was sold, in fact everything was in good working order, and it should not get lost on the Court that Plaintiffs fail in every respect to identify why the roof condition was hidden and could

not be discovered until after closing. This burden is on Plaintiffs and *must* be addressed in the Complaint – specifying with particularity every issue and fact giving rise to fraud – and yet, Plaintiffs, now on their Third Amended Complaint, have failed to follow the applicable law in this regard.

**SILENT FRAUD:** Again, Plaintiffs have abandoned this argument by failing to even address the issue let alone argue it with applicable law. The law is clear that "[T]here can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." *Aron Alan, LLC v Tanfran, Inc*, 240 Fed Appx. 678, 682 (CA 6, 2007) (citing *Webb v First of Michigan Corp*, 195 Mich App 470; 491 NW2d 851 (1992)). The Court applied the standard regarding the availability of Plaintiff to discover facts pertaining to contractual representations: "Plaintiff either knew or could have readily discovered every material fact that was known by defendants at the time of sale." *Id.*

**BREACH OF CONTRACT:** The entire argument upon which Plaintiffs rely is that there is a representation in the written agreements that all components are in working order – and they were. The building was a used structure with a roof that had readily apparent repairs and the very same written agreements provided for due diligence and a host of inspections to be undertaken by Plaintiffs. Plaintiffs did nothing and then three years later sent an e-mail complaining about the roof. That is not a breach of contract by Defendants rather Defendants represented the present condition and for Plaintiffs to

reasonably rely on the statements they had a legal obligation (as set forth above in the Fraud section and in the underlying Brief) to undertake due diligence and that included inspections. If Plaintiffs were unsatisfied with any inspection, they could have walked away. Plaintiffs argue that they learned of the roof shortly after closing and yet fail to even present an argument to this Court as to why they could not or did not discover the issues before. This is not a question of fact or a discovery issue; rather Plaintiffs cannot thrust the blame on Defendants for Plaintiffs' refusal and failure to follow the requirements of the very same contracts under which they sue and likewise their respective failures to perform due diligence.

**SPOLIATION OF EVIDENCE:** Again, the Court will note that Plaintiffs failed to address why it is that they waited three years and until after they replaced the roof *in its entirety* without notifying Defendants prior to. The onus was on Plaintiffs and Plaintiffs waited three years to give any notice and three years to sue. Despite amended their Complaint three times, Plaintiff have yet to provide any salient or legally supported arguments that would circumvent a dismissal by this Court.

        Respectfully submitted,
        **Wood, Kull, Herschfus, Obee & Kull, P.C.**

        By:   */s/ Brian H. Herschfus*
               Brian H. Herschfus (P41567)
               *Attorneys for Defendants*
               37000 Grand River Ave Ste 290
               Farmington Hills, MI 48335-2881

Dated: March 24, 2024        248-476-2000/bhh@woodkull.com